# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | : Chapter 11 |
| WASHINGTON MUTUAL, INC., et al.,[1] | : Case No. 08-12229 (MFW) |
| Debtors. | : Jointly Administered |
| | : |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, | : |
| *Plaintiff,* | : Adversary Proceeding No. _____ |
| v. | : |
| WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP., | : |
| *Defendants for all claims,* | : |
| - and- | : |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | : |
| *Additional Defendant for Interpleader claim.* | : |

---

[1]  The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are:  (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).  The Debtors continue to share their principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

## COMPLAINT

JPMorgan Chase Bank, National Association ("JPMorgan Chase" and, together with its subsidiaries and affiliates, "JPMC"), by and through its attorneys, Sullivan & Cromwell LLP and Landis Rath & Cobb LLP, for its Complaint, alleges upon knowledge as to itself and its conduct and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      JPMorgan Chase brings this action in order to ensure that JPMorgan Chase and its subsidiaries are not divested of their assets and interests purchased in good faith from the Federal Deposit Insurance Corporation ("FDIC") as receiver (the "Receiver") for Washington Mutual Bank, Henderson Nevada ("WMB") under Title 12 of the United States Code pursuant to that certain Purchase and Assumption Agreement (Whole Bank) dated as of September 25, 2008, a true and correct copy of which is attached as Exhibit A hereto (the "P&A"). JPMC also brings this action for indemnification and recovery against the Debtors for certain liabilities that may be asserted against JPMorgan Chase as the successor by merger to Washington Mutual Bank, fsb, Utah ("WMB fsb"), a former subsidiary of WMB, or against other former subsidiaries of WMB that currently are subsidiaries of JPMorgan Chase.

2.      Under the P&A, JPMorgan Chase acquired the business and related assets of WMB, including ownership of all of WMB's direct and indirect subsidiaries, and all right, title and interest of the Receiver in those assets. As provided for in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest" to these assets, pursuant to and in accordance with the Federal Deposit Insurance Act, as amended (the "FDI Act"). Among the assets acquired by JPMorgan Chase under the P&A were certain assets that have been claimed by Washington Mutual, Inc. ("WMI", and collectively with WMI Investment Corp. ("WMI

Investment"), the "Debtors").

3. Many of the assets the Debtors now improperly claim belong to them (but that JPMorgan Chase in fact acquired from the FDIC) have already been determined not to be the Debtors' property pursuant to the resolution procedures under Title 12. On December 30, 2008, the Debtors submitted claims in the Receivership for, among other things, ownership of these assets. On January 23, 2009, the FDIC, as Receiver, disallowed the Debtors' claims. The Debtors elected not to appeal the disallowance of their claims to ownership of these assets. Rather, on March 20, 2009, the Debtors filed an action against the FDIC in the United States District Court for the District of Columbia, *Washington Mutual, Inc.*, et al. v. *Federal Deposit Insurance Corporation*, Case No.1:09-cv-00533 (the "District Court Action"), challenging to the disallowance of their claims and also claiming ownership of those assets. The Debtors have exercised their purported right to demand a trial by jury in the District Court Action.

4. The assets that are the subject of the Debtors' disallowed claims are also among the assets set forth in the Debtors' Schedules and Statements of Financial Affairs filed with this Court on December 19, 2008, January 27, 2009 and February 24, 2009 (collectively, the "Schedules"). Notwithstanding the assertions in the Schedules and the District Court Action, the assets put at issue by the Debtors are not property of the Debtors' estates under 11 U.S.C. §541, nor are they property of the Receiver any longer, but rather the assets are property of JPMC, which acquired them in good faith and for value from the FDIC pursuant to the FDI Act.

5. In response to the Debtors' actions and in order to protect its economic interests in the assets the Debtors chose to put at issue in the District Court Action, JPMorgan Chase has filed this Complaint.

6. The assets of the Receiver that were sold to JPMC, as to which WMI has

asserted rights or has refused to acknowledge JPMC 's ownership, include (i) approximately $4 billion in the aggregate face amount of Trust Securities (as defined below) contributed by WMI to WMB, the amount of which constitutes regulatory core capital of WMB; (ii) the right to tax refunds arising from overpayments attributable to operations of WMB and its subsidiaries for the 2008 tax year and prior tax years and net operating loss, net capital loss, and excess tax credit carrybacks from 2008 to prior tax years; (iii) approximately $3.7 billion credited by book entry shortly prior to the receivership of WMB so as to create a purported deposit account at WMB fsb in the name of WMI without any apparent deposit of funds; (iv) at least $234 million in tax refunds that belonged to WMB and/or WMB subsidiaries and were acquired by JPMorgan Chase under the P&A but were deposited to the credit of WMI in the days following the Receivership; (v) goodwill judgments that arise from pending and prior litigation; (vi) assets of certain trusts supporting deferred compensation arrangements covering the former and current employees of WMB and its subsidiaries; and (vii) other assets of WMB, including Visa shares, intellectual property and contractual rights, as described below. The Debtors are also refusing to recognize the Receiver's ability to transfer to JPMorgan Chase certain tax qualified pension and 401(k) plans pursuant to which the trust assets are held for the exclusive benefit of participants, most of whom were WMB's employees.

7.      The liabilities at issue in this adversary proceeding are liabilities that did not transfer to the Receiver or to JPMorgan Chase, but rather are liabilities of the Debtors that relate to acts, conduct or omissions of WMI in connection with events prior to the commencement of the receivership proceedings for WMB and for which WMB and/or its former subsidiaries would be entitled to indemnification and contribution from the Debtors as primary actors. These liabilities relate principally to (i) the issuance of "Trust Securities" with the

aggregate face amount of approximately $4 billion; (ii) so-called "deposit accounts," which in the aggregate were recorded as having a book balance of approximately $4.3 billion as of the commencement of these Chapter 11 cases; and (iii) the restructuring and transfer of assets and liabilities among the Debtors and their former subsidiaries.

8.     In this action, JPMorgan Chase seeks, pursuant to Title 12 and the P&A, (i) a declaration that, as the successor of the Receiver, it has or is entitled to full legal title to and the beneficial interest in the assets at issue, (ii) a declaration that it has lien rights against, and/or is entitled to setoff, recoupment and/or imposition of a constructive trust with respect to any amounts to which the Debtors may otherwise claim to be entitled, (iii) a declaration of the rights of JPMC to indemnification, contribution and/or reimbursement for amounts paid or advanced by JPMC or WMB with respect to any of the assets at issue that are not transferred to JPMC, and (iv) adjudication of any and all conflicting claims to the so-called "deposit accounts" and any funds in them.  JPMorgan Chase intends to file its proofs of claim for the amounts, if any, that this Court may determine in this adversary proceeding constitute claims against the Debtors and their estates.

## PARTIES AND BACKGROUND RELATIONSHIPS

9.     Plaintiff JPMorgan Chase is a national banking association organized under the laws of the United States of America with its principal place of business in Columbus, Ohio.  JPMorgan Chase is a wholly-owned subsidiary of JPMorgan Chase & Co., a corporation organized under the laws of the State of Delaware.  JPMorgan Chase is the "Assuming Bank" as that term is defined in the P&A and is the successor to and good faith purchaser for value from the Receiver under the P&A and under Title 12 of the United States Code.

10.     Defendant WMI is a holding company incorporated in Washington with

its principal place of business in Seattle, Washington and is one of the debtors and debtors-in-possession in these cases, having filed its voluntary petition for reorganization under chapter 11 of Title 11 of the United States Code on September 26, 2008 (the "Petition Date") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

11. Defendant WMI Investment is a Delaware corporation with its principal place of business in Seattle, Washington and is the other debtor and debtor-in-possession in these cases.

12. Defendant FDIC is a federal corporation with its principal place of business in the District of Columbia. The FDIC is named as a defendant solely in connection with the interpleader claim.

13. At all times relevant hereto, WMI was a savings and loan holding company, WMI directly owned WMI Investment and directly or indirectly owned WMB and WMB's subsidiaries, including WMB fsb (WMB and WMB fsb as in existence prior to the Receivership are sometimes collectively referred to herein as the "Affiliated Banks").

14. At all times relevant hereto, the Debtors, WMB and WMB's direct and indirect subsidiaries, including WMB fsb, were subject to regulation by the Office of Thrift Supervision ("OTS") and various other state and federal depository institutions regulatory agencies and banking authorities, including the FDIC, which insured the banks' deposits.

15. On September 25, 2008, the Director of the OTS by order number 2008-36, appointed the FDIC as Receiver for WMB and the Receiver took possession of WMB in a receivership proceeding under section 1821 of Title 12 of the United States Code (the "Receivership").

16. On September 25, 2008, the FDIC, as Receiver and in its corporate

capacity, also entered into a Purchase and Assumption transaction with JPMorgan Chase under the P&A, whereby JPMorgan Chase acquired substantially all of the assets and assumed the deposit liabilities (as defined in the P&A and under 12 U.S.C. § 1813(1)) and certain other liabilities of WMB's banking operations under the authority vested in the FDIC by Title 12.

17. On September 26, 2008, at approximately 10:16 p.m., WMI and WMI Investment filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") in the Bankruptcy Court, thereby commencing the Chapter 11 cases in which this adversary proceeding is filed.

18. On January 30, 2009, the Bankruptcy Court entered its order setting March 31, 2009 as the date by which all proofs of claim against the Debtors and their estates must be filed.

19. On February 24, 2009, the Debtors filed amended schedules in these cases.

20. On March 20, 2009, the Debtors commenced the District Court Action.

### JURISDICTION AND VENUE

21. Since the Petition Date, the Debtors have been and continue to be authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

22. On October 3, 2008, this Court entered an order pursuant to Federal Rule of Bankruptcy Procedure 1015(b) (collectively, the "Bankruptcy Rules") authorizing the joint administration of the Debtors' Chapter 11 cases.

23. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1334, 28 U.S.C. § 157, and Bankruptcy Rule 7001.

24.     Venue of this adversary proceeding in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## STATEMENT OF FACTS

### A.     The Bank Failure and Acquisition.

25.     On September 18, 2008, the OTS designated WMB as a "problem institution," thus subjecting it to closer control and scrutiny by the federal regulatory authorities and on September 25, 2008, the OTS placed WMB in receivership because of significant concerns over the safety and soundness of the institution.  To ensure continuity of operations, maximize public confidence and minimize cost to the public treasury, the FDIC ran an accelerated bidding process in accordance with statutorily mandated procedures under Title 12 that, subject to certain limited exceptions, resulted in the sale of all of the Receiver's right, title and interest to or in WMB's assets whether or not reflected on the books and records of WMB, to JPMorgan Chase pursuant to the terms of the P&A.

26.     At the time of the Receivership, WMB was the sixth largest bank in the United States, with 2207 branches, more than 43,000 employees, and more than 13 million depositors with more than $140 billion of deposit liabilities insured by the FDIC.

27.     WMB also indirectly owned 100% of WMB fsb.  WMB fsb or "the little bank" (as it has sometimes been called) had 26 offices to WMB's 2,207 and less than $5 billion in customer deposits insured by the FDIC to WMB's more than $140 billion.

28.     The  FDIC's ability to promptly find a suitable acquirer of WMB's banking operations had significant economic and policy ramifications.  This was a bank failure of unprecedented magnitude that occurred in the midst of the most severe financial crisis in decades.  Had the FDIC been unable to sell the assets of WMB, 13 million depositors would

have lost their bank and the confidence of consumers in the banking system generally would likely have been further undermined. The protection of the title conveyed by the FDIC to institutions like JPMorgan Chase, who are encouraged to step into the breach and provide the stability and continuity necessary to avert a run on a failing bank and disruption of its services to the public, is critical to the ability of the regulators to manage bank failures under Title 12 and the government to administer an insurance fund that can maintain public confidence in the banking system.

29.     That WMB stands as the largest bank failure in United States history stems in large part from the financial crisis and crisis of confidence that still grips the nation. In the ten days immediately prior to the Receivership, WMB experienced deposit outflows of more than $16.7 billion, amounting to more than $2 billion per banking business day, as its customers and even WMI itself were apparently moving their assets so as to avoid the effects of what was increasingly perceived to be an inevitable bank failure.

30.     JPMorgan Chase had only two days after being briefed by the FDIC to submit a bid and then only twenty-four hours from the time that its bid was accepted by the FDIC until the time the acquisition closed to complete the single largest acquisition of a failed institution in United States history. The circumstances which led to execution of the P&A meant that JPMorgan Chase had limited opportunity to prepare for this unprecedented transaction.

31.     The acquisition included, among other things, a nationwide credit card lending business, a multi-family and commercial real estate lending business, and nationwide mortgage banking activities. JPMorgan Chase's acquisition avoided an interruption in banking services. It assured that the 2,207 branches operated by WMB, as well as the 26 additional branches operated by WMB fsb, opened for business on September 26, 2008, protecting the

interests of employees, customers, vendors, and communities who were dependent on WMB's banking operations. JPMorgan Chase paid $1.88 billion dollars to the FDIC for these and other assets, and assumed all deposits. This transaction involved no financial assistance from, or cost to, the FDIC's Deposit Insurance Fund. This stands in contrast to other recent bank failures such as the FDIC's sale of IndyMac Federal Bank FSB, which cost the FDIC approximately $10.7 billion, despite IndyMac being a much smaller bank than WMB.

32. The task of stabilizing, integrating and creating as smooth a transition as possible has been time-consuming and arduous. But its success has been vital to the banking system, the communities served by WMB and the general public interest.

### B. Combined Operations of Washington Mutual

33. As a federal savings association committed to serving consumers and small businesses, WMB accepted deposits from the general public, originated, purchased, serviced and sold home loans, made credit card, home equity, multi-family and other commercial real estate loans, and to a lesser degree, engaged in certain commercial banking activities. WMB's substantial mortgage business was hit especially hard by increasing home and commercial mortgage delinquencies in late 2007 and 2008.

34. As the financial crisis took root toward the end of 2007, WMI focused its efforts on raising capital for WMB. In late 2007, WMI raised approximately $3 billion in new capital through the issuance of a series of debt securities. In early 2008, WMI sought out merger partners and equity investors. A number of companies participated in the process (including JPMorgan Chase which submitted a bid to acquire WMI, but whose bid was rejected by WMI). In April 2008, in lieu of an acquisition or a merger, WMI negotiated a capital infusion of approximately $7.2 billion from a group of investment funds led by Texas Pacific Group, a

private equity firm, through an issuance of preferred stock, which included anti-dilution provisions that severely constricted the ability of WMI to raise additional capital.

35.    WMI formally contributed to WMB at least $6.5 billion of the approximately $10.2 billion in capital it had raised. As discussed below, certain book entries made between September 19 and September 24, 2008 reflect an additional contribution of $3.7 billion from WMI to WMB fsb, accounting for much of the remaining debt and equity capital raised by WMI during 2007 and 2008. While book entries were made, neither WMI nor WMB transferred cash or other good funds to WMB fsb corresponding to the book entries, whether as a contribution or otherwise.

36.    Prior to the Receivership, WMI and WMB had identical and overlapping directors and held joint meetings of the Boards of Directors of both entities on a combined basis, resulting in effect in a single Board of Directors with identical directors that met on the same topics at the same time and made decisions for both entities collectively. WMI's officers and employees were also officers and directors of WMB and WMI and WMB shared a joint general ledger and other books and records, and centralized their decision making, treasury, cash management, finance, governance, regulatory and executive functions in the same individuals. The overlap was so extensive that as of the time of the Receivership and subsequent Petition Date, WMI claimed it had only a handful of employees remaining as the result of the Receivership.

37.    Likewise, the assets and liabilities of the Debtors and their direct and indirect subsidiaries, including the Affiliated Banks, were connected and in many cases, commingled and intertwined. Prior to the Receivership, the Debtors and their direct and indirect subsidiaries operated a centralized and consolidated cash management system pursuant to which

external receipts and payments were accounted for on a consolidated basis and internal receipts or payments were done in whole or in part by book or journal entry as "due to/from" accounts on the general ledger or other books of account.

38.    At various times prior to the Receivership, WMI entered into agreements with third parties that titled assets or contractual rights in WMI's name although WMB or a subsidiary of WMB paid for the asset or contractual right or was the entity liable on the payment or liability therefore.  At various times prior to the Receivership, WMI also entered into intercompany arrangements with the Affiliated Banks with documentation different than the documentation that the Affiliated Banks would have obtained in an arm's-length transaction with an unaffiliated party.

39.    In 2007 and 2008, WMI undertook a series of projects and other acts, at least some of which appear to have moved assets away from WMB or its subsidiaries to WMI or another of WMI's subsidiaries.  This included transfers undertaken during August and September 2008 as part of WMI's self-titled "WMI Cash Optimization Program", for the apparent benefit of WMI.

40.    To the extent that that any person has or may assert claims against JPMC that resulted from these transactions, JPMC is entitled to be indemnified and held harmless by WMI since all pre-petition transactions were consummated at the behest and direction of WMI and for its benefit.

**C.    Trust Securities**

41.    Between March 2006 and October 2007, certain issuer trusts  (the "Issuing Trusts") formed by WMI and its then subsidiaries issued securities (the "Trust Securities") in the aggregate face amount of approximately $4 billion, exchangeable into depository shares

representing preferred stock of WMI upon the occurrence of certain events. A complete list of the Trust Securities is attached as Exhibit B. The Trust Securities were issued in global form registered in the name of Cede & Co., as nominee, and held by Wilmington Trust as depositary for the Depositary Trust Corporation ("DTC"). The sole assets of the Issuing Trusts, in turn, were preferred securities issued by Washington Mutual Preferred Funding LLC ("WMPF").

42. As set forth below, JPMorgan Chase acquired the Trust Securities under the P&A and all steps required to transfer the Trust Securities as required were completed prior to the Petition Date save and except for the ministerial formality of changing record title as reflected at DTC and described below.

43. The Trust Securities, like other trust securities issued by financial institutions, qualified as regulatory core capital of WMB under applicable banking laws and regulations with specific approvals and requirements governing their issuance and treatment. They were, by their express terms, mandatorily and automatically exchangeable for a like amount of newly issued depository shares representing WMI preferred stock upon the occurrence of an exchange event. In addition, for the Trust Securities to be treated as core capital of WMB or any other regulated institution when issued, the Trust Securities would have to be structured in a manner that assured they would become property of the regulated institution upon exchange.

44. On January 30, 2006, WMB submitted a Notice for Establishment of an Operating Subsidiary (the "Notice") to the OTS and the FDIC regarding the establishment of WMPF. WMPF's assets consisted of indirect interests in various residential mortgage and home equity loans and other permitted investments. WMPF in turn issued preferred securities to the Issuing Trusts that entitled the Issuing Trusts to a liquidation preference against the assets of WMPF. In the Notice to the OTS and the FDIC, WMB sought confirmation from the OTS that

the Trust Securities would qualify for inclusion in the core capital of WMB.

45.     On February 23, 2006, WMI committed to contribute the Trust Securities to WMB and stated that WMI "hereby undertakes that if, as a result of a Supervisory Event," WMI exchanges its preferred stock for the Trust Securities, "WMI will contribute to WMB the [Trust Securities]." A true and correct copy of that commitment is attached as Exhibit C.

46.     WMI's written commitment to contribute the Trust Securities to WMB in exchange for including the Trust Securities in the core capital of WMB constituted a capital commitment to a federal depository institutions regulatory agency or its predecessor which was deemed assumed as of the Petition Date under 11 U.S.C. Section 365(o). That commitment also constituted a binding agreement (the "Contribution Agreement"), the breach of which would give rise to post-petition administrative claims against WMI.

47.     At all times relevant hereto solely by virtue of the Contribution Agreement, WMB was permitted to include the Trust Securities in its core capital and counted the amount of the Trust Securities as regulatory core capital. The Trust Securities have never been beneficially owned by WMI and have always been subject to a concomitant obligation to contribute the Trust Securities to WMB as a necessary corollary to the treatment of the Trust Securities as core capital of WMB.

48.     The issuance of the Trust Securities and the Contribution Agreement were duly authorized by all requisite corporate action on the part of WMI and WMB. True and correct copies of the minutes of the Board of Directors authorizing the transaction are attached as Exhibit D.

49.     On September 25, 2008, in a letter to WMI, the OTS declared an Exchange Event had occurred and directed an immediate exchange of the Trust Securities for

WMI preferred stock. WMI responded to the OTS letter later on September 25, 2008, confirming the exchange and contribution. .

50.     On September 25, 2008, WMI contributed the Trust Securities to WMB pursuant to an Assignment Agreement, a true and correct copy of which is attached as Exhibit E, pursuant to which, among other things, effective as of September 25, 2008, WMI transferred "all of [WMI's] right, title and interest, whether now owned or hereafter acquired, in and to the [Trust] Securities" to WMB. Furthermore, upon execution, WMI assigned to WMB all present and future "rights and benefits arising out of the [Trust] Securities which come into the possession of [WMI]."

51.     Under the express terms of the P&A, JPMorgan Chase purchased "all right, title, and interest of the Receiver in and to all of the assets . . . of [WMB] whether or not reflected on the books of [WMB] as of Bank Closing," which includes WMB's and the Receiver's rights to receive the Trust Securities, a transfer that was effected on September 25, 2008. The Receiver sold the Trust Securities to JPMorgan Chase under the P&A and, therefore, JPMorgan Chase is the sole owner of all equitable and beneficial right, title and interest in the Trust Securities, leaving only the ministerial act of correcting the record at DTC (or with the Issuing Trusts and their trustees) undone before the filing of these Chapter 11 cases.

52.     Although the Debtors did not initially dispute JPMorgan Chase's ownership of the Trust Securities and the parties drafted and agreed to a stipulation to transfer the Trust Securities to JPMorgan Chase to accompany the account stipulation, the Debtors amended their schedules on January 27, 2009 to add a Footnote 4 to Schedule B regarding the Trust Securities which had not been mentioned in the Schedules originally filed on December 19, 2008. In that footnote, which is repeated verbatim in the Debtors' Second Amended Schedules

filed on February 24, 2009, the Debtors assert unspecified and potential rights to or interests in the Trust Securities.

53. To the extent that WMI ever held or now holds any interest in the Trust Securities — and JPMorgan Chase believes WMI had and has no legally cognizable interest in them — that interest has never consisted of anything more than bare legal title to a securities entitlement to the Trust Securities for the moment in time of the conditional exchange and contribution. Section 541(iv) of the Bankruptcy Code provides that "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."

54. As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest," in the Trust Securities, pursuant to and in accordance with the FDI Act. On December 30, 2008, WMI nonetheless submitted a claim to the Receiver asserting, among other things, ownership of the Trust Securities. On January 23, 2009, the Debtors' claims were disallowed by the Receiver. The Receiver's disallowance is dispositive of the fact that the Debtors do not own the Trust Securities. On March 20, 2009, the Debtors commenced the District Court Action with respect to the disallowance of their claims to the Trust Securities.

55. Accordingly, JPMorgan Chase seeks a declaration that it owns the Trust Securities and an order directing third parties including, DTC, Cede & Co., Wilmington Trust Corporation and any other trustee, custodian, depository or other securities intermediary, to take all actions reasonably necessary or appropriate, as requested by JPMorgan Chase, to have the record legal title reflect JPMorgan Chase as the sole owner of the Trust Securities.

56. In addition, JPMC is entitled to be indemnified and held harmless by WMI for any liabilities associated with the issuance, exchange, contribution or recovery of the Trust Securities, including without limitation any claims regarding authorization, enforceability, avoidability or inadequate disclosure. JPMC seeks a determination that WMI, as the controlling parent, the primary issuer and the principal actor, has the obligation to indemnify and hold harmless its indirect formerly wholly owned subsidiaries from any liability to third parties associated with or related to the Trust Securities.

**D.     Tax Refunds**

57. To the extent WMB is or was entitled to tax refunds, the right to receive those refunds was purchased by JPMorgan Chase under the P&A.

58. For taxable years prior to 2008, the Washington Mutual entities, consisting of WMI, WMB, and other direct and indirect subsidiaries of WMI (collectively, the "WaMu Group"), filed a consolidated tax return, a unitary tax report or a combined tax return with appropriate taxing authorities wherever permissible. WMB (and its subsidiaries) made payments to WMI in the same manner and at the same time as if filing separate returns or separate consolidated returns.

59. For all tax refunds and rights to receive tax refunds attributable to tax attributes of WMB or its subsidiaries, pursuant to applicable rules and regulations, and as between the Debtors and WMB (or their respective subsidiaries), WMB (or such subsidiary) is the beneficial owner of such tax refund or such right to receive a tax refund attributable to its tax attributes. All or substantially all of the refunds received by, now due and hereafter expected to be due to the WaMu Group are attributable to income and losses of, and taxes paid by, WMB and its subsidiaries, and, therefore, as among the members of the WaMu Group, WMB and its

subsidiaries were and are the beneficial owners of all or substantially all tax refunds received, tax refunds due and rights to receive tax refunds.

### (i) California Tax Refunds

60.     For taxable years prior to 2008, the WaMu Group filed a unitary tax report with the California Franchise Tax Board ("FTB"), pursuant to the filing of FTB Form 2523A (for years prior to 1991), and pursuant to a Schedule R-7 (for taxable years after 1991).  For taxable years on or after 2005, the Schedule R-7 was filed in compliance with FTB regulations promulgated in 2005 and effective for returns filed after January 8, 2005.  In each case, the WaMu Group filed group returns under California tax law, with WMI as the "key corporation." In each case, the agent and surety for the other members included in the unitary tax report was WMI, the "key corporation" as defined under California tax law.

61.     Even though each taxpayer corporation in the combined group is required under California law to file its own California return and pay its own tax due, as a matter of administrative convenience, the FTB permits groups to file a group return.

62.     A "key corporation" only acts as agent for the other taxpayer members. Thus, (i) all California refunds are identifiable to an individual taxpayer in the WMI Group, and (ii) all California tax refunds WMI receives that are identified to California income taxes of WMB (or any of WMB's subsidiaries) are held by WMI merely as agent for WMB (or its respective subsidiary) and WMB (or its respective subsidiary) is the beneficial owner of such California tax refunds.

63.     California tax refunds, substantially all of which are expected to be attributable to WMB and its subsidiaries, are expected for the 2008 tax year and for tax years prior to 2008 relating to overpayments of taxes to the FTB.

64. All facts and circumstances necessary to determine the amount of California tax refunds for WMB and for any of WMB's subsidiaries are fixed and determinable.

65. The Debtors have wrongly asserted that WMI—and not WMB (or its respective subsidiaries)—is entitled to the California tax refunds due to the WaMu Group. Accordingly, JPMorgan Chase requests that the Court enter an order declaring that, pursuant to the P&A, JPMorgan Chase and its subsidiaries own the rights to such refunds.

66. WMI has already received at least a portion of the California income tax refunds due as agent for the WaMu Group and owes those amounts to JPMorgan Chase and the former WMB subsidiaries acquired by JPMorgan Chase under the P&A.

67. The beneficial interest in all or a portion of the California income tax refunds received by WMI as agent for the WaMu Group belongs to JPMorgan Chase, as successor in interest to WMB.

68. WMI has refused to turn over to JPMorgan Chase those California income tax refunds received already or in the future that are properly allocable to WMB (and its subsidiaries). As a result, JPMorgan Chase seeks an order from the Court compelling the Debtors to turn over those tax refunds.

69. Various employees and agents of WMB and its subsidiaries had been in discussions with the FTB regarding ongoing California tax matters, such as the progress of audits, and anticipated tax refunds, prior to September 26, 2008. WMI had threatened FTB and its officials with sanctions for violation of the stay to prevent them from continuing their communications with WMB.

70. JPMorgan Chase has been significantly prejudiced by not being able to communicate directly without restrictions with the FTB about matters concerning WMB or its

subsidiaries since the Petition Date. Certain employees and agents of JPMorgan Chase need to continue these discussions with the FTB about California tax matters related to WMB and its subsidiaries, in order to preserve beneficial tax attributes, to complete pending audits and refund applications, and to arrange for the receipt of California income tax refunds.

71. JPMorgan Chase is entitled to communicate with the FTB about matters concerning refunds that may be due to WMB and its subsidiaries, or WMB's successors. WMI only recently directed a letter to the FTB granting them "permission" to speak to WMB for the limited purpose of continuing negotiation of audit matters previously under discussion subject to numerous restrictions, including that WMI retained rights as the "key corporation" for the WaMu Group.

72. WMI is ineligible to serve as a "key corporation" under California law and its attempt to exercise continuing control over assets and property that do not belong to it is without legal authority or basis. WMI is no longer able to act as an agent for either WMB or any successors in interest to WMB, for matters involving both years prior to 2008, and for years on or after 2008, because WMI is no longer affiliated with WMB or its former subsidiaries and filing for bankruptcy has caused WMI to have interests adverse to those of WMB and WMB's successors in interest. As a result, JPMorgan Chase is entitled to unrestricted communications with the FTB about all matters concerning WMB, including but not limited to audit activity, assessments, tax refunds and notices. JPMorgan Chase therefore requests that the Court enter an Order authorizing it to engage in such communications and precluding the Debtors or anyone else from interfering with those communications.

### (ii) Federal and Other State Tax Refunds

73. For taxable years prior to 2008, the WaMu Group filed a consolidated

U.S. federal tax return pursuant to regulations promulgated by the U.S. Department of the Treasury ("Treasury Regulations") and the Internal Revenue Service (the "IRS") under Internal Revenue Code ("IRC") Section 1501 *et seq.* For the tax year of 2008, WMB and its subsidiaries were members of the WaMu Group consolidated group until at least September 25, 2008. For each time period, WMI was the common parent of the consolidated group.

74. To the extent permissible under applicable state law, the WaMu Group filed consolidated tax returns, unitary reports or similar, combined returns with other (non-California) state revenue authorities with which it was required to file tax returns. Such consolidated or combined returns were filed in those states listed on Exhibit F.

75. Pursuant to applicable law, WMI acted as agent for the WaMu Group in filing the consolidated tax returns.

76. As with California tax filings, for all tax refunds attributable to tax attributes of WMB or its subsidiaries, WMB (or its respective subsidiary) is, and under applicable law and regulation is required to be, the beneficial owner of the portions of such tax refund attributable to its tax attributes.

77. WMI has already received certain U.S. federal and state income tax refunds as agent for the WaMu Group that have not been allocated and transferred to WMB (or its subsidiaries).

78. WMI has likely received additional U.S. federal and state income tax refunds as agent for the WaMu Group of which JPMorgan Chase is presently unaware.

79. The beneficial interest in all or a portion of the U.S. federal and state income tax refunds received by WMI as agent for the WaMu Group belongs to JPMorgan Chase, as successor in interest to WMB (and its subsidiaries).

80.     WMI has refused to turn over to JPMorgan Chase those U.S. federal and state income tax refunds received that are properly allocable to WMB (and its subsidiaries).

81.     U.S. federal and state income tax refunds, substantially all of which are expected to be attributable to WMB and its subsidiaries, are expected for the 2008 tax year and for tax years prior to 2008 relating to overpayments of taxes by the WaMu Group to the various state taxing authorities.

82.     For the 2008 tax year, the WaMu Group is expected to have a variety of tax attributes such as net operating losses, net capital losses, and excess tax credits, and a substantial portion of such tax attributes are expected to be attributable to the operations of WMB and its subsidiaries.  The WaMu Group expects to be able to carry back these favorable tax attributes to prior tax years, where such carrybacks will result in additional U.S. federal and state income tax refunds for such prior tax years.

83.     All facts and circumstances necessary to determine the amount of U.S. federal and state tax refunds for WMB and for any of WMB's subsidiaries are fixed and determinable.

84.     Debtors have wrongly asserted that WMI—and not WMB (nor its respective subsidiaries)—is entitled to the U.S. federal and state tax refunds due to the WaMu Group.

85.     As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest," in these tax refunds, pursuant to and in accordance with the FDI Act.  On December 30, 2008, WMI nonetheless submitted a claim to the Receiver asserting, among other things, ownership of the tax refunds.  On January 23, 2009, the Debtors' claims were disallowed by the Receiver.  The Receiver's disallowance is dispositive of the fact that the

Debtors do not own or have an interest the tax refunds. On March 20, 2009, the Debtors filed the District Court Action with respect to the disallowance of their claims to the tax refunds.

86.     Accordingly, JPMorgan Chase requests that in addition to an order directing the turnover of the funds, the Court enter an order declaring that as the acquirer of WMB's interests pursuant to the P&A, JPMorgan Chase and its subsidiaries own the rights to such refunds and further ordering Debtors to turn over to JPMorgan Chase any such refunds already received.

87.     In addition, during the time that WMI, WMB and their respective eligible subsidiaries filed a consolidated tax return for U.S. federal income tax purposes, items of income, deduction, loss and credit were combined in one consolidated return, filed by WMI on behalf of the consolidated group.

88.     During this time, WMB was subject to a variety of state and local taxes. The accrual and payment of these state and local taxes generated by WMB created a deduction against income for the combined U.S. federal income tax return. Said differently, the state and local taxes accrued by virtue of WMB's operations created deductions that were used to offset the WMI consolidated group taxable income.

89.     Although these deductions should have been recognized as a benefit that was solely WMB's, WMI did not credit WMB in any way for the state and local income tax deductions attributable to WMB's operations. In effect, WMI claimed for itself the state and local tax deductions properly attributable to WMB. Debtors have wrongly asserted that WMI— and not WMB (nor its respective subsidiaries)—is entitled to these deductions.

90.     The total dollar value of such deductions is at least approximately $517 million. As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title

and interest," in these assets, pursuant to and in accordance with the FDI Act. JPMorgan Chase requests that the Court enter an order declaring that as the acquirer of WMB's interests pursuant to the P&A, JPMorgan Chase and its subsidiaries own the rights to any cash value generated by such deductions and further ordering Debtors to turn over to JPMorgan Chase the value of any such deductions.

### (iii) Tax Sharing Agreement

91. On August 31, 1999, WMI and members of the WaMu Group entered into a Tax Sharing Agreement, which required various members of the WaMu Group to pay WMI for each member's share of the WaMu Group's consolidated income, and required WMI to return to each member such member's share of any tax refunds paid to WMI.

92. The Tax Sharing Agreement provides further support that WMI would receive any tax refund attributable to WMB's or WMB's subsidiaries' tax attributes merely as agent, and that WMB (or its respective subsidiary) would be the beneficial owner of such tax refund. At all times the Tax Sharing Agreement was subject, by law and by its own terms, to applicable bank and thrift regulatory guidelines. The ownership of the tax refunds that would result from application of either applicable law or the Tax Sharing Agreement should be identical—in neither event may WMI retain refunds that are not attributable to the tax attributes of its regulated subsidiaries.

### E. The Intercompany Amounts and Accounts

### (i) The "On-Us" Accounting Entries

93. On the Petition Date, WMI claimed that JPMorgan Chase was liable to pay a total purported deposit liability to WMI and its non-WMB subsidiaries, originally claimed in the amount of $5 billion and then ultimately asserted in the total amount of $4,358,492,498

(the "Intercompany Amounts"). According to WMI, the Intercompany Amounts represented deposits maintained by WMI at the Affiliated Banks, all as non-interest bearing demand deposit accounts. A true and correct copy of the original list of twenty-nine account numbers (the "Accounts") provided to JPMorgan Chase by WMI shortly after the Petition Date is attached as Exhibit G.

94.    As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest," in the Intercompany Amounts, pursuant to and in accordance with the FDI Act. On December 30, 2008, the Debtors nonetheless submitted a claim to the Receiver asserting, among other things, ownership of the Intercompany Amounts. On January 23, 2009, the Debtors' claims were disallowed by the Receiver. On March 20, 2009, the Debtors commenced the District Court Action with respect to the disallowance of their claims, assert that the Intercompany Amounts are deposit accounts at JPMorgan Chase, and claim damages relating to the Intercompany Amounts.

95.    With the exception of signature cards for several of the smaller Accounts, JPMC has not located and believes there do not exist pre-petition any deposit account agreements, signature cards or any other documentation for the Accounts as deposit accounts. Notwithstanding that fact and while it continued to investigate whether such documents existed somewhere, JPMorgan Chase was prepared to treat the Accounts as if they were deposit accounts so long as all rights of all parties, including JPMorgan Chase's rights, were acknowledged and approved by order of this Court. Toward that end, on or about October 15, 2008, JPMorgan Chase and the Debtors entered into a proposed stipulation (the "Account Stipulation") with respect to the Accounts that was filed with the Court for approval. The Account Stipulation was ultimately withdrawn following objections filed by certain creditors of the Receivership and the

FDIC and was never entered by the Court.

96.     Pursuant to the Account Stipulation, and before it was withdrawn, JPMorgan Chase and the Debtors executed customary deposit account agreements regarding the Accounts on or about October 21, 2008 that provided, among other things, customary rights of setoff, recoupment and banker's liens to secure JPMorgan Chase's rights to recover claims JPMC may have against the Debtors or their subsidiaries and affiliates from the funds on deposit in the Accounts.

97.     After the execution of those documents but prior to December 19, 2008, JPMorgan Chase acceded to a request of the Debtors and the Official Committee of Unsecured Creditors (the "Committee") to agree to the accrual of interest on the Intercompany Amounts as a sign of good faith in the event that it were ultimately determined that any of the Intercompany Amounts were in fact deposit accounts, without prejudice to its rights. Similarly, JPMorgan Chase agreed to the Debtors' further request that as a sign of "goodwill" it agree to release $292 million of the Intercompany Amounts attributable to the Accounts of the non-debtor subsidiaries of WMI, without prejudice to its rights.

98.     JPMorgan Chase agreed to those requests from the Debtors in good faith, without prejudice to its rights, and on the understanding that the parties were working diligently to resolve open questions and issues with respect to the Intercompany Amounts. It did so in reliance on the Debtors' execution of account documentation for the Accounts that protected the interests of JPMC, and on the understanding that the Debtors would respect those rights. However, on or about December 19, 2008, after obtaining from JPMorgan Chase the benefit of these concessions, the Debtors advised JPMorgan Chase that the execution of those deposit account agreements on October 21, 2008, was only in anticipation of the proposed Account

Stipulation and, since that stipulation had never been approved, the execution and delivery of the agreements was in error, unauthorized and considered by the Debtors to be null, void and without legal effect.

99. The execution and effectiveness of the account documentation executed by the Debtors on October 21, 2008, was a key factor in JPMorgan Chase's decision to agree to the request that it accrue interest on the Intercompany Amounts and to the release of $292 million to the Debtors and their non-debtor affiliates. While JPMorgan Chase does not dispute that the Account Stipulation was never so ordered, to the extent that such documentation is ineffective, it should be ineffective for all parties and for all purposes, including the effectiveness of any post-petition book entries reflecting any portion of the Intercompany Amounts or Accounts as deposit liabilities and the release of any funds to the Debtors or their non-Debtor affiliates.

100. Although JPMorgan Chase still has not discovered any pre-petition deposit account agreements, signature cards or other documentation for the Accounts that would have been required of depositors that were not affiliates in order to treat the Accounts as deposit accounts (except for the signature cards on a few accounts as described above), it is nonetheless clear that if these are deposit accounts—not capital contributions—they were and are subject to the standard terms and conditions specified in the Master Business Account Disclosures and Regulations (the "MBA Policy") of the Affiliated Banks.

101. The Accounts were associated with the DDA numbers provided by WMI. Of the twenty-nine, most were so-called "On–Us Accounts", the internal nomenclature for intercompany receivables that were understood to represent deposit accounts at the Affiliated Banks. Thus, the balances in these Accounts as of any point in time, unlike third party deposit

accounts, were maintained both at the depository institution and as intercompany book entries on the general ledger of WMI and the Affiliated Banks that were its subsidiaries.

102.     The decision on how to characterize an intercompany transaction was made by a single centralized Treasury group for WMI and all of its affiliates. That Treasury group was under the direct supervision of Robert Williams, currently the Chief Executive Officer of WMI.

103.     To the extent the Intercompany Amounts and the Accounts reflect capital contributions, they are the property of JPMorgan Chase under the terms of the P&A. To the extent they are deposit liabilities, they must be governed by standard terms and conditions governing unaffiliated deposit accounts, as a result of which they become subject to any liens, claims and interests that JPMC may have, and are also subject to setoff, recoupment or other offset.

### (ii)   Deposit Liabilities

104.     To the extent the Intercompany Amounts in the Accounts are not capital contributions and are in fact deposit liabilities of WMB or WMB fsb assumed by JPMorgan Chase under the P&A, WMI and its subsidiaries, like every other Affiliated Bank depositor (expressly or otherwise), are bound by the standard terms and conditions for deposits at the Affiliated Banks.

105.     The Accounts were utilized to settle intercompany obligations, including obligations arising from the payment and allocation of expenses among WMI and all of its subsidiaries, with intercompany allocations, payments and settlements on a periodic, usually monthly, basis. The balances on the Accounts were reflected on "On-Us Elevation Reports" generated on a monthly basis and on paper "Washington Mutual Internal Checking Detail"

statements mailed to an employee of WMB on a monthly basis. Copies of the "On-Us Elevation Reports" and of the "Washington Mutual Internal Checking Detail" statements for August, September and October, 2008 are attached as Exhibits H and I, respectively.

106. These Accounts were established by WMI or one of its non-bank subsidiaries at the Affiliated Banks pursuant to WMI's Internal Corporate Demand Deposit Account Establishment and Usage Policy (the "On-Us Policy"). According to that policy, WMB had the right to use the Intercompany Amounts for, among other things, processing and clearing transactions between WMB and WMI or their respective subsidiaries, customers, vendors, or investors, again raising the question of whether the Intercompany Amounts represented a continuing deposit liability or should be characterized as a general reserve, a capital contribution or a form of intercompany advance to the Affiliated Banks. The On-Us Policy was silent regarding the rules and terms governing the acceptance by the Affiliated Banks of amounts under the On-Us Policy as deposit accounts and services related to such accounts maintained at the Affiliated Banks.

107. WMI and the Affiliated Banks maintained a detailed, forty-page policy, the MBA Policy, that operated as a contract setting forth the terms and conditions governing all deposit accounts established at the Affiliated Banks. The MBA Policy contained, among other things, a self-executing clause that made the terms of the policy binding upon all depositors, even those who did not expressly give permission, through consent implied by the opening and continued use of the deposit account.

108. The MBA Policy and its terms and conditions apply to and govern any accounts that are in fact deposit accounts at the Affiliated Banks, including the Accounts to the extent any are deposit accounts. WMI as the sole shareholder and parent of the Affiliated Banks

is charged with knowledge and acceptance of the MBA Policy for any deposit account it maintained at the Affiliated Banks.

109.     Any claim that WMI is entitled to terms more favorable to it than the terms imposed on third party depositors under the MBA Policy would violate applicable federal law and regulations and be untenable. The provision of services, including deposit services, to WMI by its Affiliated Banks, under relevant banking laws and regulations, were required to have been conducted on terms and conditions no less favorable to the bank than would have been undertaken in a comparable transaction with an unaffiliated third party. Thus, these accounts, to the extent they reflect deposits, were required by law to be maintained on terms no less favorable to the Affiliated Banks than those clearly set forth in the MBA Policy.

110.     The MBA Policy expressly grants the Affiliated Banks a right to offset any and all claims against all deposit account liabilities. Specifically, the MBA Policy provides, "you agree we have the right to offset any account or asset of yours then held by us, by our sister bank, or any subsidiary of ours or our sister bank." Said differently, to the extent the Accounts and the Intercompany Amounts contained therein are deposit liabilities of the Affiliated Banks, the MBA Policy created a broad contractual right of setoff against the Accounts and the Intercompany Amounts for the benefit of the Affiliated Banks and their subsidiaries.

111.     Accordingly, to the extent that any of the Accounts or Intercompany Amounts are found by the Court to constitute deposit liabilities of JPMorgan Chase as assignee of the Receiver, they are deposit liabilities subject to and created under the MBA Policy and JPMorgan Chase has a security interest in, lien rights against and rights of set off and recoupment against the Intercompany Amounts as deposit liabilities under the MBA Policy and standard deposit account agreement terms and conditions applicable to all third party depositors

and as in effect at the time that the Affiliated Banks and their parent entered into the transactions creating and maintaining the Accounts.

### (iii) JPMorgan Chase Also Has an Express Security Interest in at Least One Account

112.    In addition, WMI entered into at least one specific security agreement with WMB (the "Security Agreement") whereby WMB received a security interest in and lien upon at least one of the Accounts in return for providing value to WMI.  According to its terms, the Security Agreement "shall be binding upon [WMI] and its successors and assigns, and shall inure to the benefit of, and may be enforced by [WMB] and its successors, transferees, and assigns."  This express security interest creates a lien to secure any and all intercompany obligations.  JPMorgan Chase is the successor, transferee or assignee of the Security Agreement and entitled to enforce its terms against WMI at least as to Intercompany Amounts associated with Account No. 177-8911206.  A true and correct copy of the Security Agreement is attached as Exhibit J.

### (iv) The September $3.67 Billion Book Entry Transfer

113.    Between September 19, 2008 and September 24, 2008, in the days immediately preceding the impending takeover of WMB by its regulators, WMI directed book entries purporting to transfer approximately $3.67 billion (the "$3.67 Billion Book Entry Transfer") from WMB to WMB fsb.  The entries direct the transfer from the triple 070-10450-009909 "On-Us" Account No. 17900001650667, which is reflected in the internal On-Us Elevation Report and the Internal Checking Detail as an account at WMB, to what WMI now claims was a deposit account at WMB fsb identified as triple 070-10441-0009909 "On-Us" Account No. 44100000064234.

114.    The general ledger entries for this transaction indicate that the entries were

posted on September 24, 2008 with a "retro" date to September 19, 2008 and describe the $3.67 Billion Book Entry Transfer as "WMI contributes to FSB." WMI has asserted that the transaction was intended to be a transfer of funds from a WMI deposit account at WMB to a WMI deposit account at WMB fsb. What is clear, however, is that no cash or other funds were actually moved to or received by WMB fsb in connection with the transfer.

115. The Debtor's agreement to the terms of the Account Stipulation and the deposit agreements that provide JPMorgan Chase on behalf of itself and its affiliates and subsidiaries with broad post-petition lien rights and rights of setoff and recoupment resulted in the entry of the $3.67 Billion Book Entry Transfer as a deposit liability on the books and records of JPMC. Having executed the standard deposit agreements with JPMorgan Chase necessary to have this account reflected as a deposit at JPMorgan Chase, WMI should be estopped from taking the position that these account agreements were a mistake and not binding on it or from enjoying the benefit of having the Accounts reflected as deposit liabilities free of the lien and setoff rights created by those very same agreements. To the extent that any post-petition book entry is considered as relevant to the status of the purported deposit, any such resulting deposit should similarly be considered subject to the depository institution's rights, including post-petition contractual and statutory rights of setoff, that accompany the post-petition deposit.

116. WMB fsb would never have accepted a deposit liability from an unaffiliated third party without first receiving good funds, or at least not a deposit liability of the magnitude its parent now asserts was created on or about September 19, 2008. The $3.67 Billion Book Entry Transfer represented approximately 44% of the total deposits at WMB fsb, an increase of nearly 80% in total deposit liabilities. In no way was this an ordinary course transaction. Regardless of the fact that WMI and its affiliates may have operated a centralized

cash management system for efficiency as members of the same corporate family, intracompany transfers, unaccompanied by actual movement of funds, cannot create obligations and liabilities as third parties when the corporate ownership link is broken. Because no cash or other funds were actually transferred by WMI to WMB fsb, the $3.67 Billion Book Entry Transfer could not have created a deposit liability of WMB fsb to WMI without receipt of good funds. To the extent the $3.7 Billion Book Entry Transfer is nonetheless deemed to create such a liability, JPMC is entitled to a complete offset for WMI's failure to deliver good funds representing that $3.67 billion deposit.

117.    The $3.7 Billion Book Entry Transfer was not a deposit account and WMI should be estopped from making any claims to the contrary.

118.    Alternatively, to the extent any third party has or may have a claim against WMB fsb and/or JPMorgan Chase with respect to or as a result of the $3.7 Billion Book Entry Transfer, JPMorgan Chase is entitled to be indemnified by WMI for any liability it may incur and is entitled to recover the amount by which it is or may be liable to any such third party from the Intercompany Amounts.

### (v) The Tax Refunds and other Funds in the Accounts

119.    A substantial portion of the Intercompany Amounts were, at the time of the Receivership and the Petition Date, in fact the property of the Affiliated Banks, representing tax payments made by the Affiliated Banks either as (i) accelerated payments of amounts previously claimed by WMI against the Affiliated Banks purportedly for taxes paid in prior years by WMI on behalf of the Affiliated Banks; or (ii) amounts transferred to WMI in payment of estimated or actual 2008 taxes.

120.    In addition, after the Petition Date, at least approximately $234 million of

tax refunds due to WMB — the rights to which were purchased by JPMorgan Chase as assets of WMB (the "Tax Refunds Received") — were paid to WMI. An amount equal to at least this $234 million of the Tax Refunds Received are included in the balance of the Intercompany Amounts and the Accounts and should be paid over to JPMorgan Chase as the lawful owner of those funds.

121. The Tax Refunds Received should not have been, and at various times were not in fact, recorded in any way as a deposit liability. The Tax Refunds Received were and are property of JPMorgan Chase purchased under the P&A.

**(vi) Section 9.5 of P&A**

122. To the extent any of the Accounts are deposit liabilities assumed by JPMorgan Chase, pursuant to Section 9.5 of the P&A, "[a]t any time, the [FDIC] may, in its discretion, determine that all or any portion of any deposit balance assumed by [JPMorgan Chase] pursuant to this Agreement does not constitute a "Deposit" . . . and may direct [JPMorgan Chase] to withhold payment of all or any portion of any such deposit. Upon such direction, [JPMorgan Chase] agrees to hold such deposit and not make payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. [JPMorgan Chase] shall be obligated to reimburse the [FDIC], . . . for the amount of any deposit balance or portion thereof paid by [JPMorgan Chase] in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance, the payment of which was withheld pursuant to this Section."

123. The FDIC has not to date notified JPMorgan Chase that all or any portion of the Intercompany Amounts or Accounts are or are not Deposit Liabilities within the meaning of the P&A. Nor has the FDIC directed JPMorgan Chase to withhold payment on all or any

portion of the Accounts. JPMorgan Chase requests that to the extent this Court orders JPMorgan Chase to pay any portion of the Intercompany Amounts or Accounts to the Debtors or into the registry of this Court, that the Court do so by way of interpleader under Rule 7022, releasing JPMorgan Chase from any liability for such amounts to any person and preserving the rights of all parties and all possible claimants with respect to those funds (including JPMorgan Chase). Specifically, JPMorgan Chase requests a finding that it only has to pay or credit the Accounts or the Intercompany Amounts once and that this Court's determination regarding ownership, character and rights in or to the Intercompany Amounts or the Accounts is final so that JPMorgan Chase has no further liability in any capacity for the Intercompany Amounts or Accounts except as may be determined by this Court in this proceeding.

124.    In the District Court Action, the Debtors assert that JPMorgan Chase assumed these liabilities as deposit liabilities under the P&A and that they are now depositors of JPMorgan Chase.

### F.    Goodwill Litigation

125.    JPMorgan Chase, as the successor in interest to the Receiver and WMB—and not WMI—is the proper recipient of both the $356,454,911 judgment entered in *Anchor Savings Bank, FSB* v. *United States*, No. 95-39C (Fed. Cl.) (the "Anchor Judgment") and the $55,028,000 partial judgment entered in *American Savings Bank, F.A.* v. *United States*, No. 92-872C (Fed. Cl.) (the "ASB Judgment"), as well as the proper plaintiff in the continuing *Anchor Savings Bank* and *American Savings Bank* cases.

126.    The *Anchor Savings Bank* and *American Savings Bank* cases are two of the numerous actions brought against the United States, asserting that passage of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") breached supervisory merger

contracts that permitted financial institutions to apply special accounting treatment to their acquisitions of failing savings and loan thrifts. Specifically, the contracts permitted the treatment of supervisory goodwill as regulatory capital that was no longer permissible under FIRREA.

127. As the facts and court decisions in the *Anchor Savings Bank* action establish, the damages resulting from the United States' breach of a series of contracts were incurred by Anchor Savings Bank. Ownership of the *Anchor Savings Bank* cause of action remained at all times with Anchor Savings Bank—the sole plaintiff in the action—and the successor thrifts so that the Anchor Judgment thereby became an asset of WMB. In 1995, the operations and assets of Anchor Savings Bank were merged with those of Dime Savings Bank. In 2002, Dime Savings Bank was merged into WMB.

128. Similarly, the capital at issue in the *American Savings Bank* action was provided and posted by American Savings Bank, F.A. and consisted of inventory capital and retained earnings held by American Savings Bank, F.A. As the facts and court decisions in the *American Savings Bank* action establish, the damages resulting from the United States' breach of the Note Forbearance—which are the damages comprising the ASB Judgment—were incurred by American Savings Bank, F.A. The plaintiff that provided the capital, American Savings Bank, F.A., was the predecessor in interest to WMB and amended its Federal Stock Charter in 1997 to change its corporate title from American Savings Bank, F.A. to Washington Mutual Bank, F.A. In addition, the parent company of American Savings Bank, F.A., New American Capital, Inc., was subsequently liquidated and merged into WMB, not WMI.

129. WMI has asserted that it is entitled to the ASB Judgment, which on February 16, 2009, this Court ordered be paid into its registry. This Court further directed that any party, other than the Debtors, asserting an ownership interest in the ASB Judgment bring its

claim through an adversary proceeding in accordance with Bankruptcy Rule 7001. JPMorgan Chase hereby does so.

### G. Legacy Rabbi Trusts and Benefit Plans

### (i) Legacy Rabbi Trusts

130. The Debtors have refused to acknowledge JPMorgan Chase's ownership of the assets of certain rabbi trusts ("Legacy Rabbi Trusts") that belong to JPMorgan Chase under the terms of the P&A, even though these assets were reflected on WMB's books and records and WMB was the successor to the original settlor. These assets support obligations under certain non-qualified retirement and pension plans covering current or former employees of or retirees from WMB or its predecessors in interest.

131. In a series of mergers in the late 1990s and the early part of this decade, WMI, through a variety of subsidiaries, acquired a number of financial institutions, which were merged into, or the assets of which were purchased by, WMB. As part of these acquisitions, WMB also acquired a number of non-qualified plans funded through Legacy Rabbi Trusts as well as liabilities for other plans not supported by trust assets. Rabbi Trusts are used to fund the payment of benefits under nonqualified deferred compensation plans that were adopted by some of the financial institutions WMI acquired. As of September 30, 2008, the books and records of WMB and WMI reflected 16 separate legacy plan Rabbi Trusts with aggregate legacy Rabbi Trust assets of over $550 million.

132. The "Legacy Rabbi Trusts" support the liabilities created under a number of non-qualified deferred compensation and supplemental retirement plans ("legacy plans") adopted by predecessor institutions acquired by the Washington Mutual family over the years.

133. Since the execution of the P&A, JPMorgan Chase has been prepared to

assume the obligations supported by the rabbi trust assets that it purchased under the P&A but the Debtors have refused to provide joint instructions to the trustees even where it is incontrovertible that the assets for a particular trust were acquired by JPMorgan Chase under the P&A. In so refusing to acknowledge JPMC's ownership and utilizing the automatic stay, the Debtors in effect have halted the payment of benefits to employees and many elderly retirees.

134. Under the P&A, the assets of twelve Legacy Rabbi Trusts were sold to JPMorgan Chase by the FDIC. With respect to five of these Legacy Rabbi Trusts, the FDIC has directed the trustees to turn the assets over to JPMorgan Chase and, when that happens, JPMorgan Chase has agreed to recommence the payment of benefits to retirees and others whose benefits were supported by the Legacy Rabbi Trust assets. With respect to the other seven Legacy Rabbi Trusts—four Dime Savings Bank Rabbi Trusts (the "Dime Rabbi Trusts"), two Great Western Rabbi Trusts (the "Great Western Rabbi Trusts"), and a Providian Rabbi Trust (the "Providian Rabbi Trust" and, together with the Dime Rabbi Trusts and the Great Western Rabbi Trusts, the "Bank Rabbi Trusts")[2]—there was some initial ambiguity as to either the identity of the successor to the original settlor of the Bank Rabbi Trust or the source of funding for the trust assets. JPMorgan Chase has since provided the Debtors with documentation for the conclusion that WMB had properly accounted for the assets of the Bank Rabbi Trusts on its books and that WMB was the successor to the original settlor. Accordingly, the assets of the Bank Rabbi Trusts were confirmed as property of WMB and thus also purchased by JPMorgan

---

[2]     JPMorgan Chase does not assert an ownership interest in the Rabbi Trusts previously sponsored by H.F. Ahmanson and Co. Accordingly, the Ahmanson Rabbi Trusts' assets and related liabilities are not included in the definition of Rabbi Trusts for the purposes of this Complaint.

Chase under the P&A. To date, the Debtors have refused to acknowledge JPMorgan Chase's ownership of the Bank RabbiTrust assets in writing.

135. To determine with finality the ownership of the assets of the Legacy Rabbi Trusts, JPMorgan Chase requests that the Court enter an order declaring that JPMorgan Chase purchased the assets of the Legacy Rabbi Trusts, and an order authorizing JPMorgan Chase and the trustees of each of the Legacy Rabbi Trusts to take all actions necessary or appropriate to transfer ownership of the assets to JPMorgan Chase and compel Debtors to cooperate in the transfer of them to JPMorgan Chase.

### (ii) The Pension Plan and the 401(k) Plan

136. As of the Petition Date, WMI sponsored the WaMu Savings Plan, a tax qualified savings plan under section 401(k) of the Internal Revenue Code (the "401(k) Plan"), and a tax qualified cash balance pension plan, the WaMu Pension Plan (the "Pension Plan") (collectively, the "Plans"). In 2007, WMB booked an intercompany receivable of approximately $316 million payable by WMI to WMB, of which approximately $275 million is still owed to WMB.

137. While WMI was the sponsor of the Plans as of the Petition Date, nearly all of the employees covered by the Plans were employees of WMB or its subsidiaries, many of whom are now employed by JPMorgan Chase.

138. Employees who participate in the 401(k) Plan contribute a percentage of their pre-tax income to the 401(k) Plan. Prior to the Petition Date, WMB would then match a portion of participants' contributions and fund that amount directly or indirectly by making a payment to the trust associated with the 401(k) Plan, which was administered by Fidelity Management Trust Company. The 401(k) Plan is administered by an administration committee

and investments are overseen by an investment committee, whose members were appointed by WMI.

139.    The Pension Plan is a defined benefit plan in which no employee contributions are required.  Instead, required funding contributions were made by WMI and/or participating employers.  As with the 401(k) Plan, the Pension Plan was administered, and investments were overseen, by individuals appointed by WMI.  As of Petition Date, the Pension Plan had approximately 32,000 participants and assets valued at approximately $1 billion.

140.    Since the Petition Date, WMI has refused to relinquish sponsorship of the Plans.  Members of the committees for each plan have made all administrative and investment decisions.  WMI has retained responsibility for making payments to participants in the Plans.

141.    Since September 25, 2008, JPMorgan Chase has been seeking to assume the Plans to ensure that covered employees retain their benefits and interests under the Plans.  In anticipation of sponsoring the Plans, JPMorgan Chase, for the benefit of former WMB employees currently employed by JPMorgan Chase, has continued to record accruals for the Pension Plan.  JPMorgan Chase also has directed employee contributions into the 401(k) Plan and funded significant matching contributions.

142.    WMB, not WMI, had the real economic interest in the Plans, having (i) incurred most of the pension and other expenses associated with the Pension Plan and funded the contributions for the 401(k) Plan and (ii) employed nearly all of the participants.  As of the Petition Date, the Pension and 401(k) Plans were not material to WMI's business or reorganization because WMI, by its own account, had only a handful of employees as of the Petition Date and, even since the Petition Date, has added only a dozen or two additional former employees of WMB.  Thus, JPMorgan Chase believed that that it would ultimately assume

sponsorship of the Plans.

143. The Debtors have nonetheless refused to allow JPMorgan Chase to assume the Plans. With respect to the Pension Plan, the Debtors' refusal appears to be based on the unfounded claim that the Pension Plan is over-funded and the desire to extract from JPMorgan Chase the purported over-funding as a condition to assuming sponsorship. There is no support for this assertion under fact, law (including the Employee Retirement Income Security Act of 1974, which likely would prevent such a recapture) or the P&A. JPMorgan Chase intends to assume and continue the Pension Plan and the sufficiency of the Pension Plan's assets to cover benefit obligations will continue to vary depending upon ongoing market and economic fluctuations that affect the value of plan assets, as well as the interest rate used to discount liabilities. It therefore makes no sense to suggest that there is "over-funding" that is due to the Debtors today as a practical matter, under relevant law or pursuant to the P&A.

144. With respect to the 401(k) Plan, Debtors' position is even less well reasoned. Debtors cannot obtain any value from the 401(k) Plan or its termination because the assets belong to the employees. Likewise, there is no basis for Debtors' assertion that, in connection with assumption of the Plans, JPMorgan Chase should acquire litigation pending against WMI and certain individual officers and directors arising from their pre-petition alleged misconduct.

145. Debtors have no rational basis on which to retain sponsorship of the Plans given the pending Chapter 11 proceeding and JPMorgan Chase's repeated attempts to assume the sponsorship and to ensure that the participants and beneficiaries are protected on an ongoing basis. To avoid hardship to its employees, JPMorgan Chase has continued to accrue benefits and make contributions into the 401(k) Plan, while waiting for WMI to stop holding the participants

and their benefits hostage as the value of the assets in the Pension Plan has dropped. The decline in value of those assets may be of little moment to WMI since it no longer employs the participants and is a debtor in bankruptcy, but it does matter to others.

146.     JPMorgan Chase seeks a determination that either (i) JPMorgan Chase be permitted immediately to assume sponsorship of the Plans without making payments to the Debtors that they have no right to demand; or (ii) the Debtors and their estates are responsible for, and must indemnify and hold JPMorgan Chase harmless for any liabilities due to the decline in value of the Pension Plan during this Chapter 11 case.

147.     JPMorgan Chase further requests that this Court allow its administrative claims against the Debtors for (i) the amount of all contributions made from and after the Petition Date to the 401(k) Plan; and (ii) the amount by which the decline in the value of the assets in the Pension Plan from and after the Petition Date has resulted from WMI's inattention and failure properly to administer the Pension Plan assets. Finally, whatever the outcome of the sponsorship issue, the pending litigation matters are and should remain the responsibility of WMI and its estate and JPMC is entitled to be fully indemnified and held harmless for any and all claims related to the Pension and 401(k) Plans prior to the date upon which JPMC may assume their sponsorship.

148.     As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest," in the Plans, pursuant to and in accordance with the FDI Act. On December 30, 2008, the Debtors nonetheless submitted a claim to the Receiver asserting, among other things, ownership of various of the employee benefits plans. On January 23, 2009, the Debtors' claims were disallowed by the Receiver. On March 20, 2009, the Debtors commenced the District Court Action with respect to the disallowance of their claims and put ownership of

the plans and its liabilities at issue in that action.

### H. Other Assets

### (i) Company and Bank Owned Life Insurance Policies

149. JPMorgan Chase also seeks an order confirming that certain life insurance policies owned by WMB and the cash surrender value of which were reflected on the books and records of WMB as of September 25, 2008 are JPMorgan Chase's property and were purchased under the P&A. These life insurance policies are known as Bank Owned Life Insurance ("BOLI").

150. The BOLI policies are types of life insurance policies purchased by WMB (or a predecessor company) on the lives of employees. Under these types of plans, WMB paid the premiums on the insurance and was also the primary beneficiary of the policies. In the case of a split dollar policy, the insurance proceeds are split by both WMB (or a predecessor company) and the insured employee's designated beneficiary. WMB used these BOLI policies and split dollar policies as a tax-deferred way to fund the costs of various welfare plans, hedge deferred compensation arrangements and to provide insurance benefits to certain employees.

151. By letter dated November 7, 2008, a true and correct copy of which is attached as Exhibit K (the "Cease and Desist Letter"), counsel for the Debtors demanded that JPMorgan Chase cease exercising control over the BOLI policies on the ground that the Debtors believed they might have an ownership interest in those policies and demanded access to books and records regarding the BOLI policies. JPMorgan Chase complied with the demand in the Cease and Desist Letter in order to provide the Debtors with the information they requested. JPMorgan Chase and Debtor have provided each other with documentation establishing the ownership of each party in certain policy list bills. (*See* Exhibit L for list bills owned by

JPMorgan Chase.)  Accordingly, each of the parties have exercised their respective ownership rights over the policies that they own.

152.    There are two BOLI policies issued by Pacific Life list bills of 7675A and 7729A on which the Debtors and JPMorgan Chase could not reach agreement as to ownership (the "Pac Life List Bill Policies").  As between WMI and WMB, these BOLI policies are reflected on WMB's books and records and owned by WMB.  WMB acquired the policies from a banking institution that merged with WMB and these policies were on the books of that institution at the time of the merger.  The accounting records of WMB do not show a dividend of these policies to WMI or a purchase of these policies by WMI, the only lawful ways that these policies could have been acquired by WMI from WMB.  However, the carrier has advised JPMorgan Chase that, according to the records of the carrier, Washington Mutual Revocable Trust, not WMB, is shown as the policy owner.  Because Debtors have refused to acknowledge JPMorgan Chase's ownership of these policies, JPMorgan Chase has not taken any action with respect thereto.  JPMorgan Chase requests that the Court determine that JPMorgan Chase acquired all right, title and interest in and to these policies under the P&A and that WMI has no interest in them.  To the extent that the carrier's records reflect WMI as the policy owner, WMI has no more than bare legal title under Section 541(iv) of the Bankruptcy Code and JPMorgan Chase is entitled to a declaration that it, and not WMI, is the rightful owner of the policies.

153.    The parties did not address and no action has been taken by JPMorgan Chase with respect to certain other policies, the cash surrender value of which is reflected on WMB's books and records as of September 25, 2008.  These policies consist of ING Security Life List Bills E208090000 and E208090001 and approximately 955 Split Dollar policies issued by a number of carriers.

154. The ING Security Life policies were reflected on the books and records of American Savings Bank, F.A. when it merged into WMB and supported American Savings Bank's executive life insurance plan. These policies were reflected on WMB's books and records as of September 25, 2008 and therefore were acquired by JPMorgan Chase from the Receiver under the P&A. WMI has no legal, record, equitable or beneficial interest in any of these policies and no right to continue to interfere with JPMorgan Chase's administration of these policies.

155. As of the date of the P&A, the 955 Split Dollar policies were recorded on the books of WMB. These policies initially belonged to Commercial Capital Bancorp Inc. ("CCBI") when it was merged into WMB in April 2006 and were reflected on its books as of the date of the merger. Correspondence with the insurance carriers for these Split Dollar policies— Beneficial Life, Jefferson Pilot Financial, John Hancock, Massachusetts Mutual, Midland National, New York Life, Northwestern Mutual, Security Life of Denver, and West Coast Life— confirms that WMB was the owner of these policies as of September 25, 2008. Once again, there can be no legitimate dispute regarding JPMorgan Chase's ownership of these policies. WMI has no legal, record, equitable, or beneficial interest in any of these policies and no right to interfere with JPMorgan Chase's administration of these policies as they clearly are property of JPMorgan Chase acquired from the Receiver under the P&A.

156. Accordingly, JPMorgan Chase seeks a determination that it owns the BOLI policies and Split Dollar policies discussed above, along with an administrative claim for its damages, fees, costs, and expenses, including for any deterioration in the value of these policies during the administration of these cases.

157. As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's

right, title and interest," in the BOLI policies and Split Dollar policies, pursuant to and in accordance with the FDI Act. On December 30, 2008, the Debtors nonetheless submitted a claim to the Receiver asserting, among other things, ownership of certain of these policies. On January 23, 2009, the Debtors' claims were disallowed by the Receiver. The Receiver's disallowance is dispositive of the fact that the Debtors do not own these policies. On March 20, 2009, the Debtors commenced the District Court Action with respect to the disallowance of their claims.

### (ii) Visa Shares

158. WMB was the original WaMu Group member of Visa U.S.A. Inc. WMB fsb became a member on July 27, 1994, when it signed the Visa U.S.A Inc. Membership Agreement with Washington Mutual, a Federal Savings Bank (predecessor to WMB) serving as its sponsor. WMB conducted the Visa payment card business for WaMu Group, paid all service fees, and bore the risk of the Visa payment card business.

159. As part of Visa's restructuring and initial public offering, members of Visa U.S.A. were allocated shares of Class B common stock in Visa, Inc. The shares were allocated based on each member's ownership interest, which was calculated on the basis of service fees paid over a period of time.

160. The allocation of Class B shares and Visa's retrospective responsibility plan (the "Plan") are outlined in Visa, Inc.'s Prospectus dated March 18, 2008 (the "Final Prospectus") (filed with the U.S. Securities and Exchange Commission), as well as in certain transaction documents. Class B shares are subject to the restrictions and are encumbered by contingent liabilities. The Class B shares are convertible into Class A shares upon the satisfaction of certain conditions and pursuant to a conversion formula, all as described in Visa

Inc.'s Final Prospectus and certain related transaction documents.

161.    Pursuant to the restructuring documents, Visa U.S.A. members have litigation indemnification obligations to Visa Inc. with respect to certain antitrust litigation (whether a named defendant or not) referred to in the transaction documents as "Covered Litigation." The Class B shares are restricted until the later of three years or the conclusion of all Covered Litigation. If shares remain at the conclusion of the Covered Litigation and after the passage of three years, the Class B shares may be converted to Class A shares.

162.    In connection with and in furtherance of the restructuring, certain Visa U.S.A. members executed a Loss Sharing Agreement (the "LSA") and an Interchange Judgment Sharing Agreement (the "JSA"), each document is dated July 2007. Each agreement provides that its signatories will indemnify Visa Inc. for potential liabilities associated with the Covered Litigation whether the signatory is a named defendant or not. The obligation is limited to their Visa U.S.A. respective membership portions. WMB signed the JSA on July 2, 2007; WMI signed the LSA, which applied to all Covered Litigation, on July 2, 2007.

163.    Indemnity obligations that may arise in connection with the Covered Litigation are to be funded by an escrow account established by Visa. The escrow was established with some proceeds of Visa Inc.'s initial public offering and, to the extent that the escrow must be replenished, through further dilution of the Class B common stock. If the funds contained in the escrow account (after continued Class B share dilution) prove insufficient to satisfy a Covered Litigation, the Final Prospectus as well as certain transaction documents, provide that in addition to the dilution of the Visa Class B shares, any shortfall is to be paid from the voting members' own funds in accordance with their respective ownership proportion. The foregoing is clearly set out in the Final Prospectus, as well as in the LSA and in other transaction

documents.

164.    On October 2, 2007, a notice of pre-true up share allocation was sent to WMI, indicating that WaMu Group would be allocated 5,465,562 shares of Visa Inc. class USA common stock.  Pursuant to a true-up procedure, on March 17, 2008, the share allocation was adjusted to 5,130,523 shares of Visa Class B common stock.  In the course of the initial public offering, Visa Inc. redeemed some of the Class B Shares of its members and paid proceeds to the members.  On March 28, 2008, after redemption and payment of proceeds, 3,147,059 shares of Visa Inc. Class B common stock (the "Visa shares") were allocated to WaMu Group.

165.    JPMorgan Chase believes that the Visa shares were issued in the name of WMI consistent with Visa's general practice of issuing its stock to the holding company of its issuing bank members.  The Visa shares were not in the name of the bank entity issuing the credit and/or debit payment cards, which entity had paid fees to Visa and also had responsibility for the gains and losses associated with being a card issuing Visa member.

166.    The proceeds Visa paid to its members in the initial public offering were in the case of WaMu Group, distributed to WMB.

167.    Although WMI may have received bare legal title from Visa upon distribution of the shares, WMB at all times remained, and was required by applicable regulations and law to be, the beneficial owner of the Visa shares.

168.    The expense and reserve associated with the Covered Litigation were posted to WMB and recorded in the profit and loss statement at the WMB level.  For example, in 2007, WMB recognized a guarantee liability of $50 million for the modified indemnification obligation that resulted from Visa's reorganization and initial public offering.  According to publicly filed documents, therefore, WMB accounted for loss with respect to the Covered

Litigation which burdens the Visa shares. WMB was the beneficial owner of the Visa shares, ownership which passed to JPMorgan Chase as the successor to the Receiver under the P&A.

169. Debtors have refused to transfer title in the Visa shares to JPMorgan Chase. In WMI's Schedule of Assets and Liabilities, originally filed December 19, 2008, first amended on January 27, 2009 and then amended again on February 24, 2009, Debtors list approximately 5.4 million shares of Visa Inc. Class B stock as an asset of the estate in "Schedule B – Personal Property," Item 13.

170. Upon information and belief, WMI holds only 3.147 million Visa shares, which it received post-redemption.

171. As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest," in the Visa shares, pursuant to and in accordance with the FDI Act. JPMorgan Chase seeks an order determining that the Visa shares in which WMI has bare legal title were owned by WMB are JPMorgan Chase's property and were purchased pursuant to the P&A.

**(iii)    Contracts, Intellectual Property and Other Intangible Assets**

172. Prior to the Receivership, WMB was the primary operating subsidiary of WMI and both WMI and WMB had registered the trademarks "Washington Mutual" and the "W" logo ("Trademarks") and utilized the marks interchangeably in their operations, agreements and transactions.

173. Prior to the Receivership, a number of contracts and other counterparty transactions to lease property, perform services, deliver goods, license, develop or acquire software were entered into for the benefit of the banking operations formerly owned by WMB, now owned and operated by JPMorgan Chase (the "Vendor Contracts"), were bought or paid for

by WMB and were utilized extensively if not exclusively by WMB. Some of the Vendor Contracts include prepaid rights, incentives, rebates or developed software (all of the foregoing, together with the Trademarks and the Vendor Contracts, the "Intangible Assets").

174. As a result of the Receivership and the P&A, WMB's banking operations and subsidiaries no longer belong directly or indirectly to WMI. Vendors have, nonetheless, continued to provide goods and services under the Vendor Contracts. By order dated December 16, 2008, this Court authorized and approved a stipulation between the Debtors and JPMorgan Chase regarding certain of the Vendor Contracts (the "Vendor Stipulation"). The Vendor Stipulation, among other things, (i) facilitates the transfer of the services to JPMorgan Chase, (ii) requires JPMorgan Chase to pay for the services provided under those contracts until twenty days after notice of the rejection of a contract is given by JPMorgan Chase to the Debtors, thereby reducing or eliminating certain expenses of administration, and (iii) allows the Debtors to use any new contracts negotiated by JPMorgan Chase for such services to mitigate any damage claims filed by such vendors for rejection of their contracts.

175. While the Vendor Stipulation resolved a number of the outstanding issues and protected the estates against administrative liability, the Vendor Stipulation did not resolve issues regarding ownership of the Intangible Assets. There are a number of Intangible Assets which JPMorgan Chase believes were properly assets of WMB, not WMI, and which have not been resolved to date.

176. Any interest of WMI in these Intangible Assets consists of nothing more than bare legal title and all beneficial and equitable rights thereunder were WMB's and now belong to JPMorgan Chase as the successor to the Receiver under the P&A and Title 12. While WMI may have been the nominal contracting party for contracts entered by the WaMu Group

entities, WMB held all beneficial and equitable title and interest in each Intangible Asset. WMB paid for the Intangible Assets, recorded the Intangible Assets on its books, and interacted directly with the counterparties as the Intangible Assets supported WMB's business, now owned and operated by JPMorgan Chase. All payments and pre-payments on the Vendor Contracts and other Intangible Assets were made by WMB.

177. WMI's Schedule of Assets and Liabilities appears to assert ownership over a number of these Intangible Assets in Schedule G—Executory Contracts and Unexpired Leases.

178. As set forth in the P&A, JPMorgan Chase purchased "all of the Receiver's right, title and interest," in the Vendor Contracts, pursuant to and in accordance with the FDI Act. On December 30, 2008, WMI nonetheless submitted a claim to the Receiver asserting, among other things, an interest in certain of these contracts. On January 23, 2009, the WMI's claims were disallowed by the Receiver. The Receiver's disallowance is dispositive of the fact that the Debtors do not own these contracts. On March 20, 2009, the Debtors commenced the District Court Action with respect to the disallowance of their claims.

179. JPMorgan Chase is entitled to a declaration that it has all right, title and interest to these Intangible Assets or, in the alternative, JPMorgan Chase is entitled to a claim for the full amount of all damages it may suffer from the loss of these Intangible Assets and to exercise rights of offset and recoupment for that loss.

## RELIEF REQUESTED BY JPMORGAN CHASE

## TRUST SECURITIES

### Count One:  Trust Securities
### (Declaratory Judgment)

180. JPMorgan Chase realleges and incorporates by reference each and every

allegation set forth above, as though fully set forth herein.

181. As set forth above, JPMorgan Chase contends that, pursuant to the P&A, it purchased the Trust Securities. The Debtors have disputed JPMorgan Chase's ownership of these assets in this bankruptcy case, in their Schedules and in the filing of the District Court Action.

182. There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

183. JPMorgan Chase requests a declaratory judgment finding that Debtors must proceed with any claim to the Trust Securities through the District Court Action it chose to commence. In the alternative, JPMorgan Chase requests a declaratory judgment determining that the Trust Securities are assets purchased by and belonging to JPMorgan Chase.

**Count Two: Trust Securities**
**(Breach of Contract)**

184. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

185. WMI assumed a direct obligation to WMB upon entering into the Contribution Agreement to immediately contribute and transfer the Trust Securities to WMB following the conditional exchange. In the alternative, WMB was the third party beneficiary of WMI's commitment to the OTS and the FDIC under the Contribution Agreement. WMI also assumed a direct obligation to WMB pursuant to the Assignment Agreement.

186. To the extent the Assignment Agreement is interpreted as leaving WMI with anything other than bare legal title, WMI breached the Contribution Agreement. WMI further breached the Contribution Agreement and the Assignment Agreement by refusing to assist JPMorgan Chase in obtaining registered ownership of the Trust Securities.

187.    JPMorgan Chase (as successor in interest to WMB), has suffered, and will suffer, substantial monetary damages as a proximate result of WMI's breach of the Contribution Agreement and the Assignment Agreement.

### Count Three:  Trust Securities
### (Unjust Enrichment)

188.    JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

189.    The Debtors would be unjustly enriched if they retained the Trust Securities.  From the time of the creation of the Trust Securities, the Debtors benefited from the treatment of the Trust Securities as core capital, which permitted the Debtors to, among other things, satisfy regulatory requirements and report higher capital ratios.

190.    Thus, to the extent the Court does not enter a declaratory judgment determining that the Trust Securities are assets purchased by and belonging to JPMorgan Chase, JPMorgan Chase requests that the Court establish a constructive trust for the benefit of JPMorgan Chase consisting of the value recognized by Debtors as a result of the treatment of the Trust Securities as core capital.

### TAX REFUNDS

### Count Four:  Tax Refunds
### (Declaratory Judgment)

191.    JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

192.    As discussed above, JPMorgan Chase is the beneficial owner of tax refunds due to, and deductions generated by, the WaMu Group.  JPMorgan Chase is also the beneficial owner of tax refunds already received by, and deductions taken by, WMI.  The

Debtors dispute JPMorgan Chase's ownership of these refunds and deductions.

193.    Furthermore, JPMorgan Chase should be permitted to communicate directly without restriction with the taxing authorities concerning ongoing tax matters affecting WMB and its subsidiaries.  The Debtors have sought to prohibit JPMorgan Chase from engaging in these communications.

194.    There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

195.    JPMorgan Chase requests a declaratory judgment finding that Debtors must proceed with any claim to the tax refunds and deduction through the District Court Action they elected to commence.  In the alternative, JPMorgan Chase requests a declaratory judgment determining that the tax refunds and deductions are assets purchased by and belonging to JPMorgan Chase.

**Count Five: Tax Refunds**
**(Unjust Enrichment)**

196.    JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

197.    In the alternative, WMI would be unjustly enriched if it retained any tax refunds received on behalf of, or generated by, the WaMu Group that are attributable to tax attributes of WMB or its subsidiaries.

198.    WMI received the tax refunds and deductions merely as agent for the WaMu Group.  If WMI is permitted to retain the tax refunds, it will have received a windfall by receiving a refund on income tax paid by WMB (or its subsidiaries).

199.    JPMorgan Chase requests that the Court establish a constructive trust for the benefit of JPMorgan Chase consisting of the tax refunds received by and/or deductions

recognized by WMI to which WMB is entitled.

200. Furthermore, any future tax refunds received by and/or deductions recognized by WMI as agent for the WaMu Group should be similarly deposited into the constructive trust for the benefit of JPMorgan Chase.

## DISPUTED INTERCOMPANY AMOUNTS

### Count Six:  Disputed Funds
### (Declaratory Judgment:  $3.7 Billion Book Entry Transfer)

201. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

202. WMI has asserted that the $3.7 Billion Book Entry Transfer creates a deposit liability owed to it by WMB fsb, now JPMorgan Chase.  JPMorgan Chase disputes that there is a valid deposit liability due to Debtors as the result of the $3.7 Billion Book Entry Transfer.

203. There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

204. JPMorgan Chase requests a declaratory judgment finding that Debtors must proceed with any claim to assert ownership of or interest in the $3.7 Billion Book Entry Transfer through the District Court Action they elected to commence.  In the alternative, JPMorgan Chase requests a declaratory judgment determining that there is no valid deposit liability due to Debtors as a result of the $3.7 Billion Book Entry Transfer.

### Count Seven:  Disputed Funds
### (Declaratory Judgment:  Setoff, Recoupment, and Other Equitable Limitations)

205. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

206.     To the extent that JPMC has any liabilities to Debtors, including deposit account liabilities, it is entitled to (i) recoup and or setoff all such amounts under the MBA Policy and/or any other applicable terms and conditions governing those liabilities or deposit accounts; (ii) imposition of a constructive trust for the amount of all such liabilities over any funds of Debtors it possesses; and (iii) enforce any security interest determined to apply to the funds of the Debtors.  Debtors dispute that JPMorgan Chase has these rights.

207.     The amounts owed to JPMorgan Chase include, but are not limited to, the at least approximately $234 million in tax refunds deposited in the Accounts and due to WMB, which the Debtors have claimed as their own, the intercompany receivables of $275 million due from WMI to WMB, and any amounts awarded by the Court under this Complaint.

208.     There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

209.     JPMorgan Chase requests a declaratory judgment determining its right to setoff, recoupment, imposition of a constructive trust, and/or enforcement of its security interests.

### Count Eight:  Any Remaining Deposit Liabilities
### (Interpleader Pursuant to Bankruptcy Rule 7022)

210.     JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

211.     Pursuant to the terms of the P&A, JPMorgan Chase, WMI, and the FDIC have asserted, or may assert, competing claims to any funds that constitute deposit liabilities and JPMorgan Chase may be exposed to double liability if it were to pay these claims to the wrong party.

212.     JPMorgan Chase seeks to interplead any remaining funds that constitute

deposit liabilities pursuant to Bankruptcy Rule 7022, less any attorneys' fees and costs, so that all claims to the amounts can be adjudged and the funds can be properly disbursed.

## GOODWILL LITIGATION

### Count Nine: Goodwill Litigations
### (Declaratory Judgment)

213. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

214. There is an actual and substantial controversy between JPMorgan Chase and WMI as to whether WMI or WMB (as successor in interest to Anchor Savings Bank and American Savings Bank) is entitled to the Anchor and ASB Judgments and any future judgment entered in either litigation.

215. This is an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

216. JPMorgan Chase requests a declaratory judgment determining that WMB (and thus JPMorgan Chase as successor in interest) owns the beneficial interest in the Anchor and American Judgments and all monies paid on account of those judgments and directing payment of the Anchor and ASB Judgments, as well as any future judgment in either the *Anchor Savings Bank* or the *American Savings Bank* litigations, to JPMorgan Chase.

## RABBI TRUSTS

### Count Ten: Rabbi Trusts
### (Declaratory Judgment)

217. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

218. As set forth above, JPMorgan Chase contends that, pursuant to the P&A, it

purchased the Legacy Rabbi Trusts. The Debtors dispute JPMorgan Chase's ownership of these assets.

219. There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

220. JPMorgan Chase requests a declaratory judgment determining that JPMorgan Chase purchased the assets of the Legacy Rabbi Trusts and an order authorizing JPMorgan Chase and the trustees of each of the Legacy Rabbi Trusts to take all actions necessary or appropriate to transfer ownership to JPMorgan Chase.

### Count Eleven: Rabbi Trusts
### (Unjust Enrichment)

221. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

222. In the alternative, in the event that this Court finds that JPMorgan Chase did not purchase the assets of the Legacy Rabbi Trusts, the Debtors would be unjustly enriched if they were allowed to retain the assets. The Debtors did not fund the Trusts and the assets were owned by WMB.

223. JPMorgan Chase requests that the Court establish a constructive trust for the benefit of JPMorgan Chase consisting of the value of the assets of the Legacy Rabbi Trusts.

### PENSION AND 401(K) PLANS

### Count Twelve: Pension and 401(k) Plans
### (Declaratory Judgment)

224. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

225. JPMorgan Chase stands ready, willing and able to assume the Pension and

401(k) Plans, and continues to record accruals for the Pension Plan and fund significant matching contributions to the 401(k) Plan in anticipation of doing so.

226. As set forth above, JPMorgan Chase contends that it may assume the Pension and 401(k) Plans in their entirety. The Debtors dispute this contention. Debtors assert that JPMorgan Chase is required to pay them an amount reflecting a purported "excess funding" in the Pension Plan. However, the Pension and 401(k) Plans will not be terminated if they are assumed by JPMorgan Chase. Rather, JPMorgan Chase would assume the Pension Plan on an ongoing basis without any termination but, instead, with the continuing obligation to pay accrued benefits. And, because the Pension Plan is continuing, the sufficiency of their assets to cover benefit obligations will continue to vary depending upon ongoing fluctuations in the value of plan assets as well as the interest rate used to discount liabilities. It therefore makes no sense to suggest that there exists some excess value to which Debtors are presently entitled as though the Pension Plan was being terminated with no further liabilities.

227. In addition, the Debtors have claimed that, in order to assume the Pension and 401(k) Plans, JPMorgan Chase must assume the liabilities associated with litigation against WMI and its officers and directors for their conduct in administrating the Pension and 401(k) Plans before the Petition Date. JPMorgan Chase does not have any obligation to assume these liabilities.

228. There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

229. JPMorgan Chase requests a declaratory judgment finding that Debtors must proceed with any claim to assert ownership of any assets in any employee benefit plans through the District Court Action they elected to commence. Alternatively, JPMorgan Chase

requests a declaratory judgment determining that JPMorgan Chase may assume the Pension and 401(k) Plans without requiring it to forfeit any hypothetical over-funding to Debtors and without imposing liability for litigation that does not belong to JPMorgan Chase. In the alternative, JPMorgan Chase requests a declaratory judgment determining that, if it is not permitted to assume the Pension and 401(k) Plans, it has no further liability to any person for any liabilities associated with those plans.

### Count Thirteen: Pension and 401(k) Plans
### (Unjust Enrichment)

230.     JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

231.     In the alternative, in the event that this Court finds that JPMorgan Chase can only assume the Pension and 401(k) Plans by either paying the hypothetical excess funding or assuming pending litigation liabilities upon assumption of the Pension and 401(k) Plans, and JPMorgan Chase does not assume the Pension and 401(k) Plans, the Debtors would be unjustly enriched by benefiting through JPMorgan Chase's contributions to the 401(k) Plan that were made in the expectation that it would be able to assume the 401(k) Plan pursuant to the P&A. Debtors and JPMorgan Chase understood that JPMorgan Chase was making these payments in anticipation of assumption of the plans.

232.     The Debtors would unjustly realize a windfall from the circumstances alleged herein if they do not reimburse JPMorgan Chase for the funds contributed to the 401(k) and resources it allocated to the Plans, which Debtors (or another party) would have needed to contribute if JPMorgan Chase had not done so. The Debtors did not contribute any of these funds or resources relating to the post-September 25, 2008 operation of the Pension and 401(k) Plans and have no right to them.

233.   By reason of the foregoing, a post-petition constructive trust should be imposed on the Debtors in the full amount necessary to reimburse JPMorgan Chase for the amounts it contributed to the 401(k) Plan.

## BANK OWNED LIFE INSURANCE POLICIES

### Count Fourteen:  Life Insurance Policies
### (Declaratory Judgment)

234.   JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

235.   As set forth above, there is an actual and substantial controversy between JPMorgan Chase and the Debtors.  JPMorgan Chase contends that, pursuant to the P&A, it purchased the BOLI policies and Split Dollar policies referenced above. The Debtors appear to contend to the contrary.

236.   There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

237.   JPMorgan Chase requests a declaratory judgment finding that Debtors must proceed with any claim to assert ownership of or interest in the BOLI Policies and Split Dollar policies through the District Court Action they elected to commence.  Alternatively, JPMorgan Chase requests a declaratory judgment determining that the BOLI policies and Split Dollar policies are assets purchased by and belonging to JPMorgan Chase.

### Count Fifteen:  Life Insurance Policies
### (Unjust Enrichment)

238.   JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

239.   In the alternative, in the event that this Court finds that JPMorgan Chase

did not purchase the BOLI policies and Split Dollar policies, the Debtors would be unjustly enriched if they were allowed to retain the policies. The Debtors were never the policyholders for the BOLI policies and Split Dollar policies. Accordingly, they have no right to the BOLI policies and Split Dollar policies and would unjustly realize a windfall from the circumstances alleged herein if they are permitted to retain the BOLI policies and Split Dollar policies.

240. JPMorgan Chase requests that the Court establish a constructive trust for the benefit of JPMorgan Chase consisting of the value of the BOLI policies and Split Dollar policies.

## VISA SHARES

### Count Sixteen: Visa Shares
### (Declaratory Judgment)

241. JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

242. There is thus an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

243. JPMorgan Chase requests a declaratory judgment determining that the Visa shares are assets purchased by and belonging to JPMorgan Chase. In the alternative, if the Court should determine that the Visa shares are assets belonging to the Debtors, JPMorgan Chase requests a declaratory judgment determining that Debtors assume the full liabilities associated with the Visa Inc. restructuring and initial public offering in which those shares were issued by requiring that the Debtors pay and discharge any Covered Litigation obligation not satisfied by the Visa shares.

## Count Seventeen:  Visa Shares
### (Unjust Enrichment)

244.    JPMorgan Chase realleges and incorporates by reference each and every

allegation set forth above, as though fully set forth herein.

245.    The Debtors would be unjustly enriched if they retained title to the Visa

shares.

246.    If the Debtors are permitted to retain the Visa shares without bearing full

liability associated with the reorganization and creation of the asset, they will incur a windfall if

and to the extent JPMorgan Chase is responsible for any Covered Litigation shortfall relating to

the Visa shares.

247.    Thus, to the extent the Court does not enter a declaratory judgment

protecting JPMorgan Chase from any such liabilities, JPMorgan Chase requests that the Court

establish a constructive trust for the benefit of JPMorgan Chase over any Visa shares remaining

after satisfaction of obligations related to the Covered Litigation.

## INTANGIBLE ASSETS

### Count Eighteen:  Intangible Assets
### (Declaratory Judgment)

248.    JPMorgan Chase realleges and incorporates by reference each and every

allegation set forth above, as though fully set forth herein.

249.    As set forth above, JPMorgan Chase contends that, pursuant to the P&A

and Title 12, it owns the Intangible Assets.  The Debtors dispute this.

250.    There is thus an actual controversy that is of sufficient immediacy to

warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

251.    JPMorgan Chase requests a declaratory judgment determining that

JPMorgan Chase is the owner of the Intangible Assets. In the alternative, JPMorgan Chase requests a declaratory judgment determining that, if it is not the owner of the Intangible Assets, it has no liability to any person for any liabilities associated with those Intangible Assets.

### Count Nineteen: Intangible Assets
### (Unjust Enrichment)

252.     JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

253.     In the alternative, in the event that this Court finds that JPMorgan Chase does not own the Intangible Assets, the Debtors would be unjustly enriched if they were allowed to retain the Intangible Assets or were not ordered to repay JPMorgan Chase for amounts paid by WMB in connection with the Intangible Assets.

254.     JPMorgan Chase requests that the Court establish a constructive trust for the benefit of JPMorgan Chase consisting of the value of Intangible Assets.

## ADMINISTRATIVE CLAIM

### Count Twenty:  Administrative Expenses

255.     JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

256.     To the extent the Court accepts WMI's claims of ownership of any of the Pension and 401(k) Plans or other assets and JPMorgan Chase has made payments and incurred expenses in connection with these assets, JPMorgan Chase is entitled to reimbursement from Debtors of all post-petition expenses it has incurred and payments it has made on account of those assets.

257.     To the extent JPMorgan Chase incurs any liability or suffers any loss as the result of conduct by Debtors after the Petition Date, including conduct by the Debtors as the

sponsor of any of the Pension and 401(k) Plans, JPMorgan Chase is entitled to post-petition administrative claim for those amounts.

## INDEMNIFICATION

### Count Twenty-One: Indemnification

258.    JPMorgan Chase realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

259.    Claims have been threatened against JPMC arising out of or relating to the acts, omissions or conduct of Debtors prior to the Petition Date.  To the extent that any claim is asserted against JPMC as a result of such matters, JPMC is entitled to be indemnified and held harmless by the Debtors for any loss, damage or liability they might incur.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff JPMorgan Chase respectfully requests that this Court grant judgment:

(i) declaring that the legal title and all beneficial interest in each of the assets described in this Complaint belong to JPMorgan Chase;

(ii) ordering WMI to deliver the assets to JPMorgan Chase;

(iii) ordering WMI to take steps to allow, and where appropriate, direct third parties to act in accordance with JPMorgan Chase's ownership of its assets;

(iv) awarding JPMorgan Chase damages as a result of Debtors' failure to transfer, or facilitate the transfer of, assets JPMorgan Chase acquired under the P&A;

(v) ordering Debtors to indemnify JPMorgan Chase for any losses JPMC incurs as a result of Debtors' pre-petition actions;

(vi) awarding JPMorgan Chase damages for losses resulting from Debtors' post-petition actions, including the Debtors' failure to deliver the Pension and 401(k) Plans and other assets to JPMorgan Chase;

(vii) granting JPMorgan Chase an administrative claim for amounts paid into or on account of the Pension and 401(k) Plans and other assets;

(viii) requiring Debtors to reimburse JPMorgan Chase for all amounts by which they have been unjustly enriched;

(ix) determining that JPMorgan Chase is entitled to setoff, recoup, or impose a lien against any liabilities that JPMC may owe to Debtors, for all amounts JPMC may be entitled to under this Complaint;

(x) determining that any and all interested persons, entities or agencies are restrained from instituting any actions against JPMC for recovery of any amounts being interplead with the Court;

(xi) determining that JPMC be discharged from any and all liability with regard to claims to the interplead funds;

(xii) awarding JPMorgan Chase, to the extent permissible, pre-judgment interest and punitive damages;

(xiii) awarding JPMorgan Chase its attorney's fees and costs; and

(xiv) awarding JPMorgan Chase such other and further relief as this Court deems just and proper.

Dated: March 24, 2009
      Wilmington, Delaware

Respectfully submitted,

*Adam G. Landis w/permission MBM #4366*

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
LANDIS RATH & COBB LLP
919 Market Street Suite 1800
Wilmington, DE 19899
Tel: (302) 467-4400
Fax: (302) 467-4450
landis@lrclaw.com

– and –

Bruce E. Clark
Robert A. Sacks
David H. Braff
Hydee R. Feldstein
Stacey R. Friedman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
clarkb@sullcrom.com
sacksr@sullrcom.com
braffd@sullcrom.com
feldsteinh@sullcrom.com
friedmans@sullcrom.com