UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE:                                      ) | |
|                                             ) | Bankruptcy Action |
| WASHINGTON MUTUAL, INC.,                    ) | Case No. 08-12229(MFW) |
| et al.,                                     ) | |
|                                             ) | Chapter 11 |
|            Debtors,                         ) | |
| _____ | |
| JPMORGAN CHASE BANK,                        ) | |
| NATIONAL ASSOCIATION,                       ) | |
|                                             ) | Adv. Pro. No. 09-50551(MFW) |
|            Plaintiff,                       ) | |
| v.                                          ) | |
|                                             ) | |
| WASHINGTON MUTUAL, INC.                     ) | |
| AND WMI INVESTMENT CORP.,                   ) | |
|                                             ) | |
|        Defendant for all                    ) | |
|        claims                               ) | |
|                                             ) | |
|             and                             ) | |
|                                             ) | |
| FEDERAL DEPOSIT INSURANCE                   ) | |
| CORPORATION,                                ) | |
|                                             ) | |
|        Additional Defendant                 ) | |
|        for Interpleader                     ) | |
|        claim                                ) | |
| _____ | |
| WASHINGTON MUTUAL, INC.,                    ) | |
| AND WMI INVESTMENT CORP.,                   ) | Adv. Proc. No. 09-50934 |
|                                             ) | |
|            Plaintiffs,                      ) | |
| v.                                          ) | |
|                                             ) | |
|                                             ) | |
| JPMORGAN CASH BANK,                         ) | |
| NATIONAL ASSOCIATION,                       ) | Wilmington, DE |
|                                             ) | June 24, 2009 |
|            Defendant.                       ) | 10:38 a.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                    BRIAN ROSEN, ESQUIRE
                                    Weil, Gotshal & Manges, LLP
                                    767 Fifth Avenue
                                    New York, New York 10153

                                    MIKE CARLINSKY, ESQUIRE
                                    SUSHEEL KIRPALANI, ESQUIRE
                                    PETER CALAMARI, ESQUIRE
                                    Quinn Emanuel Urquhart Oliver &
                                    Hedges
                                    51 Madison Avenue, 22nd Floor
                                    New York, New York

                                    MARK COLLINS, ESQUIRE
                                    CHUN L. JANG, ESQUIRE
                                    Richards, Layton & Finger
                                    One Rodney Square
                                    920 North King Street
                                    Wilmington, Delaware 19801

                                    RAFAEL ZAHRALDDIN, ESQUIRE
                                    Elliott, Greenleaf
                                    1105 North Market St.
                                    Wilmington, Delaware 19801

For WMI Bond Holders:               PAUL O'CONNOR, ESQUIRE
                                    Kasowitz, Benson, Torres & Friedman
                                    1633 Broadway
                                    New York, New York 10019

                                    JEFFREY M. SCHLERF, ESQUIRE
                                    Fox Rothschild LLP
                                    919 N. Market Street, Suite 1600
                                    Wilmington, DE 19801


For Official Committee              DAVID STRATTON, ESQUIRE
of Unsecured Creditors:             LAURENCE SHICKMAN, ESQUIRE
                                    Pepper, Hamilton
                                    Hercules Plaza
                                    1313 Market Street, Suite 5100
                                    Wilmington, Delaware

                                    FRED HODARA, ESQUIRE
                                    ROBERT JOHNSON, ESQUIRE
                                    Akin Gump Strauss Hauer & Feld LLP
                                    1 Bryant Park
                                    New York, New York

(Appearances Continued)

For FDIC:                    THOMAS CALIFANO, ESQUIRE
                            JOHN CLARKE, ESQUIRE
                            DLA Piper, LLP
                            1251 Avenue of the Americas
                            New York, New York 10020

                            BLAKE CLEARY, ESQUIRE
                            Young, Conaway, Stargatt & Taylor
                            The Brandywine Building
                            1000 West Street
                            17th Floor
                            Wilmington, DE 19801


For JPMorgan Chase Bank:    ROBERT SACHS, ESQUIRE
                            BRUCE CLARK, ESQUIRE
                            HYDEE FELDSTEIN, ESQUIRE
                            Sullivan & Cromwell, LLP
                            1888 Century Park East
                            Los Angeles, California 90067-1725

                            ADAM LANDIS, ESQUIRE
                            Landis, Rath & Cobb
                            919 Market Street
                            Wilmington, Delaware 19899

Audio Operator:             Brandon McCarthy

Transcribed by:             DIANA DOMAN TRANSCRIBING
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-129
                            PHONE:  (856)435-7172
                            FAX:    (856) 435-7124
                            Email:  Dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

<u>I N D E X</u>

<u>MOTION TO INTERVENE</u>
  Argument By:

Mr. Califano                          6, 31
Mr. Carlinsky                        11, 29
Mr. Kirpalani                            19
Mr. Sachs                                20

THE COURT:  Ruling                       33

<u>MOTION TO STAY</u>
  Argument By:

Mr. Califano                         35, 86
Mr. Sachs                                49
Mr. Carlinsky                        63, 91
Mr. Stratton                             69
Mr. O'Connor                             78
Ms. Feldstein                            80

THE COURT:  Ruling                       93

<u>MOTION FOR RECONSIDERATION</u>

Mr. Kirpalani                            97
Mr. Clark                               104

THE COURT:  Ruling                      116

1       (Call to the Order of the Court)

2           THE COURT:  Good morning.

3           MR. ROSEN:  Good morning, Your Honor, Brian Rosen,

4       Weil Gotshal & Manges, on behalf of Washington Mutual, Inc.

5           And, Your Honor, this is the monthly omnibus hearing.

6       Just quickly going through some matters on the agenda.  As the

7       Court will note, item 1, which was the debtors' motion to take

8       certain actions in connection with a rabbi trust and

9       distribution of assets there has been adjourned to the next

10      omnibus hearing on July 27th.

11          The debtors do intend to file a response by July 22.

12      Do you want to take care of that first?

13          THE COURT:  Yes.  Could the parties on the phone

14      please mute their phones, so we don't listen to your background

15      noise?

16          MR. ROSEN:  The next two items, Your Honor, items 2

17      and 3, the Court has already entered orders with respect to

18      those, granting the relief that was requested.  And we've

19      reflected that on the agenda.  That brings us, Your Honor, to

20      item 4, which is the --

21          THE COURT:  Well let me suggest we go in a little

22      different order with respect to the adversary matters.

23          MR. ROSEN:  Okay.

24          THE COURT:  I think it's appropriate that I first

25      decide the FDIC motion to intervene, which is item 6.

1          I can then address items 4 and 7, which are the

2    motions to stay the action.  Then I'll deal with the -- item

3    number 5, the motion for reconsideration.  And, if necessary,

4    item 8, the motion to dismiss.

5          MR. ROSEN:  Thank you, Your Honor.

6          THE COURT:  Does that sound logical?

7          MR. ROSEN:  That sounds fine to us, Your Honor.  I'll

8    pass the podium to Mr. Califano.

9          THE COURT:  All right.

10         MR. CALIFANO:  Your Honor, I just want to make clear,

11   the FDIC is not seeking to interfere in the administration of

12   this case.  We've sat by and we've played, what I believe to be

13   a minimal role in this case.  But we do have the obligation to

14   uphold the statute and uphold Firrea.

15         And right now, the FDIC's rights, powers and duties

16   under Firrea are directly implicated by the adversary

17   proceedings before Your Honor, and we talk about the stay.

18         We can go through that.  But with respect to

19   intervention in the turnover action, you remember the four

20   elements of intervention are timeliness, and Your Honor may

21   recall at the first status conference we brought up the fact

22   that we would intervene and seek a stay of both adversary

23   proceedings.  Because we believe both adversary proceedings

24   were commenced in violation of Firrea's jurisdictional bar.

25         Where there's an interest, or property, or the

1    transactions underlying it, Your Honor, we, in our stay motion,

2    will show that the debtors, in their proof of claim in the

3    receivership, in their litigation in the District Court of

4    D.C., recognized the FDIC's interest, and that's why they

5    sought relief with respect to these very same deposits in that

6    litigation and in that proof of claim.

7            THE COURT:  Well in that litigation and proof of

8    claim, weren't they seeking damages from the FDIC, to the

9    extent they don't get the deposit accounts?  They weren't

10   asserting title to the deposit accounts.

11           MR. CALIFANO:  I'll get you the exact language.  Not

12   title, Your Honor, but the claim implicates the rights of the

13   FDIC.  And if you look at what their proof of claim said about

14   the deposit:

15           "Claimants hereby assert a protective claim for the

16   outstanding balance on each of the accounts, in the event the

17   FDIC exercises any rights it may have under the purchase and

18   assumption agreement, or otherwise with respect to the

19   lawsuit."

20           Now when we get to the stay motion, <u>Firrea</u> has a

21   jurisdictional bar, not just against claims, but against claims

22   related to the actions of the FDIC as receiver.  Now the

23   purchase and assumption agreement -- the entering into the

24   purchase and assumption agreement, the transactions thereunder,

25   that was the core of the FDIC's action as receiver in this

1   case.

2          So to the extent they're seeking a determination, or

3   they're seeking to impact the rights under the purchase and

4   assumption agreement, the FDIC's interests are directly

5   impacted by the turnover action.

6          The purchase and assumption agreement, Your Honor,

7   has provisions which gives the FDIC rights with respect to

8   deposits.  And it also gives the FDIC the right to direct the

9   assuming bank to withhold deposits, pending any determination

10  of claims against those deposits and against the depositor.

11         THE COURT:  What rights does it have with respect to

12  the deposit account?

13         MR. CALIFANO:  Your Honor, with respect to the

14  deposit accounts, under the purchase and assumption agreement,

15  which was recognized by the debtors, which is why they recited

16  it in their proof of claim and in the District Court action,

17  the FDIC has the power with respect to the deposits, for

18  example, to direct the assuming bank, in this case JPMorgan

19  Chase, to withhold payments of that deposit until their

20  respective rights are determined.  The turnover action --

21         THE COURT:  All right.  I'm going -- excuse me -- I'm

22  going to direct the operator to mute everybody on the line,

23  since they have not listened to my request.  Is the operator

24  on?

25         OPERATOR:  I am, Your Honor, and I'm muting the lines

1    now.

2              THE COURT:  Thank you.

3              OPERATOR:  You're welcome.

4              THE COURT:  I'm sorry to interrupt.

5              MR. CALIFANO:  Okay.  That's fine, Your Honor.  The

6    FDIC's rights directly are implicated by the proof of claim and

7    by the District of D.C. action.  And the turnover --

8              THE COURT:  Well what rights other than to direct JPM

9    to withhold payment until title is determined, what other

10   rights does the FDIC assert in the deposit account?

11             MR. CALIFANO:  We've already asserted, Your Honor,

12   early on in this case in connection with the aborted

13   stipulation with JPMorgan Chase regarding deposits, we already

14   asserted, and the debtors are aware of it, potential setoff

15   rights.

16             The FDIC is doing its investigation.  That

17   investigation has not been completed.  We have filed a proof of

18   claim in this case.  We have potential setoff rights that are

19   preserved by statute and by the purchase and assumption

20   agreement --

21             THE COURT:  Well but --

22             MR. CALIFANO:  -- in these deposits.

23             THE COURT:  -- but your proof of claim did not assert

24   setoff rights, did it?

25             MR. CALIFANO:  Yes, it did, Your Honor.

1          THE COURT:  To the deposit accounts?

2          MR. CALIFANO:  We preserved our setoff rights in the

3     proof of claim.

4          THE COURT:  All right.

5          MR. CALIFANO:  And in any event, Your Honor, in

6     addition to the direct interest in the deposits, because this

7     turnover action implicates <u>Firrea</u> and the FDIC's -- and

8     <u>Firrea</u>'s bar of actions, the FDIC's interests, as an agency,

9     are directly implicated.  And we've cited the cases and the

10    support for that.

11         The FDIC has the interest in protecting its governing

12    statute.  The next element is where the disposition of the case

13    may effect that interest.  Since the debtors are seeking a

14    determination that the deposits are indisputably theirs, and

15    that the deposits should be turned over, it directly implicates

16    the FDIC's potential interests in those deposits.

17         And finally, Your Honor, the question of inadequate

18    representation.  Whether or not JPMorgan Chase would have an

19    interest in defending that turnover action, the FDIC has a

20    distinct interest, as is recognized under the purchase and

21    assumption agreement.

22         There is an interest that they have that's protected

23    in 9.5 to direct withholding of payments.  Also JPMorgan Chase

24    is a private litigant, does not have the same interest in

25    upholding the provisions of <u>Firrea</u> and the agency's protections

1    thereunder.

2         So I think we've established all the elements, Your

3    Honor.  As the debtors recognize, this is one of the principal

4    assets in a Chapter 11 case, which is also related to the

5    largest bank failure in U.S. history.

6         I find it difficult for them to argue that the FDIC

7    doesn't have a right to intervene, and doesn't have an interest

8    that needs to be protected.

9         THE COURT:  Thank you.

10        MR. CARLINSKY:  Good morning, Your Honor, Michael

11   Carlinsky from Quinn, Emanuel on behalf of the debtors.  To

12   take up the issue which Your Honor has put first on the

13   calendar, which is the motion to intervene, some of what I'm

14   going to say will also be relevant when we address -- if we

15   address the issue of the motion to stay.

16        What the FDIC has said in its papers is its supposed

17   interest in these adversary proceedings, and in particular the

18   turnover action, is because the claim against JPMC violates the

19   jurisdictional bar of <u>Firrea</u>.

20        Your Honor, what's interesting is, in their opening

21   papers that was the FDIC's first argument.  In their reply,

22   it's now moved to the second or third position.  We think

23   because the FDIC, frankly, did not anticipate the <u>Rosa</u>

24   (phonetic) case, which is Third Circuit authority binding on

25   this Court, and which we respectfully submit really is the

1    answer to this case.

2          The Rosa case, and if I can, Your Honor, I brought

3    some boards along and I've given proofs to my friends.

4          The Rosa case, I think really these are the quotes

5    that the Court needs to focus on the Rosa case.  But let me

6    describe what happened in Rosa, and I'll return to the podium.

7          THE COURT:  Yes.  So that your argument can be kept

8    as part of the record, and those on the phone can at least hear

9    you.

10          MR. CARLINSKY:  Your Honor, in Rosa you had three

11    banks.  Two that were in receivership and a third bank which

12    was not.  The assets of the first bank in receivership went to

13    the second bank, as well as an assumption of liabilities.

14    Those assets and liabilities were then sent to a second bank,

15    which was in receivership.  And then, ultimately, were assigned

16    to a third bank, which was not in receivership.

17          The argument before the Third Circuit, and first the

18    District Court, was, does the jurisdictional bar apply?  And

19    what Rosa clearly does is it looks at 1821 13 d -- I always get

20    the numerals wrong -- but looks at the two provisions of the

21    jurisdictional bar and asks the question, to which institutions

22    does that jurisdictional bar apply?

23          And what the Third Circuit tells us clearly,

24    unequivocally, and we submit it really is case over on this

25    issue is, as to the two institutions in receivership, the bar

1    applies.  But the Court draws a sharp distinction as to claims

2    against the institution not in receivership, the bar did not

3    apply.

4              And if I may come back now to the board, these are

5    the two quotes out of Rosa.  The Court says:

6              "The language of the bar simply states that it

7    applies when there is an institution for which RTC has been

8    appointed receiver.  Thus, the issue at bar is whether at the

9    time the case came before the District Court RTC has been

10   appointed receiver of the institutions."

11             And then the Court draws the distinction I was

12   alluding to.

13             "At the time the complaint was filed, the successor

14   bank, bank number 3, was in conservatorship, not receivership.

15   Thus the successor bank was not then a depository institution

16   for which the corporation has been appointed receiver."

17             The Court goes on, if there were any doubt in that

18   language, the Court said:

19             "We do not believe claims against the successor bank

20   fall under 1821(d)(13)(D)(1), because they seek neither payment

21   from nor determine a right with respect to the assets of the

22   depository institution for which RTC has been appointed

23   receiver.  Nor does the second prong of the bar, bar these

24   claims.  This is so because we construe the relating language

25   of that clause to refer to claims against the very institution

1    that are challenged, which must be an institution for which RTC

2    has been appointed receiver."

3          We have essentially the exact paradigm as in this

4    case.  The third institution here is an assignee of assets.  If

5    you trace the lineage of those assets, surely they go back to

6    an institution in receivership.  But the fact that the

7    institution which is the assignee of the assets is not in

8    receivership, according to the Third Circuit says, no bar.

9          That's our situation here, Your Honor.  What was

10   startling was, frankly, in their reply the FDIC ignores Rosa.

11   They say, Judge, you should look at this case called National

12   Union, which is subsequent from Rosa.  And, Your Honor,

13   National Union, frankly, has nothing to do with the issue of

14   the jurisdictional bar as it applies in this case, or

15   potentially applies in this case.

16         But what's more, Judge, if there were any doubt as to

17   when the bar applies, when the bar doesn't apply, and the whole

18   purpose behind Firrea, the whole purpose that Mr. Califano

19   fails to really point out, would put before the Court -- let me

20   just go in order.

21         This is the New Rock Asset Partners case, a 1996

22   decision in which the issue here was whether Firrea applied, so

23   that the FDIC would have jurisdiction in Federal Court.  And

24   the Court in this case says, Firrea was enacted to deal with a

25   banking crisis and to smooth the modalities by which

1    rehabilitation might be accomplished.  In other words, the

2    congress wanted to have a fund so claims against the RTC or

3    that institution, direct claims that funneled through the

4    administrative process, and the Third Circuit says:

5         "It is clear to the Court that this policy is not

6    advanced in any significant way by retaining Federal

7    jurisdiction, once the failed bank's assets have been assigned

8    to a private company."

9         Here, Chase.  We have the FDIC v. McFarlane case out

10   of the Fifth Circuit.  Again, right on point, holding that the

11   bar doesn't apply "When the FDIC relinquishes ownership, the

12   procedures governing its role as a receiver no longer apply."

13        And we have the Henrich case out of the Ninth

14   Circuit.  And I want to talk about the Henrich case, because,

15   again, let's just look at what the FDIC has previously told,

16   not this Court, with all due respect, the United States Supreme

17   Court.  In its petition for certiorari in the Henrich's case,

18   and this is right out of their brief, Judge.

19        And what's interesting is, again, in their reply,

20   they treat it with the back of the hand footnote that says, oh,

21   ignore the Henrich case.

22        But this is what they told the U.S. Supreme Court.

23   In Henrich, in 2007.

24        "The jurisdictional bars through Firrea do not apply

25   to suits that are brought, not against the FDIC, but against an

1    assignee of an asset formerly held by the FDIC."

2            That is exactly our case.  And they also added

3    "Section 1821(d)(13)(D) does not apply to claims that are not

4    susceptible to resolution through the administrative

5    procedure..."   And I've highlighted the language.  "...such as

6    claims against a private party who hold an asset that was once

7    held by an FDIC receivership.  In that circumstance, there is

8    no administrative claims procedure to exhaust, because that

9    procedure governs only claims against the FDIC receivership.

10   Once the receivership transferred an asset to the third party,

11   the asset is no longer an asset of the depository institution

12   for which the corporation has been appointed receiver."

13           Those were the FDIC's words.

14           And not to overstate it, but the last point I would

15   make, Your Honor, is, if there was still even a shadow of a

16   doubt as to what Rosa stands for, here's the Third Circuit in a

17   case called Hudson United Bank, describing what their holding

18   was in Rosa, in plain and simple terms.

19           And Hudson is 43 F.3d 843.  And at 848, the Third

20   Circuit says -- I'm sorry let me go back a page.  This is

21   actually at -- yes, 848, footnote 10, the Court talks about

22   Rosa and says the following.

23           "Thus with respect to this two-part subdivision..."

24           Referring specifically to romanette i and ii.

25           "...we held (i) applied..."

1          Meaning romanette i.

2          "...applied only to claims against failed

3    institutions, while (ii) applied to claims against failed

4    institutions specified in (i), as well as to claims against the

5    receiver of such institutions."

6          The Court goes on to say:

7          "The jurisdictional bar of 1821(d)(13)(D) extends

8    explicitly to claims against the receiver, as well as to those

9    against the depository institution, and even concludes in its

10   opinion by once again giving a nice sound bite and says:

11         "A single claims procedure is more consistent with

12   our decision in Rosa, which held that claims against the

13   receiver, as well as claims against the failed institution,

14   were subject to the statutory exhaustion requirement of

15   administrative review."

16         Your Honor, we think the issue is clear as day.  And

17   it is that jurisdictional bar which is the pretense for the

18   FDIC's motion to intervene.  If they cannot satisfy that

19   element, we respectfully submit, they should not be allowed to

20   intervene into the turnover proceeding.  They should not be

21   allowed to cause the additional delay that will invariably

22   result if we're now stayed in this Court and we have to proceed

23   in Washington, and we ultimately have months, and months, and

24   months of additional delay.

25         I'll hold my other remarks, if I may, until we get to

1    the stay motion, unless Your Honor has any questions.

2         THE COURT:  No.  But tell me more about the -- their

3    assertion that they otherwise have an interest in the adversary

4    through their proof of claim assertion.

5         MR. CARLINSKY:  Well, I was looking at the proof of

6    claim assertion, and I may have to defer to Mr. Kirpalani on

7    that issue.  But what I would say is this, Your Honor.  They

8    have not taken any action.  What they've told the Court, as I

9    heard Mr. Califano is, we have a right, we may have a right

10   that we want to assert.  We may have a right to tell JPMC not

11   to pay this deposit.  We have a right.

12        Well I think about it this way.  Judge, there were

13   lots and lots of deposits that went from WMI to JPMC.  Let's

14   assume my mom was a depositor, she goes to the ATM, she goes to

15   take out a hundred dollars from her account and it only gives

16   her eighty.  She goes to Chase and says, you owe me $20.

17        Is Mr. Califano seriously contending that, wait a

18   minute, we have a potential right to take back that account,

19   therefore, Mrs. Carlinsky -- oh, has a different last name than

20   me, but is it seriously contended she has to file a claim, a

21   proof of claim, go through the administrative process and

22   bring her suit in a D.C. Court?

23        I think all of these suggestions, well we might have

24   this claim to pull back the account.  We have this proof of

25   claim where we've protected, we might have some claim of

1    setoff.

2            That's not the stated basis for which they asked to

3    intervene here, Judge.  They said they needed to do so under

4    <u>Firrea</u>.  That's the motion before the Court.  And we suggest

5    that they're now just trying to dance around the fact that <u>Rosa</u>

6    stands in their way.

7            Now if I could just ask Mr. Kirpalani to address Your

8    Honor's specific question.

9            THE COURT:  Thank you.

10           MR. KIRPALANI:  Good morning, Your Honor.  Susheel

11   Kirpalani from Quinn, Emanuel.  Just in response to your

12   question about this Section 9.5, what I would call the yank a

13   deposit provision that the FDIC reserved its rights to do in

14   the purchase and assumption whole bank contract.

15           First of all, there's something that's being lost in

16   all of this.  There's only one bank that was ever subject, even

17   just for a nanosecond to the FDIC's regulatory authority, and

18   that was Washington Mutual Bank, not the subsidiary bank

19   Washington Mutual FSB, which, frankly, and this is really

20   important, Your Honor, that's where 3.7 billion dollars is.

21           It's not at the entity that, even in their proof of

22   claim they say they would potentially have some sort of setoff

23   right relating to tax refunds.

24           It's important, Your Honor, also it's in the

25   magnitude.  These tax refunds, for their setoff rights, is

1   about 240 million dollars, max, from what's there.

2        That's six percent of the deposits that's at issue,

3   and it's only against the entity that was once, for a

4   nanosecond, in receivership, not against the FSB bank, the

5   stock of which was acquired by JPMorgan Chase.  So this yank a

6   (sic) deposit provision -- excuse me, the yank a deposit

7   provision doesn't even apply to deposits that were down below

8   at the FSB level.

9        And, secondly, Judge, and I'm sure this one's not

10  going to be surprising to you, you know, with all due respect

11  to the FDIC and their contract here, Section 9.5, I don't see

12  this as having, you know, a get out of jail free card with

13  respect to the automatic stay.

14       It would have to come here first.  They would have to

15  come here and say we want a yank a deposit that's property of

16  the estate, and pull it back, and not let JPMorgan turn it over

17  to the estate.  It would have to come here, and I believe the

18  FDIC has even admitted that to us, Your Honor, they would have

19  to come here and ask Your Honor to something.

20       MR. SACHS:  Your Honor, Robert Sachs from Sullivan

21  and Cromwell representing JPMorgan Chase.  We support the

22  FDIC's motion to intervene in the turnover action, and we also,

23  as Your Honor is aware, have filed a motion independently, in

24  case it's denied, to stay that action.

25       THE COURT:  Yes.

1        MR. SACHS:  And we filed this morning, though it's

2   not on for today, a motion to withdraw the reference in

3   connection with that action on the basis of the <u>Firrea</u> bar.

4   But I'd like to respond, perhaps from our perspective to --

5        THE COURT:  Reference of which adversary, the

6   turnover, or both.

7        MR. SACHS:  Both -- both adversaries, Your Honor, on

8   the basis that both are barred under <u>Firrea</u>, and involves

9   substantial questions of banking law that need to be resolved.

10       But I'd like to address the two questions you posed

11  to Mr. Califano, in the context of the issues that need to be

12  resolved in the turnover action, and why they implicate not

13  only the rights of the FDIC, but they squarely implicate the

14  rights of a determination of the assets of the institution in

15  receivership.

16       And under 1821(d)(13)(D)(1), there's been discussion

17  about claims, but there's not been a discussion about the other

18  part of subpart (1), which is that it applies to any action

19  seeking a determination of rights with respect to the assets of

20  any depositary institution for which the corporation has been

21  appointed a receiver.

22       Adjudication of the turnover action in this context

23  is going to require a determination and adjudication of those

24  rights.  The debtors assert that these are deposit accounts.

25  But we have said they are not deposit accounts.

1     There are substantial issues as to whether these are

2     deposit accounts, whether the -- what the source of funds is in

3     those accounts, if they are deposit accounts, or if they're

4     not.

5     Whether the funds are capital contributions.  Whether

6     in fact there are any funds, or whether this is simply a book

7     entry transfer offset by corresponding book entry transfers,

8     and whether there was any delivery of funds at all.  All those

9     are going to be issues that need to be resolved as part of the

10    determination --

11    THE COURT:  And how do they implicate the FDIC

12    interests?

13    MR. SACHS:  Because they go to whether something is

14    or is not an asset, was or was not an asset of WMB at the time

15    of receivership.

16    If the debtors are correct that this was -- and I'll

17    explain why that then gets around to effecting the rights of

18    the FDIC, because the character of what these were or were not

19    will dramatically effect whether there are -- whether these are

20    -- let's assume for a minute, Your Honor, that these are not

21    deposit accounts, that we are correct that these were not

22    deposit accounts that were there.

23    The FDIC has the right, at that point in time, to

24    pull the money back, if they want to, potentially under the PNA

25    agreement.

1          In addition, it effects that rights of potential

2    purchasers -- I'm sorry, potential creditors of WMB, not WMI,

3    if in fact these were assets of WMB, not assets of WMB not

4    accounts that were at WMBFSB as the debtors claim.

5          THE COURT:  Well let me ask a question, if it is

6    determined that they are not deposit accounts, did JPMC buy

7    them?

8          MR. SACHS:  JPMC purchased all -- essentially all

9    assets.  So depending on what they are, yes, they probably

10   purchased whatever they are.  However, there are different

11   consequences that could flow from the determination as to what

12   they are.  So let me give you a for example, Your Honor.

13         The 3.7 billion dollars that the debtors throw away

14   and say, oh, this is just the -- that's grandma's checking

15   account at WMBFSB.  Well they're substantial issues.  That's

16   not grandma's checking account.

17         This was something that they claimed to be a deposit

18   account that they, in the week leading up to receivership,

19   purported to create for the first time by book entry transfer

20   of funds that have to be done and corrected in three or four

21   different steps.  Corresponding with an immediate offset of a

22   corresponding book entry transfer that immediately loaned the

23   supposed funds back to a different institution.

24         There's substantial issues as to what that is and

25   where those funds, if there are funds at all, are.  If those

1  funds were the funds of -- the assets of WMB, as opposed to

2  assets at WMBF -- or a deposit account at WMBFSB, that could

3  have a significant impact on everyone's rights with respect to

4  that, including JPMorgan Chase.  And one of the reasons that we

5  filed an interpleader claim is to be sure that nobody is

6  subjected to conflicting liabilities.

7        The FDIC is one such party.  But going back to the

8  issue, why do they have -- this is an ongoing receivership by

9  the FDIC for this -- this is not like Rosa, something that was

10  in the past and was overdone.  This is a case with an ongoing

11  receivership by the FDIC of this institution.

12        And any determination which was required for the

13  determination of the turnover action must determine whether

14  these were or were not assets of the institution.  That's an

15  essential requirement of a determination of this.

16        It by definition has to implicate the FDIC's

17  interests, because that has to be determined to resolve this

18  claim.

19        But let me go on and readdress one other -- two other

20  issues.  You asked, aren't they just asking for damages.  Well

21  that's not what they asked for in the other action.  If you in

22  fact look at the proof of claim that in fact they filed in the

23  administrative process, and, Your Honor, I should step back a

24  second.  We have an active, ongoing administrative process

25  going on here.

1       They're coming to you and asking, Your Honor, we want

2   these "deposit" accounts.  Well they're already raised an issue

3   administratively for the deposit accounts and they've

4   challenged that in the DC action.  At this point in time, their

5   claim to those deposit accounts has been disallowed.  They have

6   no claim for those deposit accounts, unless and until they get

7   the determination of the FDIC overruled in the District Court

8   in D.C.  Because otherwise you would be saying the provisions

9   of Firrea have no impact whatsoever.

10      They went and claimed these deposit accounts as

11  theirs.  They did file a proof of claim, and it was disallowed.

12      Now I'm not telling you they may not succeed in the

13  D.C. action.  But you can't independently circumvent that

14  action in order to separately adjudicate that.  But look at

15  their claim.  If you look at their proof of claim, which has

16  been submitted to Your Honor, under the deposit claims they

17  specifically say, they recite the conflicting issues and they

18  say --

19      THE COURT:  Give me a cite.  And is this attached to

20  your --

21      MR. SACHS:  Well let me tell you where these

22  different things are.  They're in different places, Your Honor.

23  The proof of claim at one place is exhibit 4 to the FDIC's

24  motion

25      THE COURT:  I have it.

1          MR. SACHS:  And the D.C. complaint is exhibit 1 to

2     the FDIC's motion.

3          THE COURT:  Okay.

4          MR. SACHS:  And, in fact, the D.C. complaint largely

5     cribs the administrative claim.  But what they seek -- they do

6     seek damages as an alternative relief.  But what they seek is

7     to have their claims re-adjudicated in that Court.  And if you

8     look at their claims, and I'm reading now, the deposit account

9     portion of it is paragraph 43 through 46.

10          And it talks in there about, and let me just find it.

11          "Without prejudice to WMI's position that it is a

12     depositor..."

13          THE COURT:  Where are you reading --

14          MR. SACHS:  I'm sorry, I'm reading at paragraph 45,

15     Your Honor.

16          THE COURT:  Okay.

17          MR. SACHS:  Of -- and, again, this is paragraph 45 of

18     the proof of claim.

19          THE COURT:  I have it.

20          MR. SACHS:  (Reading)

21          "Without prejudice to WMI'S position that it is a

22     depositor of JPMorgan Chase, claimants hereby assert a

23     protective claim for the outstanding balance on each of the

24     debtor deposit accounts."

25          And then it goes on from there.

1        So they are asserting a claim to ownership of the

2    deposit accounts in the administrative proceeding.  That claim

3    then was disallowed.  And that's what they're claiming in the

4    turnover action, we own the funds in the depositor accounts.

5        But it's alleged deposit accounts.  That claim was

6    disallowed.  In the D.C. action, which is exhibit 1 to the

7    FDIC's motion.  They seek a de novo determination of the

8    disallowance of that claim.  And, alternatively, that's Count

9    1, and alternatively in Count 5 they seek to require the FDIC

10   to redetermine their claims.

11       That's Count 5.  And so to say that they were seeking

12   in the D.C. action and through the claims process solely

13   damages against the FDIC, is a mis-characterization of the

14   scope of what they are asking for.

15       THE COURT:  Well, wait a minute, I'm looking at Count

16   5, and it seems to deal with the tax refunds.  Am I at the

17   wrong exhibit?  I'm sorry, I'm on exhibit 2.  Sorry.

18       MR. SACHS:  Count 5 declaration that the FDIC

19   receivers disallowance is void.  Sorry, it's page 27 --

20       THE COURT:  I have it.  All right.

21       MR. SACHS:  Again, if Count 1 and Count 5, Count 5

22   the end says:

23       "Therefore, the FDIC receivers disallowance should be

24   declared void, and the FDI receiver should be required to

25   reconsider plaintiffs proof of claims."

1          And, again, the proof of claim raises directly the

2     issue of, is this a deposit account, who owns it, if it is,

3     etcetera.

4          All of those issues are common to the two proceeding.

5     When we get to the issue of the bar and the stay, we can

6     address that more fully.  But in terms of looking at whether

7     the FDIC has an interest as these things, it directly is

8     implicated, because the turnover action rests fundamentally

9     upon a determination of what this is, and that it belongs to

10    the debtors in this case.

11         And that directly impacts what is already at issue in

12    the proof of claim process, both administratively and in D.C.

13    For that reason it implicates the bar, but in terms of

14    commonality and interest it directly relates to that issue, as

15    well.

16         And I think on this motion, I'll sit down and let Mr.

17    Califano speak further.  Unless you have any further questions

18    for me.

19         THE COURT:  No more.

20         MR. CALIFANO:  Your Honor, if I may.  I, you know, I

21    argued intervention, Mr. Carlinsky argued stay.  I still

22    haven't even gotten a chance to argue my stay motion.

23         THE COURT:  Yes --

24         MR. CALIFANO:  There are a number of things that he

25    had said that are just plain wrong.  And I'd like to address

1   it, but I don't know if you want to address it in the

2   context --

3           THE COURT:  I want to deal only with the motion to

4   intervene first.  Okay.  Are you done --

5           MR. CARLINSKY:  I was going to ask Your Honor if I

6   can respond to the remarks that we've just heard, very, very

7   briefly.  There are three points that I'd just like to point

8   Your Honor to.

9           THE COURT:  Yes.

10          MR. CARLINSKY:  Thank you, Your Honor.  First of all,

11  I think as Your Honor can appreciate, and as the FDIC itself in

12  its brief at page 3, it's opening brief, admitted, the D.C.

13  action was filed by the debtors because it was required to.

14          In fact the FDIC's exact words were:

15          "as they were required to do under Federal law."  We

16  filed that action because the proofs of claim were disallowed.

17  Had we not filed that action, we would have run the risk of

18  forfeiting claims and been prejudiced.  Why did we file that

19  action, Your Honor?  Because the FDIC in its disallowance

20  letter, inciting among the reasons why it disallowed the

21  claims, it said, you're suing the wrong party.

22          It's a third party you need to sue, i.e. JPMC.  This

23  is the FDIC's notice of disallowance January 23rd, 2009.  And

24  it says, "The receiver has determined to disallow your claim

25  for the following reasons."

1          And among it is, "They appear to assert claims

2    against a third party."

3          THE COURT:  Well that's only one of the reasons

4    cited.

5          MR. CARLINSKY:  Well -- yes, it is.  But the only

6    third party that we could think of that they were referring to

7    here is JPMC.

8          THE COURT:  Well, I mean, they disallow it for other

9    reasons.

10         MR. CARLINSKY:  Yes.  And I recognize this is

11   probably something called boilerplate.  But so the claim is

12   disallowed, we filed the D.C. action to preserve our rights.

13   And, in fact, it was a place holder.  It was a place holder

14   filed by us.  We turned to the FDIC and we basically said, take

15   as long as you want, six months, whatever you need, we really

16   weren't planning on moving forward.

17         This is the Court of exclusive jurisdiction.  This is

18   where we sought to proceed.  And then, the other point I would

19   make that Mr. Sachs highlighted for the Court, but just so it's

20   not lost, in the proof of claim, we couldn't be more clear.  We

21   said, and this is at paragraph 45 that was read to the Court.

22         "Without prejudice to WMI's position that it is a

23   depositor of JPMorgan Chase, claimants hereby assert a

24   protective claim."

25         A protective claim.  We did what we had to do

1    responsibly as fiduciaries.

2          Now we're somehow being told, you have to proceed in

3    that Court and will be penalized for having filed in that

4    Court.  And the last thing I would remark on, Judge, is what we

5    heard from JPMC's counsel right now is a preview --

6          THE COURT:  I'm not hearing the -- I'm hearing the

7    intervention.  Okay.

8          MR. CARLINSKY:  I'll sit down.

9          THE COURT:  Does the FDIC want to respond on --

10          MR. CALIFANO:  Yes.  Your Honor, I think Mr.

11    Carlinsky just made my case.  I mean, just like the FDIC

12    doesn't want to interfere in the administration of this

13    bankruptcy case, this is not the place for it to be determined,

14    with all due respect, as to whether the FDIC's disallowance of

15    the claim was proper.

16          Yes, we said they had to file a claim.  They had to,

17    under Federal law.  They had to file a lawsuit, after the

18    disallowance, they had two place where they could file it

19    properly.

20          One is the District of D.C., one was the District of

21    Washington.  That is the law, Your Honor.  It's not -- we're

22    not trying to trap them.  It's the law.  It's _Firrea_.  There is

23    subject matter jurisdiction limitations.  Whatever reservation

24    of rights they put in their proof of claim, that doesn't

25    matter, Your Honor.

1       This goes to subject matter jurisdiction.  They are

2   trying to implicate the determination that the FDIC made,

3   they're trying to implicate the purchase and assumption

4   agreement.

5       They're not prejudiced.  This isn't a due process

6   issue.  They have a forum for this to be determined.  They

7   recognized that they had a forum.  It's the District of D.C.

8   And in that District of D.C. complaint with respect to the

9   deposit, and this is as I -- as Mr. Sachs said, exhibit 1 to

10  our complaint.  And at paragraphs 47 through 50, there are

11  allegations regarding the deposit, and the allegations with

12  respect to the deposit reference at paragraph 48 the purchase

13  and assumption agreement and the transfer.  Your Honor, this is

14  -- the deposits are at issue.

15      We've talked about the 9.5 rights.  And what Mr.

16  Kirpalani said about the 9.5 rights and FSB, this is the

17  ultimate issue.  But I don't want to get into the ultimate

18  issue.  But as we put with our reply, Your Honor, it's attached

19  to our reply as the debtors own submission, which shows, not

20  240 million in tax related payments, but 3 billion.  And one

21  other fact, Your Honor, that should probably weigh in whether

22  we have an interest in these deposits, regardless of whether

23  they're nominally at FSB or WMB, that transfer from WMB to FSB

24  allegedly happened three days before the receivership.

25      And we're not even sure whether it happened.  Okay?

1   That's a fact that will be determined.  Where that fact will be

2   determined or should be determined is the District of Columbia

3   District Court.  That's the statutory scheme, Your Honor.

4          I will address the cases in connection with the

5   motion for a stay.  But I do want to say, Mr. Carlinsky said we

6   changed our argument because we missed the Rosa case.

7          Our opening brief, at page 7, cites the Rosa case.

8          THE COURT:  All right.  We're getting far afield from

9   the motion to intervene, aren't we?

10         MR. CALIFANO:  Yes, Your Honor.

11         THE COURT:  All right.  Let me just say with respect

12  to the motion to intervene, the parties really went afield.

13  But the standards, as I understand it, for mandatory

14  intervention are whether the motion was timely, whether the

15  movant has an interest in the adversary, whether the

16  disposition of the adversary may impair the movant's ability to

17  protect that interest, and whether its interests are adequately

18  protected by others already in the action.  I find that is

19  timely.

20         It was filed shortly after the adversary was.  The

21  parties were put on notice that the motion would be filed.  The

22  question of whether or not the FDIC has an interest in the

23  adversary, I think is close one.  This is an adversary dealing

24  with ownership of property claimed to be property of the

25  estate.  Which is not in the possession of the FDIC, but is in

1    the possession of an assignee of the FDIC.

2         Nonetheless, the FDIC asserts that its interest is in

3    protecting the jurisdictional reach of _Firrea_, it is a

4    Government agency that is governed by _Firrea_.  I think really

5    the -- there is enough to state that it has an interest

6    generally in the proceeding.

7         Its interest in protecting _Firrea_ -- the reach of

8    _Firrea_ may not be adequately protected by JPMorgan, which is a

9    private party and has interests of its own.

10        And even though JPM is adequately and vigorously

11   defending this action, I think that there may be a question of

12   whether or not JPM's private interests would extend to

13   protecting the public interest issues that the FDIC seeks to

14   protect.

15        So I will grant -- find that mandatory intervention

16   is applicable and will grant the motion.  Alternatively, it was

17   argued, although not today, but in the pleadings, that

18   permissive intervention may be appropriate because the FDIC has

19   a claim which shares a common fact or law question with this

20   action.  It is a Government agency and the action does

21   implicate a statute it is administering and whether

22   intervention will delay the action.

23        I think permissive intervention clearly is found here

24   for the reasons stated above.  So I will grant the motion to

25   intervene for the sole purpose of prosecuting the action for a

1    stay of the turnover proceeding.  And I think that's how the

2    FDIC limited it.  Have the parties finished their arguments for

3    the motion for stay, or is there more?

4              MR. CALIFANO:  Your Honor, I -- it's my motion, I

5    didn't get a chance to argue it so --

6              THE COURT:  I understand.

7              MR. CALIFANO:  So if you don't mind.

8              THE COURT:  You may.

9              MR. CALIFANO:  Thank you, Your Honor.  Your Honor, as

10   we all know, on September 25th the Office of Thrift Supervision

11   closed WMB and appointed the FDIC as receiver.

12             Almost immediately thereafter, the FDIC entered into

13   the purchase and assumption agreement with JPMorgan Chase.

14   Under which, JPMorgan Chase purchased substantially all of

15   WMB's assets and assumed most liabilities.  Everything, I

16   submit Your Honor, in these two adversary proceedings relates

17   to that transaction.

18             The procedural history here, Your Honor, is that on

19   December 30th, the debtor filed a proof of claim in the

20   receivership that is still pending.  The receivership's

21   pending, not the proof of claim.  And we talked about that and

22   in connection with the turnover action.

23             But, Your Honor, the proof of claim not only

24   addressed the turnover action and the deposits, it related to

25   everything which is part of WMB's proofs of claim.

1          There was the inter company loans, the inter company

2      receivables, the tax claim, the capital contribution claim, the

3      trust preferred claim, the preference claim, the allegation

4      that the sale itself was improper.  The deposit claim we talked

5      about.  And the employer -- employee/employer related costs and

6      insurance claims.

7          Thereafter, on January 23rd, and we talked about that

8      also, the FDIC disallowed that claim.  And whether that's

9      boilerplate or not, or whether there's a meaning in that,

10     hopefully, that will be decided by the District Court.

11         On March 20th, as the debtors were required under

12     Firrea, and, you know, it's -- when Mr. Carlinsky talked, and I

13     don't want to talk about his mother, when he talked about his

14     mother's $20 claim.

15         Well, first of all, if the FDIC had a claim against

16     Mrs. Carlinsky, or whatever your mom's name is, then she would

17     have had to file a proof of -- then she would have been subject

18     to the deposit claim.

19         THE COURT:  Now if you had a claim against her, or if

20     she had a claim against you?

21         MR. CALIFANO:  No, he's talking about the 9.5, then

22     she would have been subject to 9.5.

23         THE COURT:  If she had a claim against you?

24         MR. CALIFANO:  No if the FDIC -- he walked through

25     the deposit definition in 9.5, then she would of been subject

1    to it, as ridiculous as that -- as his example is.  But, Your

2    Honor, the debtors filed the proof of claim, they complied with

3    <u>Firrea</u>.  They filed the proof of claim, and then they filed the

4    litigation that they needed to, to contest that disallowance

5    for the proof of claim.

6           In that District Court action they asserted the

7    capital contribution claim, the trust preferred securities

8    claim, the taxes, the dissipation of WMB's asset, the deposit

9    claims, inter company loans, inter company receivables, and

10   improper asset sales.

11          Thereafter, JPMorgan Chase filed an adversary

12   proceeding.  And I don't think they should have filed that

13   adversary proceeding here.  That's why we're seeking to stay

14   that.

15          In that case, they asserted entitlement to the trust

16   referred part of our sale.  The tax attributes deposit

17   accounts, goodwill litigation, various other assets.

18          THE COURT:  Well let me ask you a question.  Do you

19   think that JPMC could have filed a claim against the FDIC for

20   the assets that it alleges it bought from you?

21          MR. CALIFANO:  Well it filed -- it filed the claim

22   against WMI.  Could they have intervened in the District Court

23   action which is pending?  They did intervene -- I'm sorry, they

24   did intervene, Your Honor.  They have sought to intervene in

25   that pending action.

1     THE COURT:  But in the absence of that, did they need

2     to, if the debtor had not filed a claim with the FDIC but

3     simply filed this turnover action here, would JPM -- and an

4     action or its counterclaim against all the other assets, would

5     JPMC have had to filed a claim in the first instance to the

6     administrative process against the FDIC?

7     MR. CALIFANO:  No, Your Honor, because there isn't an

8     issue.  Do they have a potential indemnification claim under

9     the purchase and assumption agreement?  Yes, they have a

10    potential indemnification claim that's under the purchase and

11    assumption agreement.

12    Because they recognize, or at least I believe because

13    they recognized, that the transaction was at issue, the very

14    transaction was at issue, they sought intervention in District

15    Court action.  That's pending.

16    So on April 27th, debtors filed the turnover action,

17    relates the deposits.  We've talked about how the deposits were

18    implicated in the proof of claim and in the District Court

19    action.  Then they filed counterclaims in the JPMorgan Chase

20    action, which seek avoidance recovery of the capital

21    contributions, we've heard that before.

22    The trust preferred securities, once again.  The

23    preferential transfers.  They seek to avoid the PNA transaction

24    entirely, which is something they sought to do in the proof of

25    claim and the District Court action.  And they seek relief

1    against JPMorgan Chase, including the inter company loans,

2    which were subject of the proof of claim and the District Court

3    action.  So as I said, Your Honor, their own submissions show

4    this all relates to the purchase and assumption transaction.

5         The statute that's implicated, Your Honor, is 12

6    U.S.C. 1821.  And I have the same problem as Mr. Carlinsky, I

7    can't find the jump.  But I believe it's (d)(13)(D).  And that

8    provides:

9         "Except as otherwise provided in the subsection, no

10   Court shall have jurisdiction over any claim or action for

11   payment from, or any action seeking a determination of rights

12   with respect to, the assets of any depository institution for

13   which the corporation has been appointed receiver.

14        "Including assets which the corporation may require

15   from itself as such receiver.  Or any claim relating to any act

16   or omission of such institution or the corporation as

17   receiver."

18        So, Your Honor, clearly we're talking about a dispute

19   over assets which JPMorgan Chase believes were purchased under

20   the purchase and assumption agreement.  And an attack on

21   actions that were taken by the FDIC in its role as receiver.

22        THE COURT:  Well let's first focus on jurisdiction

23   over property in the FDIC receivership.  The property is no

24   longer there.  And do you not agree that the courts have held

25   that once the property leaves the receivership and is assigned

1    to a third party, the <u>Firrea</u> jurisdictional bar no longer

2    applies.

3          MR. CALIFANO:  Your Honor, the cases that were cited

4    by Mr. Carlinsky say something like what he's arguing, but they

5    don't' say what he's arguing.

6          And if you look at the cases that they rely on, and

7    if you look at the decisions in National Union and Village of

8    Oakwood, the jurisdictional bar is not that narrow, Your Honor.

9          <u>Heinrich</u>'s was a case where a private party purchased

10   a note.  It was a quiet title action afterwards.  And that

11   private party sought to assert the <u>Firrea</u> bar.

12         That doesn't apply to an attack on a transaction.

13   And that's what we have here, Your Honor.  And it's not even

14   that you have to read between the lines.  In the proof of claim

15   in the District of D.C. action, they attacked the transfer, the

16   very transfer of the assets.

17         That is a claim relating to an act or omission of

18   such institution where the corporation is receiver.  And

19   they're not just seeking damage --

20         THE COURT:  Well I think their action is against

21   JPMC, and their action asserts that it was the actions of JPMC,

22   not the FDIC, that caused their harm.  Not a claim against the

23   FDIC.

24         MR. CALIFANO:  In their counterclaims they are.  But

25   they made the very same claim against the FDIC --

1          THE COURT:  In the D.C action.

2          MR. CALIFANO:  In the D.C. action.

3          THE COURT:  Well that claim is not before me.

4          MR. CALIFANO:  Your Honor, but the claim that is

5     before you --

6          THE COURT:  Yes.

7          MR. CALIFANO:  -- is potentially inconsistent, and it

8     relates to the actions and it's -- they're asking you to make a

9     determination as to the actions of the FDIC.

10          THE COURT:  No, they're asking me to make a

11     determination as to the actions of JPMC.

12          MR. CALIFANO:  Your Honor, you can't -- you can't

13     separate the two.  You can't bifurcate the two.  Because if the

14     transaction was a fraudulent transfer, as they're alleging,

15     okay, then the FDIC was party to that fraudulent transfer,

16     which is why they made the claims in the District Court action.

17          It goes to the actions that the FDIC took.  It goes

18     to the transfers that the FDIC took.  It has an impact on the

19     FDIC through the indemnification claim, Your Honor.  And we

20     have the very same -- not just the very same facts, not just

21     the same facts, we have these same facts and the same legal

22     theories being asserted by the debtor here, and by the debtor

23     in the district Court action.

24          THE COURT:  But it's against two different parties.

25          MR. CALIFANO:  It is against two different parties,

1   Your Honor.  But that's not, you know, as we've cited in the

2   cases, that's not dispositive of the issue of the First Filed

3   Rule, Your Honor.

4           But --

5           THE COURT:  Well are we on the First Filed Rule?

6           MR. CALIFANO:  No, I'm just saying --

7           THE COURT:  Or _Firrea_ bar --

8           MR. CALIFANO:  But I'm just talking about, they still

9   are -- they still implicate the actions.  It doesn't have to

10  be.  Our reading of the statute in _Village of Oakwood Homes_

11  which we cited, a Sixth Circuit case, which came out after _Rosa_

12  doesn't require that the FDIC be a defendant.

13          In _Village of Oakwood Homes_ we have the -- almost the

14  very same facts that we have here where a claim was asserted

15  against an assuming bank.  That implicates the actions of the

16  FDIC, Your Honor.  And it implicates, in our case, our

17  potential indemnification claim.

18          It's not remote.  They're asking this Court to rule

19  on, with JPMorgan Chase as the nominal defendant, the very same

20  facts and claims they're seeking to assert in the District

21  Court action against the FDIC.

22          This, you know, it's not as limited as Mr. Carlinsky

23  said.  The statute does not limit itself to claims against the

24  receiver.  It limits -- it covers claims related to any act or

25  omission of such institution, or the corporation as receiver.

1      And I think this issue is put to bed in <u>Village of</u>

2 <u>Oakwood Homes</u> which is a recent Sixth Circuit decision.  This

3 is not a remote -- you have to remember the cases that the

4 debtors are citing, there's a remote connection between the

5 cause of action against the non-debtor party or the assuming

6 bank, and the actions of the FDIC.

7      What is being faced here, Your Honor, and the

8 implication, not just in this case, but the implications with

9 respect to the actions of the FDIC, are very broad and very

10 far-reaching.  And the prejudice to the debtor is minimal here,

11 Your Honor.  They're not being denied their day in Court.

12 They're being -- what we're asking is that they litigate these

13 issues in the District Court, as opposed to litigating these

14 issues here.  Which is what <u>Firrea</u> says it must do.

15      Now --

16      THE COURT:  Well talk about the deposit accounts.

17 Are you suggesting that <u>Firrea</u> bars any action by any customer

18 regarding a deposit account?

19      MR. CALIFANO:  No, Your Honor.  But what <u>Firrea</u> --

20      THE COURT:  Why here?

21      MR. CALIFANO:  It doesn't bar it here.  It bars it in

22 the Bankruptcy Court here.  What -- they've already made the

23 claim in the District Court, they don't lose their claim to the

24 deposits if you stay the turnover action.

25      They've asserted the claim --

1          THE COURT:  But is that true under _Firrea_, or are you

2     now on the First Filed Rule?

3          MR. CALIFANO:  No, it's both, Your Honor.

4          THE COURT:  How -- how does _Firrea_ --

5          MR. CALIFANO:  I already -- okay, well the connection

6     with _Firrea_, as the debtors have recognized, in the allegations

7     from the complaint that I read to the Court.

8          They recognized the FDIC asserts an interest in those

9     deposits.  The FDIC's interest -- potential interest in those

10    deposits, which will be an ultimate issue to determined at some

11    point, relates to its role as receiver.

12         There was a reservation, a carve-out from the

13    deposits language, of funds owed to a party who has obligations

14    to the FDIC.  That's in the purchase and assumption agreement.

15         We've asserted a proof of claim here.  They are

16    potentially liable to us.  Potentially, we have an interest in

17    those deposits in our role as receiver.  Under Section 9.5, we

18    have the right to direct JPMorgan Chase, and whether the stay

19    applies or not, we could be in here, Your Honor, fighting the

20    stay on that.  I want the Court to recognize, we have that 9.5

21    right.

22         We have not asserted that 9.5 right.  Because we do

23    not want to interfere with the administration of this

24    bankruptcy case.  Btu there are claims that are to be

25    administered in the receivership, and to be administered under

1    Firrea.

2          They made a claim in the receivership to those

3    deposits.  We disallowed it.  That's being litigated in the

4    District Court.  The deposits are an asset which the FDIC and

5    the debtors recognize, there's no issue, they acknowledge we

6    have asserted an interest in those deposits.  That will be -- I

7    don't want to go into the ultimate issues and the base for

8    that.  Mr. Kirpalani did, I think he was -- I just -- I think

9    he wasn't on all fours with the facts, we could fight about

10   that some other time.

11         But the deposits are at issue in our receivership,

12   Your Honor.  They clearly are at issue.  Made the proof of

13   claim, we denied it, they filed the District Court action.

14         THE COURT:  But are they at issue only because you

15   assert setoff rights?

16         MR. CALIFANO:  No.  They're at issue because they

17   asserted a right to them and we denied that right.  So the --

18         THE COURT:  But --

19         MR. CALIFANO:  It's not just --

20         THE COURT:  Okay.  I understand.

21         MR. CALIFANO:  You understand what I'm saying?  It's

22   administering a claim.  They asserted a right, we disallowed

23   it, they filed the District Court action.  That's the FDIC's

24   claim process, that's what Firrea provides.  And they -- and I

25   want to make clear, the prejudice to them is minimal, Your

1    Honor.

2          Nobody is saying that the FDIC has the absolute right

3    there's no -- it's not subject to judicial review.  There is no

4    due process argument here.  _Firrea_, though, provide -- and in

5    _National Union_ the due process argument is dealt with under the

6    facts, and in _National Union_ they rejected the _Rosa_ -- the very

7    _Rosa_ interpretation, and without belaboring it, it's in our

8    reply brief.  The very _Rosa_ interpretation that the debtors are

9    putting forth, that was rejected by the Third Circuit

10   subsequently in _National Union._

11         The _Village of Oakwood_ case, that determined the

12   issue as to whether the FDIC needs to be a defendant.  But,

13   Your Honor, we need to keep in mind there is a statutory

14   scheme.  The statutory scheme requires in the receivership to

15   file a proof of claim.

16         The FDIC can allow it or disallow it.  The District

17   Court ,if it is disallowed, the claimant has the right to seek

18   de novo review.  Okay.  So it's de novo review of the

19   disallowance and of the claims which underlie it.

20         They have taken advantage of that right.  That case

21   is pending in the District Court.  They are not being denied

22   their day in Court, Your Honor.  What we have here is the

23   debtor not being happy with _Firrea_, not being happy with the

24   way it works.  Saying, I know I'm in the District Court, I know

25   I have to be in the District Court, but I really don't want to

1    be in the District Court, I want to file a turnover action.  I

2    want to file a turnover action against another defendant, and

3    then that may or may not moot the District Court action.

4         What that would require, Your Honor, that if their

5    turnover action goes forward on these sort of terms, that's

6    going to require the FDIC now to make a lift stay motion and

7    start fighting over the very thing that Mr. Rosen talked about.

8    We don't want to do that.

9         We haven't done it for months.  We came in here and

10   the very first appearance, when the JPMorgan Chase stip was on,

11   and we said, we're fine with the deposits going, as long as our

12   rights are preserved, we don't want to interfere.

13        That fell by the wayside for reasons that are not,

14   you know, not clear to us, but it's not our issue.  But, Your

15   Honor, we are here to protect our statutory framework.  And

16   _Firrea_ provides for a claims process.  They may not like the

17   claims process, but, you know, what they're -- they have to go

18   to their congressman, it's not here.

19        There is a claims process, they've recognized the

20   claims process, they've made the very same claims.  And it's

21   every claim in the counterclaims, it's the deposits claim and

22   the turnover, they've made those claims here.  We're not

23   seeking dismissal.

24        Your Honor, what we are are seeking is that this

25   litigation, which shouldn't be here, is stayed while we

1    determine what happens in the District Court litigation.

2         There's no prejudice to them.  And also, Your Honor,

3    there's, you know, the only Court that can really adjudicate

4    the interests of all the parties here, is the District Court of

5    the District of Columbia.

6         The FDIC is a defendant in that litigation.  We're

7    part of that litigation, we're litigating it with the debtors.

8    All right?  JPMorgan Chase has sought to intervene.  We don't

9    know whether that intervention will be granted or not.  But if

10   Your Honor was concerned about that intervention, you could

11   transfer these actions to the District of Columbia.

12        The fact that -- there is some very significant

13   policy concerns here, Your Honor.  And it's not just Firrea.

14   And it's not just the fact that we could have inconsistent

15   rulings here, Your Honor.  We have a debtor who's not happy

16   with Firrea, follows Firrea and then tries to find another back

17   door avenue.  We have a place for this litigation to be

18   determined.  We have a place where all the parties could be

19   present.

20        And that's where these issues need to be determined.

21   We cannot have two separate courts dealing with the very same

22   operative facts and the very same legal theories where one --

23   you know, without all the parties.  It just doesn't make sense.

24   And talk about effective administration of the estate, I can't

25   see how the estate is better administered by having a lawsuit

1    proceed with estate assets, where the Court really can't grant

2    compete relief.

3         Because not all the parties would before Your Honor.

4    And where it's fatally flawed on a subject matter jurisdiction

5    basis, and I go back to this is subject matter jurisdiction.

6    The parties can't waive it, the parties can't consent to it.

7    Firrea is jurisdictional Your Honor.  What I'm asking, give

8    them their day in Court.  But their day in Court is not here,

9    their day of Court is in the District of Columbia.

10        Thank you.

11        THE COURT:  Thank you.  Yes.

12        MR. SACHS:  Again, Your Honor, Robert Sachs on behalf

13   of JPMorgan Chase.  Let me start -- I'd like to address both

14   the jurisdictional issue and the first filed issue, as well,

15   and the principals there.  But let me start with, again, a

16   question that you asked, because I think -- I think the premise

17   of your question was incorrect.  And your question was, isn't

18   the action here different from -- the claim against JPMorgan

19   Chase different than the claim against the FDIC, because the

20   claim here is based upon JPMorgan Chase's conduct, not based

21   upon the conduct of the receiver.

22        And the answer is no.  The claim here against

23   JPMorgan Chase, in substantial part, is not based upon JPMorgan

24   Chase's conduct at all, other than that it is asserting that it

25   is the owner of property.

1          The issue is identical in both cases.  The issue is,

2     was this property of WMB, the bank for which the FDIC is

3     receiver, or was this property at the time of receivership of

4     the holding company?

5          The claims here asserted by WMI, the debtors, are

6     that it was their property.  The claims that are being asserted

7     by JPMorgan Chase, and perhaps the FDIC as to certain issues,

8     is, no, this was the bank's property.  If that issue needs to

9     be resolved in order -- it is the dispositive issue in all of

10    the claims, whether asserted against JPMorgan Chase, or whether

11    asserted against the FDIC in the claims process and the

12    receivership.

13         If the property is determined to have been not the

14    property of the bank, then it's arguably the property of the

15    debtors.

16         If it's determined to have been the property of the

17    bank, which is the current state of affairs at the moment given

18    the disallowance of the claim, then it is not property in which

19    the debtors have any interest and it is the property we allege

20    of JPMorgan Chase.  So that is at the core, it is a common

21    issue at the core, it is the dispositive issue at the core of

22    both sets of claims.

23         THE COURT:  Well if you put it that way, then don't I

24    have exclusive jurisdiction to determine what is property of

25    the estate?

1      MR. SACHS:  No, Your Honor.  In fact, it's been

2   determined and I'd refer -- it's addressed here, as well, the

3   <u>Amsave</u> (phonetic) case addresses it directly.  It's cited in

4   the brief.  That is the issue under -- <u>Firrea</u>, there is general

5   bankruptcy exclusive jurisdiction, <u>Firrea</u> is a later enacted

6   statute that gives specific authority and exclusive authority

7   for determining what is the property of -- again, looking again

8   at 1821(d)(13)(D), it gives exclusive jurisdiction, again, a

9   later enacted statute, very specific, enacted with the backdrop

10   of bankruptcy in mind, it gives exclusive jurisdiction to the

11   FDIC, the receiver, followed by a claims process that limits

12   you to two courts, District of D.C., or the home Court for the

13   institution, for any action, and then we've talked about 1 and

14   2.

15      And that includes any action seeking a determination

16   of rights with respect to the assets of any depository

17   institution, i.e. with respect to the rights with respect to

18   the assets of WMB and --

19      THE COURT:  That is in receivership.

20      MR. SACHS:  It is in receivership.  But it is right

21   now.

22      THE COURT:  The assets are.

23      MR. SACHS:  No, no, no.  Let's read what it says,

24   Your Honor, because that's not correct.  And, again, that's

25   been -- there is a receivership -- let's be clear here, there

1    is a receivership, it is pending.  So WMB is in receivership.

2    Each claim asserted by the debtors, whether asserted against

3    JPMorgan Chase, or against WMB, the receiver, is dependent upon

4    a determination as to whether a particular asset, let's use the

5    deposit account since -- the accounts that they claim are

6    deposit accounts.

7           There's a substantial question as to whether if these

8    are deposited accounts and if there are funds in those

9    accounts, whether those funds were in fact the property of the

10   debtors, i.e., the holding company parent, or the property of

11   the bank.  For example, are they tax funds in those accounts

12   that belong to the bank.

13          That is a determination that must be made under

14   _Firrea_, given both the pendency of the receivership, and, I

15   would suggest, _Oakwood_ as well, Your Honor, which I'll address

16   in a moment specifically, because it is an action seeking a

17   determination of rights with respect to assets of any

18   depository institution.

19          THE COURT:  Well you're suggesting that so long as it

20   involves an asset that was owned by a depository institution

21   that is in receivership, jurisdiction lasts forever.  But

22   wouldn't that make the last clause of the first paragraph

23   superfluous?  Because it says, "including assets which the

24   corporation, the FDIC, may acquire from itself as such

25   receiver."

1    Why would that be there, if jurisdiction remained as

2    long as the asset was in the depository institution from the

3    beginning?

4         MR. SACHS:  I'm not saying that forever that it

5    matters.  But I am saying that while, as in this case -- let's

6    step back a minute and look at what they're -- involve in this

7    case there is an ongoing administrative proceeding.  There is

8    both the -- there is a <u>Firrea</u> proceeding that is ongoing as to

9    these assets.  Your Honor, at the moment, they filed a claim to

10   these very assets that was disallowed.  If Your Honor were to

11   take concurrent jurisdiction over the same claim that must,

12   under <u>Firrea</u>, be adjudicated in D.C., you are raising starkly

13   the possibility of inconsistent rulings.

14        Let's assume, for a moment, that in the proceeding in

15   D.C. they proceed and it is determined there that the supposed

16   4 billion dollars in deposit accounts in fact are accounts that

17   include 3 billion dollars in tax refunds that belong to WMB,

18   not to WMI, no matter how WMI want -- the debtors want to

19   characterize it.

20        You are suggesting that you could independently

21   determine that issue and reach a different conclusion.  And

22   that is exactly what <u>Firrea</u> is designed to prevent.  To prevent

23   any other Court from adjudicating the question of whether

24   something is or is not an asset of the institution over which

25   the FDIC has put in receivership.

1      And in this case, there is going to be a

2   determination in D.C. as to each and every one of these issues.

3   And, again, the claims against JPMorgan Chase are founded upon

4   a determinant -- a requirement that a Court determine that

5   these were assets of WMI, not assets of WMV, and, therefore,

6   and therefore not transferred to JPMorgan Chase.  So looking at

7   their adversary complaint, and looking at the D.C. complaint,

8   for example, the taxes issue.

9      They seek a determination in D.C. that the taxes

10   belong to them.  They seek a determination in their

11   counterclaims in the adversary proceeding here that the taxes

12   belong to them.  The same determination that is required to be

13   made.

14      And under 1821(d)(13)(D), that is a determination

15   that must be made through the exclusive jurisdiction of Firrea.

16   It goes to each and every asset practically that is in their

17   counterclaim.  Trust preferred securities.  They seek a

18   determination in the D.C. action, and through their proof of

19   claim that that is -- those are assets that belong to them, and

20   that they're entitled to that determination in the

21   counterclaims here.  They simply seek the same determination,

22   and then say, and because JPMorgan Chase has it, they have to

23   give it back to us.

24      But it is founded upon the threshold determination

25   that this was an asset of theirs, as opposed to an asset of

1    Washington Mutual Bank, the subsidiary at the time of

2    receivership.

3         So each and every one of their claims, Trust

4    Preferred Securities, the accounts, employee benefit plans,

5    inter company payables and receivables, contributions, and then

6    vendor contracts, as to who owns vendor contracts.  Each and

7    every one is identical and is founded upon for resolution, the

8    identical factual and legal determination.

9         And if --

10        THE COURT:  Then if you felt that the jurisdictional

11   bar of <u>Firrea</u> required that all issues be decided by the D.C.

12   Court, why did you file your adversary asking me to determine

13   these issues?

14        MR. SACHS:  We actually didn't, Your Honor.  In the

15   adversary we filed, the first request we made is that these

16   issues in our request for relief, we claim that these issues

17   should be resolved by the D.C. Court.  And solely to the extent

18   they are not resolved by the D.C. Court, should they be put

19   here for resolution by Your Honor.

20        There are what I would call a few cats and dogs that

21   are not at issue.  None of the big stuff we're talking about

22   that are at issue.  And of course we were under time lines to

23   file claims to protect our interest.  But, fundamentally, in

24   filing the adversary proceeding, our first request, our

25   fundamental request is that these issues should be resolved, to

1    the extent they are disputed, by the Court in D.C. as part of

2    _Firrea_'s process.  And only to the extent they are not resolved

3    there, or in light of the outcome there, should there be a

4    determination here.

5          I mean, Your Honor, going on, just one more, they

6    claim, you asked Mr. Califano about it, they attack the

7    transaction by which the receiver -- the PNA transaction.  They

8    claim it is a fraudulent conveyance.  They claim it was an

9    improper transaction.

10          What could be -- you can't adjudicate just -- the

11    transaction is at issue.  And what could be clearer under

12    1821(d)(13)(D), it's exclusive jurisdictional bar as any claim

13    relating to any act or omission of such institution or the

14    corporation as receiver.

15          They are challenging the act of the receiver in

16    electing to sell assets and liabilities to JPMorgan Chase under

17    the PNA agreement on certain terms and conditions.  They

18    challenge the terms and conditions.

19          That is squarely, there's no jurisdiction in this

20    Court to determine that claim.  It's in their proof of claim.

21    It is in the D.C. action.  And it is -- there couldn't be

22    anything that is more squarely within the scope of the

23    jurisdictional bar than that.

24          Every single one of their claims, again, rests

25    foundationally upon a determination as to whether something was

1    or was not an asset of the bank at the time of receivership,

2    and/or the conduct of the FDIC in deciding what to do with the

3    assets of the receivership institution, WMB, and, therefore,

4    falls squarely with 1821(d)(13)(D).

5            There's never been, not withstanding what you've

6    heard from the other side, there's never been a case like this.

7    There's no case where somebody is -- a debtor is simultaneously

8    pursuing a claim under Firrea, through Firrea's 1821(d)(13)(D)

9    claim process, and trying to circumvent that claim

10   simultaneously to have the same issues resolved by a different

11   Court that it prefers.

12           It simply prefers to have the Bankruptcy Court

13   resolve it, as opposed to having the D.C. Court, where they

14   filed the action, resolve it.  But it's never been done before.

15   There is no case along those lines.

16           The cases that are cited involve factual

17   circumstances that are entirely at odds here.  The only one

18   that is even remotely close is the Village of Oakwood case,

19   Your Honor.  And in that case, it's a case where the Sixth

20   Circuit said, of course the bar applies to claims against the

21   successor, the people who stand in the shoes of the FDIC who

22   acquire the assets from the FDIC.

23           Because, if not, it would undermine the entire

24   foundation of the Firrea bar, because you could simply --

25   nobody would enter into a PNA transaction, because they would

1    be subject to all the claims that _Firrea_ requires be brought

2    against the receivership.  So every claim could be brought

3    against the person who is the successor to the interest of the

4    receiver.  They said -- they almost laughed at the argument

5    that it didn't apply in that case.  And it was, again, the same

6    sort of thing.

7         They tried to circumvent the _Firrea_ bar by a bunch of

8    unsecured debt holders, by arguing in that particular case that

9    by suing only the successor bank under the PNA.  And the Sixth

10   Circuit said, no, you can't do that.  But _Rosa_, again, an

11   entirely different case, limited to a narrow section of _Firrea_

12   relating to the claim section of _Firrea_, overruled in

13   connection with other aspects of the decision, as well, but

14   involving a receivership that had been over for years, and

15   years, and years.

16        We have an ongoing, current receivership in this case

17   by the FDIC, and we have an ongoing claims process in this

18   case, which the debtors have initiated by filing their claim.

19   The debtors didn't have to file a claim against the FDIC and

20   the receivership.  If they didn't think they were

21   jurisdictionally required to do so under _Firrea_, they could

22   have elected not to do it.

23        But they did, because they believed and knew they

24   were jurisdictionally required, and that's where they have to

25   litigate this issue.

1       Let me move on, if I could -- and in terms of just

2    efficiency and sense, the D.C. Court is the only Court that can

3    resolve all of these issues.  There are these limitations as to

4    imposed by <u>Firrea</u> on adjudicating these issues as to whether

5    thee are or are not assets of the bank.

6       And, as I say, that's going to be outcome

7    determinative for the claims, whether they're asserted against

8    the FDIC or asserted against JPMorgan Chase.  If the Court in

9    D.C. determines that the trust preferred securities are the

10   property of WMI and were not the property of Washington Mutual

11   Bank at the time of receivership, then we have no claim to

12   those assets directly as against Washington Mut -- the debtors

13   in this case, because they weren't the property of the FDIC to

14   transfer to us.

15       And our rights are only derivative of the rights that

16   the FDIC had, which is why everything implicates the rights of

17   the FDIC in this case.  But the only Court that can determine

18   that in one forum and avoid risking inconsistent adjudications

19   is the D.C. Court.  That's where this belongs.

20       Your Honor has three alternatives.  And let me segue

21   in, if I could for a moment, into the question of the First

22   Filed Rule.  Which, of course, as Your Honor's aware, is a

23   discretionary issue, but one that is founded in equitable --

24   strong equitable concerns of having efficient litigation,

25   avoiding duplication and avoiding inconsistent results.

1        That the Court that first acquires jurisdiction be

2   the one that resolves the case.  The D.C. Court is the one in

3   this particular case that should, not only because it is the

4   first to have acquired jurisdiction over the issues here, but

5   it is the only Court that can give complete relief to everybody

6   in a single forum, given the <u>Firrea</u> jurisdictional limitations

7   that exist in any other Court.

8        If you look in this particular case, if you are not

9   to -- Your Honor has the discretion to stay, transfer or

10  dismiss the adversary proceedings here.  In furtherance of

11  that, the FDIC has requested a stay.

12       We have suggested that the proper -- a preferable

13  course may be to transfer these actions to D.C., so they can

14  all be adjudicated together.  But either way, the principles

15  that are applicable are one in the same.

16       They are the efficiency, avoiding duplication and

17  avoiding inconsistent results.  All of those principles are

18  applicable here in spades.  If the Court does not combine these

19  cases, there is the fundamental probability or possibility of

20  -- even if you could avoid the jurisdictional bar, you're

21  talking about the possibility of two different courts resolving

22  the very same legal and factual issues and coming to

23  inconsistent adjudications.

24       This is about as clear a case as there could possibly

25  be for exercise of that equitable discretion to put all of

1    these cases in one place so that the underlying factual issues

2    will be resolved one time, by one Court, with one set of

3    discovery, binding all of the appropriate parties in a Court

4    that indisputably has jurisdiction over all of the claims,

5    including claims for and against the FDIC.

6         THE COURT:  Well, but it currently doesn't have all

7    the parties.  Your motion to intervene hasn't been granted yet,

8    has it?

9         MR. SACHS:  It has not been ruled on, Your Honor, but

10   there, again, there are two ways to deal with that.  One, if

11   Your Honor were to stay this in favor of that, that clearly is

12   something that would be of relevance to the Court there.

13   Number two is, you could transfer these actions to D.C. and

14   thereby have all the parties there.

15        And the third is, I assume, at some point in time,

16   the FDIC could bring us in as a third party in that case, if

17   appropriate to do so.

18        So I don't think there's any serious issue that are

19   -- we will not have a way into that forum, Your Honor.  And,

20   again, you can transfer this and there's no issue, at that

21   point in time.  The only reason we are not a party there is

22   because the debtors have objected to us being a party.

23        Nobody else has objected.  The debtors are the ones

24   who are preventing us from being a party there.  The debtors

25   are the ones who seem to want to litigate the same case in

1     multiple forums.  They don't want -- they don't like <u>Firrea</u>.

2     They don't like the limitations <u>Firrea</u> imposes upon them.  And

3     they want to be in different forums.  And they have -- they're

4     the only ones who have objected to our participation in that

5     case.

6          So I think there's a substantial likelihood that we

7     will end up in that case eventually.  I can't explain why that

8     Court hasn't ruled on it.  We've tried to find out what's going

9     on there, with limited success.

10         The Court there doesn't always have hearings on

11    motion.  Generally does not have hearings, so we don't know

12    when the Court will rule.  We've asked for a prompt ruling,

13    we've conveyed that request.

14         But, again, we are the ones arguing that this case

15    should be adjudicated in that forum, because it is the only

16    forum.  And having this adjudicated in multiple places imposes

17    all of the risks.  But the First Filed Rule and the general

18    equitable principles that underlie it, are designed to prevent.

19    And so, either way, Your Honor, we think that both

20    jurisdictionally this must be resolved in D.C., given the

21    limitations imposed jurisdictionally by <u>Firrea</u>.

22         Or even if Your Honor did not want to rely upon that,

23    that these cases should go there to have a single, consistent

24    adjudication as to whether the assets at issue, the same assets

25    in both claims, are the assets of WMB or the debtors.

1        Because that is outcome determinative as to all of

2    these claims.  Thank you, Your Honor.

3        THE COURT:  Thank you.

4        MR. CARLINSKY:  I scribbled a lot of notes, so I'm

5    going to try to cover as much as I can.  I may jump around,

6    Your Honor.  Mike Carlinsky, again.  Let me first just pickup

7    on the last point that Mr. Sachs was mentioning, which is the

8    D.C. action.

9        That D.C. action is filed under <u>Firrea</u>.  It is a

10   limited action.  And it is an action where the Court has

11   limited jurisdiction.  We oppose the intervention.  Who knows,

12   maybe Mr. Sachs has a crystal ball, but we think that there is

13   a serious issue whether Chase could ever intervene there,

14   because it is under <u>Firrea</u>, and <u>Firrea</u> is limited to claims

15   against the FDIC.

16       But I don't profess to predict what's going to happen

17   there.  What I will say Your Honor that's critical here is, we

18   did not file a claim against the FDIC in Washington for the

19   deposits.

20       As I read before, we filed a protective claim that

21   said, in the event this Court, or in the event we somehow have

22   lost our rights to the deposit, we are preserving that claim.

23   So I think with respect to the deposits, it is truly a misnomer

24   to suggest we filed a claim there.

25       Mr. Sachs made the point that on the deposits, the

1    core issue, and I tried to quote him exactly, was, or is, was

2    this the property of WMB, or was this the property of WMI?

3    Your Honor made the point, isn't that right in my wheelhouse,

4    in the exclusive jurisdiction of this Court.  Answer, yes.  But

5    more fundamentally, why can't that issue, which is a factual

6    issue, which, frankly, as Mr. Kirpalani will talk about after,

7    is before the Court, what is so complicated about that issue

8    that is Court is incapable of deciding that issue?

9         That's a simple one, that's a simple one.  Now, more

10   broadly, what we have heard is Firrea, Firrea, Firrea, as if,

11   my God, this statute is there and no one can move, we're frozen

12   in place by Firrea.

13        Let's remember why Firrea was enacted, and I won't

14   tread over old ground.  But it was enacted so that, when the

15   FDIC takes over an institution, and it's in that crisis mode,

16   it's not attacked from all sides and having to defend itself in

17   litigations all over the world.

18        That's not this case.  And more importantly, we saw

19   the cases.  Rosa is good law.  And Hudson, which is after

20   National Union, tells us exactly what Rosa stands for.  There

21   was a suggestion made, Rosa is a very different case.  The

22   receivership was long over.

23        I urge the Court to read Rosa.  Not only was the

24   receivership of the two -- the first two institutions not over,

25   but the Third Circuit commented, by the time the case came to

1    Court, the Third Circuit, the third institution was in

2    receivership.

3            Yet, the Third Circuit says in <u>Rosa</u>, we look at the

4    jurisdictional bar issue at the time the complaint was filed.

5    Doesn't matter to us that today this case -- this company is in

6    receivership.

7            The question was at the time the complaint was filed,

8    was it in receivership?  No.  The answer was clear.  Therefore,

9    no jurisdictional bar.

10           Your Honor asked another question, although I think

11   Mr. Califano didn't quite get it.  The question was, and I

12   don't mean to -- I think there was a sort of --

13           MR. CALIFANO:  You meant it in a nice way.

14           MR. CARLINSKY:  I meant that in the nicest way.

15   Think about it.  Again, I hate to use my mother's example in

16   vain, but right now, there are depositors out there all over

17   the land that have what they think are accounts at JPMorgan

18   Chase.  What happens if depositor goes to the bank and says,

19   give me my deposit.

20           And Chase says, what deposit?  You don't have a

21   deposit here.  You had a capital contributions, or whatever the

22   answer is.  Are we seriously contending that because those

23   assets have their lineage from a failed institution, that those

24   depositors either have their claims barred because they didn't

25   go through <u>Firrea</u>, or they have to file in the D.C. Court?

1    It's absurd.  And those cases recognize it's absurd.

2  Let me say a word, then, about the Oakwood case, which we've

3  now heard, Oakwood, Oakwood, that's the solution.  Oakwood's a

4  Sixth Circuit case, so obviously it's not binding authority.

5    But, more importantly, here's what happens in

6  Oakwood.  First of all, the assets in question -- and let me

7  take a step back.  The plaintiffs in Oakwood are raising breach

8  of fiduciary duty claims against the FDIC about creating a sham

9  bank.  The opinion says so.

10    The assets, which are the subject of the action,

11  never get sent to the depository institution that's not in

12  receivership.

13    So what the plaintiffs do, because the plaintiffs in

14  that case failed to go through the administrative process, so

15  the bar would stand in contravention, unless they can find a

16  way outside the bar.

17    So they sue a bank not in receivership.  What the

18  Sixth Circuit says is, ut-uh, that's too cute.  Your claim, and

19  the Court says it plain as day, it says, even though the claim

20  is against the FDIC for a fraud, and more importantly, the

21  assets at issue never left the FDIC to go to this bank, we're

22  not going to allow you to bring a claim against an institution

23  where the assets never left the FDIC's possession.

24    So it is a very different case.  The bar applied

25  there because the Court says, this is really about the assets

1   still in receivership, still in a institution in receivership.

2        Your Honor, so the jurisdictional bar, I hope to give

3   the Court comfort, doesn't apply.  There is no _Firrea_ mandate

4   here that says, Judge, you can't act.  And we urge the Court to

5   go forward.

6        Now we get to the issue of first filed.  Again, we

7   are somehow being asked, in essence, to be penalized because we

8   file an action in D.C., as we were required to do.  Now this

9   isn't a case of first filed.  The typical first filed case, as

10  Your Honor I'm sure knows, is Carlinsky sues Califano in D.C.

11  Califano turns around and sues Carlinsky here and is trying to

12  get the second Court to move in advance of the first Court.

13       We filed the D.C. action, as a protective measure.

14  But we want to proceed, we're the plaintiff there, but we want

15  to proceed here with our claim.

16       And the easiest one is the deposit claim.  Because

17  it's bound up in D.C., it is here, it is a core -- it is within

18  the exclusive jurisdiction of this Court.  And our turnover

19  proceeding is a core proceeding of this Court.

20       The last point I would make is, Judge, we heard

21  there's no prejudice -- there's no prejudice.  Well let's just

22  pack up and we'll all go to D.C.

23       And Chase, which of course did file an adversary

24  proceeding here, did file 40 proofs of claim months before that

25  here, Chase, too, is saying, yeah, let's all go to D.C., what's

1    the prejudice?

2          Well there's prejudice.  The courtroom is filled with

3    creditors.  And the creditors are saying, give us our money

4    back.  And what Chase wants to do, because the longer they hold

5    onto those deposits and pay no interest, the longer they

6    benefit, and the worse we are.

7          And so there is prejudice.  And the last point I

8    would make is, in the D.C. action, we also heard a comment, I'm

9    sort of going back to something that Mr. Califano said.  The

10   whole shooting match could be heard down in D.C.  Well, Judge,

11   they're talking out of both sides of their mouth.

12         Because what they did in D.C., the FDIC, they filed a

13   motion to dismiss, and they say your claims, meaning WMI, your

14   claims, the so called claims we -- the whole thing could be

15   decided down there.

16         Your claims, other than the ones for which you

17   submitted proofs of claim, all ought to be dismissed, because

18   they're all barred from -- barred under <u>Firrea</u>.  So what

19   they're doing is, they are prejudicing us.  They're prejudicing

20   us be delaying us, they're prejudicing us by trying to send us

21   to a Court where there are these motions pending.

22         We belong here, this Court has exclusive jurisdiction

23   over the assets.  And we respectfully urge the Court to deny

24   the stay motions, let's move forward and let's get, at least to

25   the issue of the turnover of the deposits, so that we can get

1     money into the estate and we can start to prepare for

2     distributions to the creditors who are prejudiced.

3             Thank you very much, Your Honor.

4             THE COURT:  Thank you.

5             MR. STRATTON:  Good afternoon, Your Honor.  David

6     Stratton for the Committee.

7             Your Honor, I'd like to offer the Court some thoughts

8     on the three volumes of briefing on this issue.  And what I'll

9     try to do is focus on some issues which I think should be

10    helpful, or I hope will be helpful to Your Honor in deciding

11    the stay issue, which is really what is before us.

12            The first point I'd like to address is whether or not

13    the Court should decide the motion now.  And it touches on the

14    issue Your Honor raised about -- and Chase and FDIC have raised

15    about, can the Court down there grant complete relief.

16            Chase is not a party to that litigation.  The Court

17    may decide, because it's really an appeal from the denial of

18    the claim, that Chase doesn't belong in that litigation because

19    it's an appellate procedure involving the FDIC, and the debtors

20    are not a pool party where everybody who thinks they might have

21    a claim to some of the assets in the receivership, who were not

22    in the receivership, depending on what the deposits end up

23    being, should become a party and get -- so that the matter gets

24    completely out of hand.

25            The other reason why I think Your Honor might want to

1  hold your hand on this issue, is that it's not clear what that

2  litigation's going to look like when all is said and done.

3         As I understand it, the Galvaston action, which was

4  the subject matter of some discussion in the context of the

5  2004 motion the debtors file, the FDIC has filed a motion to

6  transfer venue of that case back to D.C.

7         Now if we start piling all this litigation together,

8  the concern I would have, and I hope Your Honor shares this

9  concern, is that we're going to have a morass, a Gordian knot

10  of mythical proportions, which will takes years, and years, and

11  years to cut through, to the detriment of the creditors of this

12  estate.

13         And I'm going to talk about that issue a little while

14  later.  With respect to the second point, Your Honor, it's the

15  jurisdictional issue.  And I'd like to refer to the FDIC's

16  memorandum of law in support of it's motion to stay, which was

17  filed on June 1st.

18         This looks to me like a two-party dispute.  Chase

19  says it bought a bunch of assets out of the receivership, or

20  assets which weren't in the receivership, in the case of the

21  savings bank, and we don't want to lose track of that sight --

22  or point, as Mr. Kirpalani has noted for us, but Chase says, we

23  bought a bunch of stuff.  The debtor says and the Committee

24  says, no, you didn't.

25         The deposits are ours, the tax refunds are ours, so

1    on, and so on, and so forth.  It's a two-party dispute.  And

2    the FDIC, when they filed their memorandum of law, agreed with

3    that position.  And I refer Your Honor to page 1, at the very

4    outset of their papers the FDIC wrote, and I'm going to come

5    back to this quote in connection with another point.

6         "Disputes concerning the ownership of assets and

7    assumption of liabilities between the debtors and JPMorgan

8    Chase, JPMC, have been a centerpiece of these Chapter 11 cases

9    since their filing.  The two adversary proceedings that are the

10    subject of this motion to stay..."

11         And now I'm going to skip over an indented phrase or

12    a phrase they've used.

13         "...reflect the parties' latest attempts to seek a

14    determination of their respective rights to certain disputed

15    assets."

16         It's a two-party fight.  If Your Honor has the

17    ability to resolve those issues, it's at the very core of what

18    this Court does.  That is, the Court determines, not everyday,

19    but on a regular basis, what the assets of the estate are, and

20    what the assets of the estate aren't.  That's the fundamental

21    jurisdictional grant that congress gave this Court.  And the

22    Court should not give it up lightly, or at all, just because

23    the FDIC says you should, or because the FDIC would like to

24    read Firrea so broadly as to provide, as Mr. Carlinsky argued,

25    that from now on, forever, a year from now, two years from now,

1    three years from now, if someone says to Chase, oh, by the way,

2    I'd like my deposit back, Chase says oh, no, no, no, you didn't

3    file a claim in the FDIC receivership proceeding, so your

4    claim's barred, or the only place you can try to get your money

5    back is in a lawsuit against, not us, but the FDIC in the

6    District of Columbia, or where the bank had its headquarters.

7         That's not, I think, a proper reading of the statute,

8    and the cases don't seem to agree with that.

9         On a narrower basis, with respect to the deposits at

10   the savings bank, as opposed to the bank that was in a

11   receivership, there is absolutely no basis to argue that <u>Firrea</u>

12   precludes this Court's exercising jurisdiction over that

13   deposit.  It was never in a receivership.

14        And the bulk of the deposit, we believe, was in that

15   account.  Now people may take issue with that, and they may

16   say, well there's this issue and that issue.  But that issue --

17   those issues for Your Honor to decide.  There is no <u>Firrea</u>

18   overhang here.  And when I read the papers, the 40 some odd

19   papers that were filed by Chase and the FDIC Monday night on

20   this issue, they don't address it.

21        Or the FDIC says "The FDIC receiver will reserve its

22   arguments as to this assertion for another day."

23        Well, today's the day.  I'm sorry, but they if want

24   to stay the proceeding, they've got to carry the burden as to

25   their jurisdiction over this asset.  They don't have any.

1      So at least as to that, Your Honor can and should

2  deny the stay motion.  As to the rest, I think it's a two-party

3  dispute, and Your Honor can and should assert your

4  jurisdictional prerogatives and say, you know what, I can do

5  this, I can do this promptly, and I'm going to do it.

6      Let's talk about promptly.  Because the parties have

7  discussed, and Mr. Carlinsky discussed briefly, the issue of

8  prejudice.  But we represent the creditors and we've got a

9  courtroom full of them

10     And I'd like to talk a little more about that.  The

11  FDIC, in its reply brief, makes what I view to be an incredible

12  assertion, and I'm quoting.

13     "The FDIC receiver's motion if granted will not delay

14  or stall these bankruptcy cases, as the debtors assert."

15     And then Chase says in its brief:

16     "A stay would in no way prejudice the debtors."

17     I would submit to Your Honor that that conclusion is

18  impossible to sustain.  Both the FDIC and Chase ignore the

19  point made in the debtors brief, and I'm referring -- I'm

20  referring to page 30 of the debtors' opposition to the stay

21  motion, in which the debtor refers to a statistic, which I

22  think we need to keep front and center in these deliberations.

23  And I'm reading now.

24     In 2008, the median time from filing to the

25  commencement of trial for civil cases commenced in the District

1    Court for the District of Columbia, was greater than 3 years.

2          And they cite for that proposition the 2008 Federal

3    Court management statistics, U.S. District Court judicial

4    caseload profile.  Three years.  That means, for the next three

5    years, we'll have litigation, upon litigation, upon litigation.

6          I could recite for Your Honor the multiplicity of

7    litigation that Chase has sparked in this case.  They even

8    opposed the imposition of a bar date as to themselves.

9          And they continue with their motion to withdraw the

10   reference, which basically is that, if we lose here, we'll just

11   ask the District Court to give us the same result.

12         So we'll have tons of litigation in the District

13   Court, we won't get the trial for three or more years, and,

14   meanwhile, what's happening here?  Well money's gone out the

15   door like crazy to professionals.  We can't begin to imagine

16   what the hourly rate for the professionals in this courtroom

17   is.

18         Two, the administration of this estate will come to a

19   screeching halt, because all the assets of this estate, for the

20   most, part are at issue.  Chase is saying, they're all ours,

21   and the estate's saying, no, they're not.  They belong to us.

22         So we won't be able to propose a plan that has any

23   kind of sense to it.  A disclosure statement would -- how do we

24   write a disclosure statement?  We don't know what you're going

25   to get, and we don't know when you're going to get it.

1    But you'll get it when we know what it is.  That

2    doesn't work.  And so, at the end of the day, these creditors,

3    and the thousands of other creditors in this case, will sit

4    there and wait, and wait, and wait as the estate gets a little

5    bit smaller and a little bit smaller each day through the costs

6    of administration.

7    And they may get some money four or five years from

8    now.  And that to me, plain and simple, is prejudice.  And that

9    in fact is my primary concern about this whole mess.

10   Let me talk about one last point, and I call it the

11   bankruptcy issue.  I've touched on it a little bit, but I think

12   it goes to both the jurisdictional issue that -- the Firrea

13   argument that the FDIC and Chase makes, and also to the first

14   filed.

15   And by way -- in context, by way of background, I'd

16   like to focus on a couple of things.  This bankruptcy was filed

17   last September, the day after the receivership was imposed and

18   the assets were sold to Chase.

19   As I've already indicated, the FDIC has conceded

20   that, from the day this case was filed or shortly thereafter,

21   disputes between the estate and JPMC have been at the

22   centerpiece of this case.

23   Chase has filed a proof of claim.  It tried to get a

24   different bar date, or no bar date, but it was forced to file a

25   claim and it did file a claim.  It also filed an adversary

1   proceeding, which in many ways is a mirror image of its claim.

2          It's a little odd, they said here are your claims one

3   through, whatever.  And then when they filed a lawsuit saying,

4   these are our claims, decide them, Judge.

5          I'm not sure why they did that, and I'm not going to

6   speculate.  The FDIC has filed a claim.  The debtors filed a

7   turnover action.  The turnover action, at least with respect to

8   the motion to dismiss, has been briefed.  The debtors have

9   filed a motion for summary judgment in the turnover action.

10         Those deposits, that four billion dollars, how many

11  cases do we ever have with billions of dollars to fight over?

12  And maybe that's part of the problem.  Four billion dollars,

13  that's the centerpiece of this estate.

14         And once that's determined, and especially if the

15  debtors, as we believe they are, are correct that that 4

16  billion dollars belongs to this estate, we can move forward

17  with a Chapter 11 plan and confirmation, all the while

18  respecting the FDIC's rights with respect to setoff, and

19  whatever rights it asserted in its claims, because those aren't

20  new issues.

21         Creditors have setoff rights all the time.  Creditors

22  file proofs of claim all the time.  And those issues can be

23  addressed in the context of a plan.

24         So where does that -- where am I going with this

25  argument?  Well, first, I think, and the FDIC has more or less

1    admitted, that this bankruptcy proceeding, not the litigation

2    in the District of Columbia, but this very bankruptcy

3    proceeding, is really the first proceeding in which these

4    issues were put before a Court.  It's the first filed action.

5    Second, it's a fundamental, fundamental precept of bankruptcy

6    that you submit yourself to the jurisdiction of a Court when

7    you file a proof of claim.

8            It's so fundamental, that it trumps a creditor or an

9    individual's right to a jury trial.  How can it not also trump

10   the Firrea jurisdiction given to the FDIC?  And the debtors

11   address that issue in their papers, and I won't go into that in

12   any detail here.

13           The last point on this argument, Your Honor, I'd like

14   you to consider is this, and this is the sort of bankruptcy

15   lawyer talking.  We won't know what the assets are for years.

16   We won't be able to put a plan together.  The estate will be

17   diminished.  Your Honor will be giving up jurisdiction that's

18   clearly given to you by the Bankruptcy Code and Title 28.

19   Creditors rights will be prejudiced because of the delay, and

20   because of the effect on the administration, the size of the

21   assets, just through erosion, through payment of fees and

22   expenses.

23           Based on that, I would respectfully request that Your

24   Honor first has the discretion to decide whether or not to stay

25   this matter, and Your Honor exercise that discretion to deny

1    the stay.

2          If Your Honor has any questions, I'd be happy to

3    answer them.

4          THE COURT:  No.  Thank you.

5          MR. STRATTON:  Thank you,

6          MR. O'CONNOR:  Your Honor, my name if Paul O'Connor.

7    And a pro hac vice application has been filed in the Court

8    earlier this week.  We represent -- I represent Washington

9    Mutual note holder's group, which collectively holds at least

10   3.3 billion dollars of value of outstanding debt securities of

11   the debtor Washington Mutual.

12          We've submitted a statement pursuant to Section 1109

13   of the Bankruptcy Code in opposition to the motions filed by

14   JPMorgan and FDIC that have been argued here today.

15          And I don't want to belabor any of the points that

16   have been made.  We obviously associate ourselves and join with

17   the remarks that have been made by the debtor and for counsel

18   for the Committee.

19          However, there are a couple of points I would like to

20   make.  And that is, first, as the holder of 3.3 billion dollars

21   in the face mount of WMI debt, we are obviously the principal

22   stakeholder in this -- these Chapter 11 cases.

23          We have a real interest in the outcome of this estate

24   and ensuring a maximum value for creditors.  Second, the real

25   issue that we're all arguing about here today, is what to do

1  with this 4.4 billion dollars in deposits at JPMorgan.  And as

2  others have said, and I'll reiterate here today, those are core

3  assets of the estate.  Those are the assets of the estate.

4          There's really -- there's other stuff to argue about,

5  but without those assets being decided and ruled upon by Your

6  Honor in the context of this proceedings, moving forward on

7  plans and plan reorganizations is almost impossible.

8          If this matter is not dealt with in this Court,

9  resolving these Chapter 11 cases, in our view, will

10 fundamentally be impossible.  And I do want to also point out

11 that the prejudice to creditors from the delay that's likely to

12 come if we are sent to D.C. is significant.

13         And since we're all here and the assets can be dealt

14 with here, we think they should be dealt with here.

15         Finally, you know, I think it's also important to

16 point out that there are two adversary proceedings that we're

17 dealing with here today.  One of which is an adversary

18 proceedings that JPM brought.

19         They chose this forum.  They picked it.  They filed

20 the papers here, and then the debtor responded with some

21 counterclaims.  And now we're hearing arguments that having

22 picked this forum, the debtor having then filed counterclaims

23 in that, that somehow or another, because they were forced by

24 statute to file a more limited pleading in D.C., they should be

25 prohibited from going forward in the proceeding that JPM filed

1    here.

2         And we think ultimately that's an argument that

3    doesn't hold together.  And so we'd urge the Court to hear this

4    matter and to decide these matters and not to stay or dismiss

5    them.  Thank you.

6         MR. SACHS:  Your Honor, could I indulge you for just

7    a couple of seconds to let Ms. Feldstein respond to a few

8    jurisdictional issues that have been raised?

9         THE COURT:  Sure.

10        MR. SACHS:  Thank you, Your Honor.

11        MS. FELDSTEIN:  Good morning, Your Honor.  Hydee

12   Feldstein of Sullivan and Cromwell appearing on behalf of

13   JPMorgan Chase.  And I rise very briefly principally to address

14   some of the jurisdictional issues raised by Mr. Stratton and by

15   Mr. O'Connor.

16        As a preliminary matter, we did file this morning a

17   response to the note holders papers asking that they file a

18   Bankruptcy Rule 2019 statement.  And I would ask that the the

19   Court at least take that into consideration.  We have not

20   formally moved at this time, I will acknowledge that.

21        But the Court can also on its own initiative, either

22   request that they file it, or at least take that into

23   consideration in hearing the note holders' arguments.

24        The other issues I'd like to talk about very briefly.

25   I stood before you in October in connection with a stipulation

1    for deposit accounts.  And on behalf of JPMorgan Chase, I made

2    two points to the Court.  One was that we did not think that

3    possession of funds, to the extent funds existed, was really

4    the issue.

5           That the issue to us was twofold.  One was, we had

6    not determined what JPMorgan Chase's rights in and to those

7    funds were.  And we did not wish to prejudice our right to

8    those funds, which is why the original stipulation had a full

9    blown deposit account agreement with post petition setoff

10   rights associated with it.

11          With that basis, we were prepared to take into

12   account and defer all of the ownership issues.  So contrary to

13   everybody's assertions, we haven't been sitting here trying to

14   "hang onto the money," but we have been trying to preserve our

15   own rights in and to those funds.

16          The second point that I would make to the Court is,

17   we said to you back in October, we do not want to be subjected

18   to double jeopardy.  Whatever happens here, Your Honor,

19   whatever the funds are, that which is ours ought to belong to

20   us, and we ought not to have to pay twice.  I would point out

21   to the Court that the D.C. action was filed on Friday, March

22   20th.  Our adversary proceeding before this Court, which asks

23   in the first instance to be sure that whatever rights there are

24   in the assets at issue in D.C. go to the D.C. Court, was filed

25   on March 24th.

1      We had to file that in order to stave off the very

2      concern that we had expressed to you back in October.  We did

3      not want to be in the position where JPMorgan Chase's rights

4      with respect to these assets were subject to competing and

5      potentially inconsistent determinations.

6      We did not want to be in a position where our

7      liabilities, because, Your Honor, to some extent the deposit

8      account, is also arguably a liability of either the

9      receivership estate as successor to the depository institution,

10     or of JPMorgan Chase.

11     We did not want to be in a position where those

12     liabilities could be inconsistently determined, or determined

13     twice.  I understand that the creditors of this estate would

14     like to take the money and run.  They'd like to say, thank you,

15     JPM, pay it over to us and you worry about all these other

16     assets.

17     There's 4 billion in trust preferred securities.

18     There's at least 3 billion in tax refunds, by their own

19     admissions.  I understand that claims to 4.4 billion, or 3.7

20     billion, depending upon what you look at, in deposit in deposit

21     accounts, or book entry transfers, or offsetting liabilities,

22     or master notes, or whatever they are, is a lot of money.

23     But is not all the money that's at stake in this

24     proceeding, or in the D.C. action, Your Honor.  And at the end

25     of the day, that's the problem.  The problem is, that as I have

1    said to you for 8 months now, JPMorgan Chase is to some extent,

2    Malcolm in the Middle.

3         So long as our rights are adjudicated in a single

4    forum, where we're not subject to inconsistent determination,

5    where all parties with claims against us can be bound by that

6    determination, and where in that forum we are in a position to

7    protect our rights as the legitimate purchaser from an assignee

8    of the FDIC, that's what's important.

9         I want to move very quickly, Your Honor, we did file

10   a motion to withdraw the reference last night.  We did that

11   largely due to the counterclaims that were filed before this

12   Court by the debtors, or by the very concern that we had that,

13   if the stay motion was not granted, we would be a position

14   where we were, again, in two forums on the same issues and

15   subject to inconsistent determinations.

16        We have accompanied that withdrawal with a request to

17   transfer this litigation over to the D.C. action.  And if you

18   can indulge me for a moment, the issue of the deposit account

19   is a simple one.  Is addressed at some length in the withdrawal

20   of the reference papers,

21        It's not a simple determination, Your Honor.  WMI was

22   the holding company of two depository institutions, and itself

23   subject to banking laws and principles, including sections

24   23(a) and 23(b), limiting affiliate transactions with its

25   depository institutions.  Both WMB and WMBFSB were subject to

1    lending limits.  They were subject to rules and regulations

2    regarding safety and soundness.  There were all kinds of

3    principles under Title 12, not just with respect to, what did

4    the FDIC have at the time that the receivership receiving was

5    commenced, and not just with respect to, what did JPMC acquire.

6    But in untangling the Gordian Knot that is already before this

7    Court, Your Honor.

8         There is a Gordian Knot.  And the question is, will

9    it be all in one forum, or is it going too be kind of split up

10   and we're going to be dealing with Gordian Knots in two

11   different forums, or three different forums, where people can

12   be subject to inconsistent determinations.

13        But the under raveling of that very tapestry itself

14   requires consideration of Title 12.  There's no way around it,

15   Your Honor.  There's two competing insolvency regimes.  There

16   are in fact principles that govern the insolvency of a

17   depository institution.

18        To give you just an example.  The deposit accounts

19   here, to the extent they were provided by book entry transfer

20   to create a so-called demand deposit account, under the FDIC's

21   insurance program today, checking accounts that are demand

22   deposit accounts are insured without limitation.

23        So by a stroke of the pen, and by somehow creating an

24   inter company obligation that's called a demand deposit

25   account, WMI is contending that by book entry transfer, if a

1  holding company did it today as to a depository institution, it

2  could put the full faith and credit of the FDIC and our

3  taxpayer dollars at risk.  And, Your Honor, I submit to you

4  that the determination of those accounts simply can't be made

5  without regard to Title 12.

6          And for that reason, we filed our motion to withdraw

7  the reference.  And for that reason, it would be appropriate to

8  simply put this matter over to the D.C. Court for its

9  consideration, as it seems to be the only Court that has

10 complete jurisdiction and can afford complete relief to the

11 parties.

12         Does the Court have questions of me?

13         THE COURT:  Well you say it has complete

14 jurisdiction, but is that clear after Rosa?

15         MS. FELDSTEIN:  I think, Your Honor, that if this

16 matter were transferred to the D.C. action, yes, it has in --

17 there's in personam jurisdiction, there's in rem jurisdiction,

18 and there's subject matter jurisdiction.

19         I would submit to the Court that the D.C. Court has

20 subject matter jurisdiction to determine what were the assets

21 of the depository institution, which this Court does not.  It

22 has in rem jurisdiction over those assets, to the extent that

23 they are here as a successor, we are here as a successor and a

24 purchaser from the FDIC.

25         And it would have in personam jurisdiction over us.

1    We've effectively have consented to be part of that action and

2    have asked to be part of that action by our motion to

3    intervene.

4         We are not going to attempt to contest that Court's

5    jurisdiction...

6       (12:39:35 Recording stops - 12:55:58 Recording Resumes)

7            THE COURT:  All right.

8            MS. FELDSTEIN:  Thank you very much.  I'm going cede

9    to Mr. Califano.

10           THE COURT:  Okay.

11           MR. CALIFANO:  Your Honor, I'd like to open by

12   pointing out the jurisdiction is not exclusive when the

13   ownership of assets is at stake.  And the question of whether

14   1334 trumps Firrea, that's already been addressed.

15         And at page 17 of our reply brief, we address that

16   case and we address that issue, and we cite the cases.

17         But what I would like to do, Your Honor, is reconcile

18   the -- the question of Rosa and National Union, because I think

19   there's been some confusion created.

20         And the fact is, Your Honor, if you track the cases

21   and the actual language of the statute, it is clear that Rosa

22   and Henrich and those cases don't apply.

23         And one thing we need to keep in mind, when we're

24   looking at these cases, is that this is not a tangential attack

25   on a transfer that somehow was related to the receivership.

1   This is the central act of the FDIC as receiver.

2          As we said, they came in as receiver, they took over

3   and immediately sold the assets.  Substantially all the assets

4   then JPMorgan Chase assumed substantially all the liabilities.

5          THE COURT:  But let's go to the history of Firrea

6   and, when the RTC in earlier days the assets of the bank were

7   held for some time.  And really wasn't Firrea to prevent the

8   lawsuits and interference with the receivership?  And can you

9   extend the jurisdiction by transferring those assets, the first

10  day?

11         MR. CALIFANO:  We're not extending the jurisdiction,

12  okay.

13         THE COURT:  Well you're seeking to extend it to any

14  claims against JPMC.

15         MR. CALIFANO:  But it's not, Your Honor.  Because the

16  claims, as we've said throughout --

17         THE COURT:  Are identical.

18         MR. CALIFANO:  -- they've made claims about the

19  actions of the receiver.  The claims that they're making

20  against JPMorgan Chase are the flip side of those claims.

21  We're -- if you think about the history behind Firrea, Your

22  Honor, we're right now in a situation which is as bad, if not

23  worse, than then.

24         And right now the FDIC is selling banks.  They seize

25  banks, they sell banks.

1    There needs to be a market to assume the liabilities.

2    There needs to be buyers.  Those buyers need finality, much

3    like a 363 buyer who comes into the Bankruptcy Court needs to

4    know that there is finality.  So there are the same, if not

5    stronger policy considerations now.  But when you look at Rosa,

6    Your Honor, Rosa was dealing with the first clause of

7    1821(d)(13)(D)(i).  Any claim or action for payment from.

8    Okay?  The National Union case, the other cases deal with --

9    the language, or any action seeking a determination of rights.

10    Now the Third Circuit in National Union looked at the

11    issue and said, does the claim that is at issue need to be a

12    claim against the FDIC as receiver that would be part of the

13    administration process for the bar to apply.

14    Because there's a narrow universe of claims, as

15    opposed to any action with respect to determination.  And if

16    Your Honor will allow me, the Third Circuit said in National

17    Union:

18    "In Rosa we indicted that there was an

19    interrelationship between the jurisdictional bar contained in

20    Section 1821(d)(13)(D), and the administrative claims procedure

21    contained in 1821(d)(3), (d)(5) and (d)(6).  By characterizing

22    the jurisdictional bar as a statutory exhaustion remedy."

23    Meaning creditors had to exhaust their claims by

24    going first to through the receivership.  Surely that

25    characterization is accurate as to a claim, i.e. an action

1    asserting a right to payment.

2         In the portion of the opinion characterizing the

3    jurisdictional bar as an exhaustion requirement, the Rosa Court

4    addressed only claims, as opposed to the any action language

5    contained in 1821(d)(13)(d)(1), stating that subsection (d) of

6    1821 provides for de novo District Court jurisdiction only

7    after the filing of a claim with and the initial processing of

8    that claim by the RTC.

9         But Rosa did not address or decide the interesting

10   issue, which is still an open question, whether the class of

11   actions addressed by the administrative claims procedure is

12   smaller than the class of actions addressed by the

13   jurisdictional bar.

14        And the Third Circuit went on to rule, Your Honor,

15   that the bar of 1821(d) is larger, the universe of actions that

16   are effected, is larger than simply those claims which need to

17   be asserted in the receivership.

18        That's what National Union did, that's what Rosa

19   means.  Your Honor this is an attack on -- this is a lawsuit,

20   which is an action seeking a determination of rights with

21   respect to the assets of any depository institution for which

22   the corporation has been appointed receiver.

23        And it is a claim relating to any act or omission of

24   such institution, or the corporation as receiver.  It falls

25   right within the jurisdictional bar.

1      They can't circumvent the jurisdictional bar by

2   bringing an action against JPMorgan Chase.  That is the -- and

3   in the counterclaims that is the mirror image of the claims in

4   the receivership.  It is the mirror image, it is against

5   JPMorgan Chase, as opposed to the FDIC.

6      But it goes to the core of the actions of the FDIC as

7   receiver.  With respect to the reference to the motion to

8   dismiss in D.C., that's not really -- we did make a motion to

9   dismiss, but we did not move to dismiss any of the claims that

10  relate to the receivership proof of claim.

11     We did not move -- we moved to dismiss claims which

12  we believe are improper, but we did not move to dismiss any

13  claims which relate to the proof of claim they filed and

14  receivership claim.  They're ancillary claims that we moved to

15  dismiss.

16     Also with respect to the statements that we've heard

17  about the Bankruptcy Court, 1821 is very clear, Your Honor.  It

18  says any Court -- I'm sorry, it says no Court can review the

19  actions of the FDIC as receiver other than the District Court

20  in the two choices of venue.  Where the bank was situated, or

21  in the District of D.C.

22     There's no exception for Bankruptcy Courts.  and

23  there's a bankruptcy District of New Jersey case, cited in our

24  reply brief, which addresses that, Your Honor.  And with

25  respect to, you know, going back to Mr. Carlinsky's mother,

1    once again, and I'm sorry.  But that issue, that's a red

2    herring, because that only relates to the FDIC's exercise of

3    9.5.  So she would only be denied her deposit if the FDIC had

4    previously exercised its 9.5 right.  It's not every depositor,

5    everywhere.

6            But, Your Honor, if you look at the cases, if you

7    look at Rosa, if you look at Oakwood, this issue is resolved.

8    The fact is, this is an attack, whether the FDIC is a nominal

9    defendant in the adversary proceeding or not, this is an attack

10   on the actions of the FDIC.

11           They have their forum, the forum is not here.  Thank

12   you.

13           MR. CARLINSKY:  Your Honor, I will be ever so brief.

14   First, I think it's obvious that all of the parties are before

15   this Court.  The FDIC filed proofs of claim.  JPMorgan has

16   filed proofs of claims and an adversary proceeding.  And the

17   debtors are here.

18           This Court can afford full relief.  The second point

19   I want to make is, Mr. Califano says that the claims here

20   represent a central attack.  Well how is the deposit claim,

21   which JPMorgan itself described as a question of, was it an

22   asset at one institution, verse the other?

23           Any kind of central attack, as if that would even be

24   relevant in connection with the jurisdictional bar, but saying

25   so doesn't make it so.  The question on the deposits is a

1    simple one.  It will be a -- one that it may be bound up in

2    some facts, but it is a simple one that has nothing to do,

3    frankly, with an attack on the FDIC.

4            I want to just give the Court one more piece of

5    comfort as to what Rosa stands for, what National Union stands

6    for, and then Hudson, which is after National Union, and I read

7    the Court the quotes earlier from Hudson, which is the latest

8    of the three pronouncements.  And Hudson is clear that the

9    jurisdictional bar is limited to a claim against the

10   institution in receivership, or the receiver itself, period,

11   end of story.

12           And that is absolutely crystal clear in Hudson, which

13   the FDIC simply ignores.

14           National Union dealt with the question of whether a

15   debtor to the failed financial institution which had brought a

16   declaratory judgment claim against the receiver, was barred

17   under Firrea.  And ultimately, in that particular case, the

18   Court actually didn't reach the decision, it simply found that

19   the failure to file proofs of claim barred the debtor's claim.

20           National Union, quite honestly, Judge, is an

21   irrelevant case on the issue before the Court.  And, as I say,

22   the answer is clear from Rosa and the later case which is

23   Hudson.  Lastly, the only comment I have to finish on is, I

24   didn't realize we would be arguing the motion to withdraw the

25   reference, and I'm not going to respond to the substantive

1    assertions.

2         I just want to make the observation, which I'm sure

3    is not lost on Your Honor, that to file a motion to withdraw

4    the reference at midnight on the night before this hearing, in

5    a case in which you've been a party for months and months, and

6    have filed proofs of claims and your own adversary proceeding,

7    and now to stand up, as they do in their papers and say, Judge,

8    it wasn't until like a week ago that the scales fell from our

9    eyes, and we realized that, you know, the issues we asserted as

10   Chase and the counterclaims that you asserted and the turnover

11   proceeding, it just struck us that these are all bound up in

12   Federal law, so let's withdraw the reference.

13        To me, this was the most transparent gamesmanship

14   that I've seen in a while, and it just reflects, (a) their lack

15   of conviction in their arguments, and, (b) an inexplicable

16   desire to run from this Court and to ultimately bind us up in

17   more, and more, and more delay.  Thank you, Judge.

18        THE COURT:  Thank you.  All right.  Well let me issue

19   my ruling with respect to this.  First, I do not find Firrea is

20   a jurisdictional bar to the debtors' claims to property that is

21   no longer in the hands of the FDIC as receiver, but are in the

22   hands of JPMC.  I think that's clear from the Third Circuit

23   law, which is binding on this Court.

24        Hudson made it clear that Firrea only bars claims

25   against a receiver or an institution in receivership.  The FDIC

1    argued this same point in the Henrich case in the Ninth

2    Circuit, arguing before the Supreme Court that Firrea is not

3    applicable to a suit against a private party assignee of assets

4    from FDIC.

5          And I'm not prepared to find that the Firrea bar,

6    bars any claims, or any dispute over what assets were

7    transferred.  And I just don't think that, despite the FDIC's

8    predictions, I don't think that it is going to cause

9    institutions not to deal with the FDIC.

10         I think the Firrea jurisdictional bar is limited.

11   And simply is not applicable to the turnover action where the

12   debtor asserts that it has title to funds in the possession of

13   JPMC.

14         Similarly, to the extent in the counterclaims in the

15   JPMC adversary, the debtor is asserting a claim against JPMC to

16   assets that the debtor claims are property of the estate, for

17   various reasons, and I won't get into the legal theories, I

18   think that Firrea does not bar it.

19         With respect to the First Filed Rule, I don't think

20   it applies in this case, either.  The two actions are not

21   between the same parties dealing with the same claims.

22         The action in the D.C. Court is between the debtor

23   and the FDIC, and involves claims the debtor has against the

24   FDIC, which it could not bring here, because they must be

25   brought in the D.C. Court.

1        The actions here involve claims against JPMC, which

2   is not an institution in receivership.  And while they may be

3   similar, or based on the same facts, they are distinct claims

4   against distinct parties.  And, therefore, I'm not inclined,

5   under the First Filed Rule to defer to the D.C. Court.

6        As much as I might wish to defer to another Court,

7   unfortunately, I do have exclusive jurisdiction to decide what

8   is property of the estate.  If I determine that the property at

9   issue is property of the estate, then this Court has exclusive

10  jurisdiction over that property, and over claims,

11  counterclaims, other claims against the estate.

12       If I determined it is not property of the estate, I

13  may, in my discretion, defer to the District Court, or to any

14  other Court to decide the countervailing claims to that

15  property.  But I think, in the first instance, I have to decide

16  whether what the debtors are asserting is that they own the

17  property, or whether the debtors simply assert a claim against

18  a party.

19       So I'm going to deny the motion to stay the turnover

20  action and the JPMC actions.  I guess we have to then go onto

21  what's next.

22            MR. CLARKE:  Your Honor --

23            THE COURT:  Yes.

24            MR. CLARKE:  -- my name's John Clarke, I'm Mr.

25  Califano's partner from DLA Piper, counsel for the FDIC

1    receiver.

2         THE COURT:  Yes.

3         MR. CLARKE:  The FDIC receiver believes that Your

4    Honor's ruling implicates subject matter jurisdiction concerns

5    and is appealable as of right.  But in the alternative, the

6    FDIC receiver respectfully requests that the Court certify this

7    ruling for an interlocutory appeal pursuant to 1292(b), because

8    it involves a controlling question of law as to a substantial

9    disagreement may exist.

10        And we would like to take an immediate appeal of that

11   decision to the District Court.

12        THE COURT:  Response?

13        MR. CARLINSKY:  Your Honor, I would think that if

14   there is a 1292 motion being brought, it ought to be briefed.

15   I'm just stating that there is a significant issue as to which

16   there is disagreement doesn't make it so.

17        And I would respectfully ask that Your Honor setup a

18   briefing schedule.  It may be expedited, and we don't have

19   objection to that, but let's do it right.  And let's do it

20   right, and let's do it on the papers.  And my suggestion would

21   be, if they want to file the brief, we'll take 5 days to

22   respond, and then Your Honor could decide that issue, whether

23   it's going -- whether the Court's going to certify the issue

24   for immediate appeal.

25        MR. CLARKE:  Your Honor, if I might be heard in that

1    regard.  If it's the Court's preference to review papers on the

2    issue we would be -- we would be happy to submit briefs on the

3    question of whether this is a controlling question of law as to

4    which there's a substantial ground for difference of opinion.

5            However, Your Honor, for reasons that have already

6    been set forth in our reply brief in this matter, National

7    Union, respectfully, governs the question of whether the

8    jurisdictional apply -- the bar applies in an action that seeks

9    to determine rights with respect to assets of the receivership.

10           In National Union, the Court limited Rosa very

11   expressly.

12           THE COURT:  Well I'm not going to hear argument.  I

13   will allow the parties, I think nothing that would prejudice

14   the parties is going to occur, even in addressing the following

15   motions.  So I will allow the parties to brief the issue.

16           MR. CLARKE:  Thank you, Your Honor.  We would be

17   prepared to submit a brief within 7 days, if the debtors would

18   be willing to abide by a similar schedule.

19           THE COURT:  All right.

20           MR. CARLINSKY:  That sounds fine, Your Honor.

21           THE COURT:  All right.

22           MR. CARLINSKY:  That's reasonable.

23           MR. KIRPALANI:  Good afternoon, Your Honor.  Susheel

24   Kirpalani, again, from Quinn, Emanuel on behalf of Washington

25   Mutual.  Your Honor, I'd like to argue our motion for

1    reconsideration of Your Honor's permitting JPMorgan Chase to

2    have its motion to dismiss heard, frankly, prior to our motion

3    for summary judgment.  And as Your Honor knows, we were in the

4    middle of drafting our opposition to JPMorgan Chase's expedited

5    motion when the order was entered.

6         And I don't think that anybody's saying we sat on our

7    rights.  I think it was just a question of two days was what we

8    needed to file our papers.  I think, Your Honor, the issue

9    comes down to a pretty simple one, and I'm not going to spend

10   too much time going through what I know Your Honor knows from

11   the Lexington Insurance case, which is, upon a motion to

12   dismiss a turnover action on the basis at 542(b) is susceptible

13   to a judicial gloss that says, a disputed contract right, or a

14   disputed debt doesn't fall within 542(b), that those cases that

15   deal with the issue, there must actually be a bonafide dispute,

16   a legitimate dispute.

17        And what JPMorgan Chase is doing instead, is asking

18   Your Honor to close one eye to read just the motion to dismiss

19   and just the complaint and their spin on it, and because they

20   say so, and because they stand up here and they say things

21   like, Ms. Feldenstein (sic) -- Feldstein said, that, Your

22   Honor, WMI was a holding company of a bank that was -- two

23   banks that were regulatory deposit institutions, and,

24   therefore, they're susceptible to all sorts of interesting

25   Federal laws, etcetera.

1       Ultimately, Your Honor, there's been no fact

2   whatsoever as to a dispute as to the debt.

3       And I think, what was really driving me nuts sitting

4   through the argument, Your Honor, is, if Your Honor employs the

5   analysis that you did in <u>Lexington Insurance</u>, or if you do the

6   analysis that Judge Walsh has done in several decisions, or

7   Judge Farnan, as well, in looking at turnover actions and

8   whether or not they are susceptible to motion to dismiss, or

9   whether in fact that motion to dismiss is tantamount to a

10  motion for summary judgment.

11      Because you will look at the circumstances.  I think

12  Your Honor just needs to look at the single account statement

13  that JPMorgan has been sending the debtors since the bankruptcy

14  filing.

15      And if Your Honor, if I could just approach, because

16  I think it's germane, and it's really the document, it's one

17  piece of paper that --

18      THE COURT:  Well is it attached to your complaint?

19      MR. KIRPALANI:  It is attached to our motion for

20  summary judgment.  It is germane to the complaint.  It is the

21  statement that says, this is the debt that's owed, Your Honor.

22      And it's attached to the complaint, as well.

23      THE COURT:  Yes.  I have that.

24      MR. KIRPALANI:  Did you have it?

25      THE COURT:  Yes.

1          MR. KIRPALANI:  Okay.  Your Honor, just looking at

2     page A38, which is exhibit B to Dorian Logan's affidavit, but I

3     know it's also attached to the complaint.  It says right there

4     on the top, "Chase, deposit accounts now held by JPMorgan Chase

5     Bank."

6          The statement covers the period March 1st to March

7     31st, 2009.  The beginning balance is 3.6 billion dollars, and

8     the ending balance is a little more than 3.6 billion dollars.

9     This is the document, Your Honor, this is not a lease that Your

10    Honor had in <u>Lexington Insurance</u> where there was really a

11    legitimate dispute as to what the security deposit was intended

12    to cover and not intended to cover.

13         Whether the landlord actually had damages claims

14    against the debtor that it would seek to hold those deposits

15    and not turn them over.

16         The only dispute, Your Honor, that anyone has raised

17    with any legitimate --

18         THE COURT:  Well now you're arguing your motion for

19    summary judgment, aren't you?  Let's talk about whether the

20    standard on a motion to dismiss is the same as the standard for

21    summary judgment.  And I don't think it is.

22         MR. KIRPALANI:  I think it's extremely close, Your

23    Honor.  And I do think that courts have said, and I can

24    summarize those cases, Your Honor, but even Your Honor's

25    decision in <u>Lexington Insurance</u> went outside and looked at --

1          THE COURT:  I looked at the lease that was attached

2    to the complaint.

3          MR. KIRPALANI:  Well so if Your Honor did the same

4    thing here, there is no dispute, Your Honor, correct?

5          THE COURT:  All right.  So now you're arguing the

6    motion to dismiss.  But let's go back to, are the standards the

7    same?  I think they're not.  I think with a motion to dismiss,

8    I only look at the complaint.

9          MR. KIRPALANI:  Your Honor, I think Your Honor on a

10   Rule 12(b)(6) --

11         THE COURT:  I can, but, their motion to dismiss did

12   not include documents outside of the record.

13         MR. KIRPALANI:  No, it did not, Your Honor.

14         THE COURT:  So --

15         MR. KIRPALANI:  But it didn't include anything, other

16   than we believe there's a dispute, Your Honor.  And if Your

17   Honor were to hold that a turnover action under 542(b), which

18   the statute simply says it's a matured payable on demand debt,

19   attached to our complaint is a deposit statement saying 3.7

20   billion dollars is on deposit from this debtor.  And JPMorgan's

21   counsel can stand up and say, Your Honor, we dispute that that

22   money is actually owed.

23         And the dispute, just to be clear, is two types.  One

24   dispute is, we have setoff rights.  Well we know that doesn't

25   count.  Right, Your Honor, because the statute itself says

1    setoff rights are part of -- it's gone up to the Supreme Court.

2    That's part of a 542(b), so I don't think that's really

3    relevant.

4          We don't have to spend a lot of time on that for the

5    motion to dismiss.  The other one is, there could be something

6    in the way that the accounts were setup.

7          THE COURT:  Now you're arguing the motion to dismiss,

8    again.  I want you to focus on, aren't they two different

9    standards.

10         MR. KIRPALANI:  I think -- well I think, Your Honor,

11   the standard for determining whether or not our complaint

12   satisfies a turnover action, should be limited to what the

13   complaint says.

14         THE COURT:  Agreed.

15         MR. KIRPALANI:  The complaint does not deviate from

16   the statement that there is a mature, payable on demand,

17   deposit.  And the account statements indicate that there is a

18   mature, payable on demand, deposit.

19         And those statements have been sent to the debtor

20   since the beginning.  And when we tried to use our ATM card,

21   JPMorgan Chase said, no, not for you.

22         THE COURT:  That would be a lot of 20 dollar bills,

23   wouldn't it.

24         MR. KIRPALANI:  We'll take it, Your Honor.  All

25   right.  So I think that ends the analysis with respect to

1    whether or not what they have filed can be sustained as a

2    motion to dismiss.  If Your Honor were to take any kind of

3    credit, or give credence to any of the statements of JPMorgan

4    Chase that the way the account was setup, which are unsworn

5    statements of counsel in a brief, no business person, even

6    though they've had several months to try to find that business

7    person, and they employ every single one of them, except Dorian

8    Logan, nobody wants to come forward and swear before Your Honor

9    that there's actually a legitimate dispute.

10          There's no dispute, Your Honor.  Even the proof of

11   claim that JPMorgan Chase filed in this Court says, the tax

12   refund payments that were paid post-petition went to WMI's

13   account.  That's one of the accounts, Your Honor, that we're

14   talking about.

15          There's no dispute that this is a turnover.  That's

16   exactly what the Court -- what the Bankruptcy Code contemplated

17   for this type of action.  And just to give Your Honor some

18   comfort, I was struggling a couple of days ago with, why is

19   there all this disputing over whether turnover is the right

20   statute, or whether, as Your Honor found in Lexington

21   Insurance, the obligation to pay a contract claim.

22          Why is there a dispute over whether it should be

23   under 542(b), or the others.  I went back and I looked at some

24   of the cases from the mid-eighties, as to where all of this

25   came from.

1       And I think, Your Honor, and Your Honor probably

2    knows this, because Your Honor was practicing at that time, is

3    it's the Marathon Pipeline issue.  It started there, Your

4    Honor.  And I think it's important, even though it doesn't

5    apply here, because of course JPMorgan filed a proof of claim,

6    40 of them, the FDIC filed a proof of claim.  JPMorgan then

7    sued us in this Court.

8       There's no question that Your Honor has jurisdiction

9    over these issues.  There's no question, this is not a case

10   where a debtor is trying to find a disputed accounts

11   receivable, in some location out in Nevada, and say, ah-ha,

12   we've got core jurisdiction, we're going to drag that creditor

13   -- the account debtor, rather, in here, and we're going to try

14   and collect and have Your Honor rule on the issue under 28

15   U.S.C. 157.

16      Your Honor, this is an adversary proceeding.  There's

17   no procedural defects with the type of proceeding we're using.

18   This is a turnover.  I think the issue's pretty

19   straightforward, Your Honor.

20      THE COURT:  Thank you.

21      MR. CLARK:  Good afternoon, Your Honor, Bruce Clark

22   for JPMorgan Chase.  I'm going to try to deal with the question

23   that Your Honor asked, and try to focus on, which is, are the

24   standards the same or are they different?

25      In their brief on this issue the debtors say it's

1    just two sides of the same coin.  I submit that is not the

2    case, and that has been resolved fully by Your Honor, the Third

3    Circuit, and the Seventh Circuit.

4         The Third Circuit in <u>BTW</u> decided which of three

5    different District Court standards they would apply.  One out

6    of Hawaii, one out of Colorado, which said it's pretty much the

7    same as summary judgment, which the debtors papers recite to

8    you.  And then another case called <u>Lau</u> (phonetic).

9         And what the <u>BTW</u> court did, the Third Circuit did,

10   was say we're going to follow what the Seventh Circuit did in a

11   case called <u>Busik</u> (phonetic).  And the Seventh Circuit in <u>Busik</u>

12   analyzed these three different cases, and they came out saying

13   that the right standard is the <u>Lau</u> case.

14        And what they said there was, under the <u>Lau</u> standard,

15   the Bankruptcy Court must determine whether there is an

16   objective basis for either a factual or a legal dispute as to

17   the validity of debt.  That's what you cited in the <u>Lexington</u>

18   case.  They went on to say, "However, the statute does not

19   require the Court to determine the outcome of any dispute, only

20   its presence or absence.  Only a limited analysis of the claims

21   at issue is necessary."

22        In the <u>Lexington</u> case, the plaintiff -- I sort of

23   hesitate to tell you what happened in your own case, but the

24   way I read it, the plaintiff came in and said, I filed a

25   turnover complaint, I didn't say there was a dispute, therefore

1    that's the end of it.

2          And then the defendant came in and put some papers in

3    and pointed to the lease that was attached to the complaint,

4    and said, no, here's this issue and there's that issue.  And

5    the plaintiff came back, the debtor came back, the trustee came

6    back and said, well now they've taken it outside a motion to

7    dismiss, you have to treat it as a summary judgment motion.

8          And Your Honor said, that's not right, I can decide

9    short of a summary judgment motion whether or not a motion to

10   dismiss is appropriate.  The trustee is wrong, and I go the

11   other way.

12         I'm paraphrasing.

13         THE COURT:  Well wasn't it --

14         MR. CLARK:  So I'm saying is, they're two different

15   issues.

16         THE COURT:  -- wasn't it clear that from the

17   complaint and the attachment to the complaint on the face of

18   the lease there was a dispute as to the security deposit.  It

19   did not say trustee debtor gets the security deposit back in

20   every circumstance.

21         MR. CLARK:  I think, under the circumstances of that

22   case, where they filed that paper with the complaint, that was

23   among the sources you could look at in reaching the decision

24   about which standard to apply.  Just as, in this case, you can

25   look at the papers that have been filed and the claims that

1    have been made, you're entirely permitted to do that.  And

2    understand what this is about.

3         This isn't about accounts.  If, at the end of the

4    day, we have at JPMorgan Chase 6 accounts, the debtors could

5    care less.  It's about the money.  It's about the funds.  And

6    there are very substantial issues about millions of dollars,

7    maybe all of it.  Maybe all of the 3.6 billion.  And you're

8    entitled, in fact I think you're required to look at what the

9    disputes are that have been raised by various parties in the

10   pleadings that are before you, either directly in your Court or

11   by way of exhibits to the papers that have been filed.

12        And to say that, in this midnight raid, that there

13   was a 3.67 billion dollar transfer on paper, not a penny moved,

14   immediately after the OTS came in and said, you folks have a

15   liquidity problem, we're worried about your safety and

16   soundness, then a day or two later they say, well we can't move

17   the funds, we're going to leave them right there, but we're

18   going to setup paper that says, we're transferring the money

19   from one bank to the other, and then we're going to loan it

20   back to the bank that the OTS says they're worried about.

21        And they come in and say, there's no dispute, there's

22   no issue.  This is the only circumstance anybody would try to

23   say that you've got a 3.7 billion dollar issue, and you don't

24   have to look at the facts.

25        THE COURT:  Well, in a motion to dismiss, I am

1    limited to the facts as stated in the complaint, though, aren't

2    I?

3         MR. CLARK:  I believe you're also entitled in a

4    turnover action to look at the materials that are available to

5    you to determine whether or not there is a dispute.  I mean,

6    what Your Honor is positing -- suppose in the <u>Lexington</u> case

7    the trustee had come in and said, I want this property, I'm

8    entitled to it, there's no dispute about it.

9         I think your question assumes that would be the end

10   of it, and I think that's not correct.  I believe you are

11   entitled to, in fact I think you must, look at the facts that

12   are in the area that you can explore, without turning it into a

13   motion for summary judgment.  And that includes the papers

14   filed by the FDIC.  The papers filed by the debtors themselves,

15   where they call these assets disputed assets.

16        THE COURT:  Well if I'm going to look at any facts

17   outside of the four corners of the complaint, don't I have to

18   look at all of them?  And doesn't that convert it to a motion

19   for summary judgment?

20        MR. CLARK:  No.  Because the difference is between

21   deciding whether or not there is a dispute and resolving the

22   issue on the merits, we are not saying in moving to dismiss the

23   turnover action, that on the merits the rights to those monies

24   are going to be decided in that decision.

25        That has to be decided somewhere, we thought D.C.,

1    Your Honor disagrees, but it's got to be decided somewhere, but

2    not on a turnover action.

3         The turnover action issue was whether or not there is

4    a dispute, and there are so many papers before you where the

5    debtors have admitted there's a dispute, where the FDIC has

6    claimed the funds, it's -- even the bond holders at the bank

7    level have put in papers saying that this had to be a

8    fraudulent conveyance, that this had to be a violation of

9    banking law.  To take 3.7 billion out of one bank and move it

10   to another.

11        THE COURT:  But see, even if I go to those facts,

12   those facts don't deal with the title which a turnover deals

13   with.  Title to property, they don't contest that the title is

14   in the name of the debtor.  There may be claims for fraudulent

15   conveyance, or other improper actions by the debtor, but they

16   don't even go to title.

17        There's not, for example, anything in the motion to

18   dismiss to suggest that, on the face of the bank statement it's

19   clear there's a dispute as to who is the deposit account

20   holder.

21        MR. CLARK:  That bank statement is one piece of

22   paper.

23        THE COURT:  Yes.

24        MR. CLARK:  One piece of evidence that they're

25   entitled to use to the extent that the laws of evidence permit

1    it, when the ultimate issue is to be decided.  It has nothing

2    to do with deciding whether or not a turnover action is

3    appropriate.

4              What they're claiming, what they want you to decide,

5    are issues about the funds that are in those accounts.  And

6    they want to do it by way of turnover, without the FDIC,

7    without the receivership, just them and JPMorgan.

8              And they want to make it as simple as they can,

9    that's why they went through the turnover procedure.

10             THE COURT:  Yes.

11             MR. CLARK:  That is not permitted in these

12   circumstances, where you have so many disputes of such

13   importance.  And all you're deciding on the motion to dismiss

14   is that that's the wrong procedure.  You can't use the turnover

15   procedure to do it.

16             And I believe that's what the law requires.

17             THE COURT:  Well turnover procedure, you say it's

18   simple.  It does not preclude arguments regarding entitlement

19   to that property.

20             MR. CLARK:  Well if there is --

21             THE COURT:  I'm not deciding by dealing with a motion

22   to dismiss that in fact the debtor has title to that property

23   and is entitled to it under 542.  I'm only, in a motion to

24   dismiss, to look and see if there is facially a dispute as to

25   title.

1    MR. CLARK:  And, Your Honor, I submit you can't

2    conclude otherwise, when you look at what has been put before

3    your Court in connection with these proceedings relating to

4    those various accounts and the money in them.  I mean --

5         THE COURT:  But in a motion to dismiss --

6         MR. CLARK:  Yes.

7         THE COURT:  -- think I'm precluded from considering

8    other things.

9         MR. CLARK:  You see, I think what you're coming back

10   to is how does the Court deal with a question on a motion to

11   dismiss about whether or not there's a dispute?  And you're

12   saying in effect, if the plaintiff comes in and says, there is

13   no dispute, their complaint says in a couple of places, no,

14   there's no dispute we get the money.

15        THE COURT:  And there is no facial dispute, then, no,

16   I don't say they get the money, I say I deny your motion to

17   dismiss and we'll have a full evidentiary hearing, or motion

18   for summary judgment to decide if in fact, notwithstanding the

19   four corners of the complaint, who has title to that property.

20        MR. CLARKE:  I submit, Your Honor, you don't get that

21   far when the disputes are as patent as they are here.  Because

22   if there's a dispute, there's a line a mile long of cases that

23   say that you don't use 542, and your case is one of them.

24        THE COURT:  But where in the depository account

25   documentation or the complaint is the dispute evident?

1      MR. CLARK:  It doesn't have to be just in the

2   complaint, that's what I'm saying.

3      THE COURT:  Where is it?  Where is it?

4      MR. CLARK:  All right.  JPMC, the bank itself has

5   filed a claim specifically to 234 million dollars in tax

6   refunds that were put into these accounts post-petition.  They

7   are tax refunds which are property, were property of WMB and

8   were sold to JPMC.

9      We have reason to believe there are millions of

10  dollars in addition to that.  That's one specific transaction,

11  one transfer we know about.

12     THE COURT:  All right.  Let's talk about it.  You

13  filed a proof of claim that says that.  But that deals, again,

14  not with title to the deposit account.  It deals with what is

15  in that.

16     MR. CLARK:  Which is what we're fighting about.  I

17  mean, if it were simply title to the deposit account without

18  any funds being transferred because of title, which is not what

19  they want --

20     THE COURT:  Well let's talk about --

21     MR. CLARK:  -- I mean, obviously it's the money.

22     THE COURT:  Let me give you an example.  Title to

23  real estate is in the debtor's name, and the debtor files, you

24  know, a turnover action because possession is in somebody

25  else's name.

1        Do I dismiss that because the person in possession

2    says, well, wait a minute, title, you know, was fraudulently

3    conveyed to the debtor, and you can't use a turnover action to

4    do that, you've got to look at the underlying things.  Dismiss

5    this adversary.

6        MR. CLARK:  You would dismiss the turnover if there

7    was a legitimate dispute along the lines you're describing.

8        THE COURT:  But, again, on a motion to dismiss, I'm

9    limited to what the complaint says, aren't I?

10        MR. CLARK:  I don't believe that's true when you're

11    talking about materials that are in the Court's files of which

12    you can take judicial notice, which raise the disputes, the

13    legitimate disputes to these amounts.  And they are not just

14    JPMorgan claims, they are claims that were raised by the FDIC

15    and by the bond holders at the bank level with regard to

16    potential fraudulent conveyance claims.

17        I mean, the way this money -- strike money, the money

18    was not moved, the way the paper was moved in the days before

19    their receivership, has got to open up a host of questions

20    about whether or not that was valid.

21        About whether any transfer that can be upheld

22    occurred.  It's remarkable that --

23        THE COURT:  But your putting it in a pleading and

24    saying that this is what happened, is not enough.

25        MR. CLARK:  It's --

1          THE COURT:  Otherwise, there could never be a

2    turnover action.

3          MR. CLARK:  It's enough to show -- it's enough to

4    show that there's a dispute, a legitimate dispute.

5          THE COURT:  If that were enough, there could never be

6    a turnover action.

7          MR. CLARK:  Well, I mean, people have got to be able

8    to sustain what they have in these pleadings that they put in.

9          THE COURT:  But I'm not going to have an evidentiary

10   hearing to determine whether you're correct, or the debtors are

11   correct as to the source of those monies.

12         MR. CLARK:  Nor should you.  Because of the existence

13   of the dispute, you should require them not to use Section 542

14   for whatever claim they have.

15         Because turnover only applies when there's no dispute

16   and you can't be limited --

17         THE COURT:  But, no, then every turnover -- there

18   would never be a turnover.  If there were no dispute the debtor

19   would not have to file a lawsuit.

20         MR. CLARK:  I think what Your Honor is saying is the

21   converse of that.  If they come in and they file a pleading

22   that says there is no dispute, then they get to have a turnover

23   action.

24         THE COURT:  No, unless on the face of their claim

25   there appears to be a dispute.  They cannot, for example, come

1    in and claim title to property where it says it's in the name

2    of the debtor and somebody else.  They can't come in and say --

3    claim we have sole title to that property.

4         If on the face of their claim the dispute is evident,

5    I think turnover is not applicable.

6         MR. CLARK:  Your Honor, what -- I think I'm back to

7    saying the same thing, that if in fact they plead purely, so

8    that there is nothing that they follow up with in the

9    complaint, they don't make a mistake and say, by the way,

10   there's another claim over here, then they get to pursue their

11   turnover proceeding.

12        I mean, in the D.C. action, in the complaint that

13   they filed, they said they acknowledged, I think it was

14   paragraph 168, they said, we understand that both JPMC and the

15   FDIC have claims that they may file, that they may pursue with

16   regard to the deposit accounts.

17        And, therefore, we are filing this particular section

18   of our complaint to resolve that dispute.  That's what they

19   said in Federal Court in D.C.  And what Your Honor's saying is,

20   I just can't take any account of that.

21        And I don't think that's the rule.

22        THE COURT:  In deciding whether a turnover action is

23   appropriate.

24        MR. CLARK:  Yes.

25        THE COURT:  Certainly on the merits of who has actual

1  title to the deposit account, that is relevant.

2          MR. CLARK:  I think it's relevant on the turnover

3  procedure, as well.  Because if it's that clear that there's a

4  dispute here, then I think Your Honor should require them not

5  to use a turnover procedure, but to follow other procedures.

6          THE COURT:  All right.  Did I interrupt, and did you

7  have more?

8          MR. CLARK:  I think, you know, I tried to only do the

9  standards question, but, Your Honor and I, between us, got onto

10  the merits of dismissal, as well.

11          THE COURT:  That's all right.  The other side did, as

12  well.

13          MR. CLARK:  Thank you.

14          THE COURT:  Anybody else on that?  Any reply?  Well,

15  let me do this, I am going to deny the motion to reconsider,

16  because I think they are two different standards.  The standard

17  to dismiss must only look at the four corners of the complaint

18  and attachments, while summary judgment, obviously, can

19  consider matters outside the complaint.

20          So I think it is appropriate to deal with the motion

21  to dismiss first, rather than together with the debtors' motion

22  for summary judgment.  However, I will deny the motion to

23  dismiss the complaint, because I think that in deciding such a

24  motion, even of a turnover action, I'm limited to the four

25  corners of the complaint and its attachment.

1          And it is not evidence from this -- the complaint and

2     the attachments that there's any dispute as to the title to the

3     account -- excuse me, deposit accounts.  Obviously, I'm not

4     deciding a disputed issue, and that may be disputed by the

5     filing of an answer.  I think I can predict that.

6          But this is different from the <u>Lexington Healthcare</u>

7     case, where the dispute was evident from the debtor's complaint

8     and attachments.  It is not simply enough to say there is a

9     dispute to preclude a turnover action.  Otherwise, there could

10    never be a turnover action.

11         So I will, as I say, deny the motion to dismiss the

12    complaint.

13         MR. ROSEN:  Your Honor, if I may, can we prepare four

14    very simple orders based upon the record and send those to

15    opposing counsel and to the Court?

16         THE COURT:  You may.

17         MR. ROSEN:  Thank you.

18         THE COURT:  I think we're done today.

19         MR. CARLINSKY:  The one additional issue, Your Honor,

20    is in light of the motion to dismiss being denied, do we need a

21    schedule for the opposition on the summary judgment motion,

22    which is currently an open motion?

23         THE COURT:  Yes.

24         MR. CARLINSKY:  We can work that out --

25         THE COURT:  Why don't you work that out.  I think --

1    yes.

2              MR. CARLINSKY:  Yes, Your Honor.

3              THE COURT:  And just also to let the parties know, I

4    do have the matter of the 2004 under advisement, and I expect

5    to issue a ruling today.

6              We'll stand adjourned.

7    (Court adjourned)

8                          * * * * *

9                   C E R T I F I C A T I O N

10   I, Josette Jones, court app roved transcriber, certify that the

11   foregoing is a correct transcript from the official electronic

12   sound recording of the proceedings in the above-entitled

13   matter.

14

15   --------------------------------        -------------------

16   JOSETTE JONES                                DATE

17   DIANA DOMAN TRANSCRIBING