29.     The Capital Contributions were transfers of an interest in WMI's property.  In its Complaint, JPMorgan Chase admits that the Capital Contributions were transferred to WMB, stating:  "WMI formally contributed to WMB at least $6.5 billion of the approximately $10.2 billion in capital it had raised." (Complaint at ¶ 35).

30.     Pursuant to the P&A Agreement, JPMorgan Chase purchased substantially all of WMB's assets.  On the Receivership Date, funds that comprised the Capital Contributions were transferred to JPMorgan Chase.

31.     Because the Capital Contributions are avoidable as constructive fraudulent transfers, WMI may recover from JPMorgan Chase as the subsequent transferee of the Capital Contributions, either the Capital Contributions or the value of the Capital Contributions for the benefit of WMI's estate pursuant to section 550 of the Bankruptcy Code.  On the Receivership Date, JPMorgan Chase knew or should have known of the Capital Contributions and about the respective financial conditions of WMI and WMB.  Thus, JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Capital Contributions.

## B.     The Trust Securities

### (i)     Issuance of the Trust Securities

32.     Between March 2006 and October 2007, in four instances, certain SPEs associated with WMI and its then subsidiaries issued the Trust Securities in connection with, and facilitated by, WMPF.  The Trust Securities have an aggregate liquidation preference of approximately $4 billion and upon information and belief are currently worth at least as much.

33.     WMPF's assets were limited to direct or indirect interests in mortgage or mortgage-related assets, cash, and other permitted assets which were held in certain trusts.  WMPF issued preferred securities which were held by, and were the only asset of, the SPEs.  These

securities were senior in priority to the common equity interests of WMPF which were indirectly held by WMB and WMI. In turn, the SPEs issued the Trust Securities.

34.     The Trust Securities were offered and sold to "qualified institutional buyers" or "qualified purchasers" subject to a conditional exchange feature that operated to exchange the Trust Securities into related classes of WMI preferred stock, or depository shares representing WMI preferred stock, upon the occurrence of certain events as directed by the OTS under certain circumstances (*i.e.*, WMB becoming undercapitalized, WMB being placed into receivership, or the OTS anticipating WMB becoming undercapitalized in the near future, each an "<u>Exchange Event</u>"). Pursuant to the declaration of such an Exchange Event, the Trust Securities would be then held by WMI, having been exchanged for newly-issued preferred stock of WMI (a "<u>Conditional Exchange</u>"). A simplified illustrative chart follows:



35.     On February 23, 2006, by letter addressed to Darrel Dochow of the OTS, John F. Robinson, WMI Corporate Risk Management, indicated to the OTS that if, as a result of the occurrence of an Exchange Event declared by the OTS, WMI issues preferred stock, or depository shares representing WMI preferred stock, in exchange for the Trust Securities, "WMI will

contribute to WMB the [Trust Securities]" (collectively, with the November 14, 2006 and the August 17, 2007 correspondence discussed below, the "Downstream Undertakings").   On February 24, 2006, the OTS responded by letter from Dochow to Robinson, indicating that it would consider the value of the Trust Securities in WMB's core capital in light of WMI's Downstream Undertaking.  With respect to subsequent issuances of Trust Securities, similar letter exchanges took place on November 14, 2006 and December 4, 2006, and August 17, 2007 and September 20, 2007.

36.    The February 26, 2006 OTS letter went on to state that "[n]otwithstanding the above, the OTS reserves the right, in its sole discretion, to exclude the [Trust Securities] (or prospective issuances of [Trust Securities]) if the terms are revised or it otherwise ceases to provide meaningful capital support and a realistic ability to absorb losses, or otherwise raises supervisory concerns."  Similar reservations of rights appeared in correspondence relating to subsequent issuances of Trust Securities (collectively, the "OTS Reservation of Rights").

37.    The Trust Securities were certificated securities, represented by global certificates held by Depository Trust Company ("DTC") and registered in the name of DTC's nominee, Cede & Co.

### (ii)    The OTS Declares an Exchange Event

38.    On September 24, 2008, the day prior to the Receivership Date, the OTS notified WMI that an Exchange Event had occurred.

39.    On September 25, 2008, by letter addressed to Steve Frank and Alan Fishman of WMI from Darrel Dochow of the OTS, the OTS directed WMI to cause a Conditional Exchange, exchanging the Trust Securities for preferred shares of WMI.

40.    Later that day, immediately after the OTS closed WMB, its assets were purportedly sold to JPMorgan Chase pursuant to the P&A Transaction.

41.     Still later that day, just prior to 9:00 p.m. Eastern time, an employee of WMI executed an Assignment Agreement which purported to assign the right, title, and interest in the Trust Securities to WMB (the "Assignment").

42.     Pursuant to section 4.08 of the Amended and Restated Trust Agreement, dated as of March 7, 2006 (the "Trust Agreement") governing the Trust Securities, the Trust Securities were to be transferred to WMI in a Conditional Exchange at "the earliest possible date such exchange could occur consistent with the directive, as evidenced by the issuance by WMI of a press release prior to such time." (Trust Agreement §4.08). WMI sent a letter to the OTS on the evening of September 25, 2008, indicating that the Conditional Exchange would occur at 8:00 a.m. Eastern time on the 26th of September and that WMI would immediately contribute the Trust Securities to WMB upon the Conditional Exchange.

### (iii)     The Transfer of the Trust Securities Was Made For Less Than Reasonably Equivalent Value

43.     The transfer of the Trust Securities pursuant to the Assignment Agreement is avoidable as a constructive fraudulent transfer of an interest in WMI's property that harmed WMI and its creditors.

44.     At 8:00 a.m. Eastern time on the Petition Date, at a time when WMI was insolvent, WMI transferred the Trust Securities to WMB or to JPMorgan Chase, as successor in interest to WMB (Complaint at ¶ 79), for no consideration.

45.     WMI did not receive any direct benefit in exchange for the transfer of the Trust Securities. WMI received no indirect benefit either, such as increased equity value flowing from WMB because its wholly-owned subsidiary WMB was insolvent. Moreover, both the transfer, and the Assignment the day prior, were made after WMB had been seized by the OTS, and thus WMI's equity shares in WMB were likewise valueless.

46.     JPMorgan Chase is liable to WMI's estate as an initial or subsequent transferee of the Trust Securities. On the Receivership Date and the Petition Date, JPMorgan Chase knew or should have known of the transfers of the Trust Securities and about the financial condition of WMI and WMB. Thus, JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the transfer of the Trust Securities.

      **(iv)     In the Alternative, the Transfer of the Trust Securities in Satisfaction of the Downstream Undertakings is Fraudulent as to Creditors and a Voidable Preference**

47.     Alternatively, the transfer of the Trust Securities at 8:00 a.m. Eastern time on the Petition Date in satisfaction of the Downstream Undertakings was both fraudulent as to WMI's creditors under applicable state law and a preferential transfer under the Bankruptcy Code.

48.     First, the transfer of the Trust Securities was fraudulent as to WMI's creditors that existed as of the date of the transfer under applicable state law because the transfer was made to an insider, WMB or JPMorgan Chase, as successor in interest to WMB, while WMI was insolvent and while WMB or JPMorgan Chase had reasonable cause to believe that WMI was insolvent. The transfer was made on account of an antecedent obligation – the Downstream Undertakings. Thus, JPMorgan Chase is liable to WMI's estate as an initial or subsequent transferee of the Trust Securities. On the Receivership Date and the Petition Date, JPMorgan Chase knew or should have known of the purported transfers of the Trust Securities and about the financial condition of WMI. Thus, JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the transfer of the Trust Securities.

49.     Second, the transfer of the Trust Securities was a preferential transfer under the Bankruptcy Code. At a time when WMI was insolvent, WMI transferred the Trust Securities on account of an antecedent obligation – the Downstream Undertakings.

50.    The transfer was made either to WMB or JPMorgan Chase and enabled WMB or JPMorgan Chase to receive more than either would have received if WMI had not transferred the Trust Securities and had filed a bankruptcy case under chapter 7 of the Bankruptcy Code.

51.    JPMorgan Chase expressly did not acquire any claims against WMI under the P&A Agreement and cannot be construed as a contractual assignee (P&A Agreement, Schedule 3.5), yet it asserted a claim to the Trust Securities in light of its assumption of all of WMB's deposit liabilities.  If the Trust Securities are deemed to have been transferred to JPMorgan Chase, they were transferred to JPMorgan Chase as subrogee to WMB, and subrogees do not enjoy the priority contemplated by section 507(a)(9) of the Bankruptcy Code.  Therefore, the transfer enabled WMB to receive more than it would have received in a hypothetical WMI chapter 7 bankruptcy case.  As such, JPMorgan Chase would be left with only a general unsecured claim and would stand to recover significantly less than the value of the Trust Securities.

52.    Further, even if WMB or JPMorgan Chase could assert a priority claim under section 507(a)(9) of the Bankruptcy Code, which WMI disputes, the transfer enabled WMB or JPMorgan Chase to receive more than either would have received in a hypothetical WMI chapter 7 bankruptcy case.  This is so because, as asserted above and below, WMB and JPMorgan Chase are transferees of transfers that are avoidable under the Bankruptcy Code.  Section 502(d) of the Bankruptcy Code would operate to disallow any claim of WMB in a hypothetical WMI chapter 7 bankruptcy case.

53.    JPMorgan Chase is liable to WMI's estate as an initial or subsequent transferee of the Trust Securities.  On the Receivership Date and the Petition Date, JPMorgan Chase knew or should have known of the purported transfers of the Trust Securities and about the financial

condition of WMI. Thus, JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the transfer of the Trust Securities.

### (v) In the Alternative, the Trust Securities Were Not Transferred and are Owned by WMI

54.     In the alternative, if it is determined that the Trust Securities were not in fact transferred to WMB or to JPMorgan Chase pursuant to the Assignment Agreement, then the Trust Securities are owned by WMI and are property of WMI's bankruptcy estate.

55.     Pursuant to section 4.08 of the Trust Agreement, upon a Conditional Exchange, until replacement certificates are issued by WMI for the new WMI preferred stock issued to the prior holders of the Trust Securities, the certificates formerly representing the Trust Securities shall be deemed for all purposes to represent the preferred shares of WMI. (Trust Agreement § 4.08). The September 26, 2008 press release provided that "until such depositary receipts are delivered or in the event such depositary receipts are not delivered, any certificates previously representing [Trust] Securities will be deemed for all purposes, effective as of 8:00 AM New York time on September 26, 2008, to represent Fixed Rate Depositary Shares or Fixed-to-Floating Rate Depositary Shares, as applicable." A copy of the press release is attached hereto as Exhibit 1. Thus, upon a Conditional Exchange, the Trust Securities necessarily became uncertificated.

56.     Upon information and belief, the SPEs, the issuers of the Trust Securities, have made no transfer notations registering the Trust Securities to WMB to reflect any purported Assignment.[8]

57.     More than simply a clerical act, registration is a legally significant act that facilitates the administration of a large-scale security issuance involving multiple holders, like the

---

[8]     The Debtors are not aware of any transfer notations being made post-petition, but reserve their right to amend the complaint to avoid any such unauthorized transfers of property of the Debtors' estate.

Trust Securities. Neither WMB nor JPMorgan Chase is the registered owner listed in the registrar's books with respect to the Trust Securities. Therefore, under applicable law and the Uniform Commercial Code as adopted by the State of Washington, the Trust Securities have not been delivered to WMB. Thus, the Trust Securities are property of WMI's bankruptcy estate.

### (vi)    JPMorgan Chase Has No Claim for the Trust Securities

58.    The Trust Securities were not assigned to JPMorgan Chase under the terms of the P&A Agreement. Under Section 3.2(b) of the P&A Agreement, JPMorgan Chase was required to submit a bid for any securities that were not the capital stock of an acquired subsidiary of WMB. (P&A Agreement ¶ 3.2(b)). No such bid was submitted to WMB or the FDIC for the Trust Securities. The P&A Agreement further provides that "in the absence of an acceptable bid from [JPMorgan Chase], each such security shall not pass to [JPMorgan Chase] and shall be deemed to be an excluded asset hereunder." (P&A Agreement ¶ 3.2(b)). Therefore, JPMorgan Chase has no claim to the Trust Securities.

59.    Further, Section 3.5 of the P&A Agreement provides that Schedule 3.5, "Certain Assets Not Purchased," enumerates certain assets not purchased, acquired, or assumed by JPMorgan Chase under the P&A Agreement. (P&A Agreement ¶ 3.5). Listed on Schedule 3.5 is "any interest, right, action, claim, or judgment against . . . any shareholder or holding company of [WMB] . . . ." (P&A Agreement, Schedule 3.5). Thus, JPMorgan Chase expressly did not acquire any claim from WMB for the Trust Securities under the Assignment Agreement or otherwise.

60.    Further, in light of the fact that JPMorgan Chase assumed all of WMB's deposit liabilities, to the extent JPMorgan Chase has subrogated to the rights of WMB with respect to the Trust Securities, section 507(d) of the Bankruptcy Code provides that any priority status that

WMB may have with respect to the Trust Securities will not inure to the benefit of JPMorgan Chase as subrogee.

61.     Moreover, property is recoverable from JPMorgan Chase on account of, among other things, its status as a transferee of the avoidable Capital Contributions, as asserted above. Thus, section 502(d) of the Bankruptcy Code operates to disallow any claim of JPMorgan Chase (in any event) until JPMorgan Chase turns over the value of the avoidable Capital Contributions, among other things, to WMI's estate.  Accordingly, any claim JPMorgan Chase may have on account of the Trust Securities or otherwise is disallowed.

### C.     Preferential Payments

#### (i)     WMI Transfers Cash and Interests in Property to WMB on Account of Antecedent Debt

62.     On or before the Receivership Date, WMI transferred significant sums or other interest in property to WMB, to third parties for the benefit of WMB, or to WMB fsb.  These transfers were made on account of pre-existing tax-related obligations (the "Tax Transfers") or, administrative obligations  (the "Intercompany Settlements," and with"), and indemnification obligations arising out of WMI's agreement to indemnify WMB for losses and fees incurred in connection with loans acquired pursuant to the merger of WMB with Long Beach Mortgage Company in July 2006 (the "Long Beach Transfers," and with the Intercompany Settlements and the Tax Transfers, the "Preferential Transfers").  In each case, the obligations were owed WMB and were made during the one-year period immediately preceding the Petition Date.

63.     During thisthe one-year period immediately preceding the Petition Date, the Tax Transfers were made to WMB by WMI in an approximate amount of $1,112,517,472.3,051,127,370. During this period, the Intercompany Settlements were made to

WMB by WMI in an approximate amount of $151,934,564.  During this period, the Long Beach Transfers were made to WMB by WMI in an approximate amount of $192,171,812 .  The Preferential Transfers are detailed in the schedules attached hereto as Exhibit 2.  At the time of the Preferential Transfers, WMB and WMB fsb were both "insiders" of WMI and "creditors" of WMI as those terms are defined in the Bankruptcy Code or under applicable non-bankruptcy law.

64.    WMB and WMB fsb received more on account of the Preferential Transfers than they would have received under a hypothetical chapter 7 bankruptcy case had the Preferential Transfers not been made.

65.    To the extent WMI was insolvent at the time of the various Preferential Transfers, the Preferential Transfers are avoidable under the Bankruptcy Code and under applicable state law as fraudulent transfers.  To the extent WMI was insolvent at the time of the various Preferential Transfers, WMB and WMB fsb had reasonable cause to believe that WMI was insolvent.

### (ii)    Preferential Transfers are Subsequently Transferred to JPMorgan Chase

66.    The Preferential Transfers were transfers of an interest of WMI in property. Pursuant to P&A Agreement, JPMorgan Chase purchased substantially all of WMB's assets. Moreover, by subsequent transaction, JPMorgan Chase merged with WMB fsb.  Thus, on the Receivership Date, the funds and/or value that comprised the Preferential Transfers were transferred to JPMorgan Chase.

67.    Because the Preferential Transfers are avoidable as preferential transfers or as fraudulent transfers, then pursuant to section 550 of the Bankruptcy Code, WMI may recover the Preferential Transfers from JPMorgan Chase as subsequent transferee, or the value of the

Preferential Transfers for the benefit of WMI's estate. On the Receivership Date and the Petition Date, JPMorgan Chase knew or should have known of the Preferential Transfers and about the financial condition of WMI. Thus, JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Preferential Transfers.

### D. FDIC Sells WMB's Assets to JPMorgan Chase For Less Than Reasonably Equivalent Value

68.    As reported in the *Wall Street Journal*, because the FDIC had informed JPMorgan Chase in early September that it desired to "immediately auction off WaMu's assets" upon the seizure of WMB, "J.P. Morgan was well-prepared . . . when the FDIC asked for bids" for the purchase of WMB's assets. Heidi N. Moore, *Deal Journal*, WALL ST. J., Sept. 30, 2008, at C7.

69.    Prior to the Receivership Date, the FDIC determined that it would accept JPMorgan Chase's bid for WMB's assets.

70.    Immediately after its appointment as receiver, the FDIC purportedly sold the majority of WMB's assets to JPMorgan Chase in exchange for consideration of $1.88 billion.

71.    Under the P&A Transaction, JPMorgan Chase likely acquired more than $300 billion of assets at book value, including $134 billion of retail deposits and over $8 billion of uninsured deposits which have matching liabilities. *See* FDIC Memorandum to Board of Directors, September 24, 2008.

72.    Less than a week after the P&A Transaction was consummated, JPMorgan Chase booked an after-tax extraordinary gain from "merger-related items" in connection with the P&A Transaction in the amount of $581 million. *See* JPMorgan Chase & Co., Form 10-Q for the quarter ended September 30, 2008, at 9. This amount reflected "negative goodwill," or a gain occurring when the price paid for an acquisition is less than the fair value of the acquired net assets. Subsequently, and because JPMorgan Chase's initial assessment of the value received over and

beyond what it paid was conducted just days after the P&A Transaction, that gain was reassessed and increased to *$1.9 billion* – an amount in and of itself more than the total consideration paid by JPMorgan Chase. *See* JPMorgan Chase & Co., Form 10-K for the fiscal year ended December 31, 2008, at 26.

73.     The actual windfall to JPMorgan Chase was even greater, taking an immediate effect on JPMorgan Chase revenues. Having acquired WMB at fire-sale prices, JPMorgan Chase has achieved "record firmwide revenue" in first quarter 2009 and has enjoyed growth in retail banking deposits by 62% and in checking accounts by 126%.[9]  Further, JPMorgan Chase has announced that it is now poised to recognize significant gains (*i.e.*, as much as $29 billion), as it recognizes the actual market value of many of the WMB assets it purchased and marked down at aggressive discounts. *See* Ari Levy and Elizabeth Hester, *JPMorgan's WaMu Windfall Turns Bad Loans Into Income,* BLOOMBERG.COM, May 26, 2009.[10]

74.     At the time of the P&A Transaction, WMI was an actual creditor of WMB pursuant to various promissory notes and other intercompany payables. WMB was insolvent at the time of, or was rendered insolvent by, the P&A Transaction or was engaged in a business for which its remaining assets were unreasonably small.

75.     In short, WMB did not receive from JPMorgan Chase reasonably equivalent value in exchange for the transfer of WMB's assets in the P&A Transaction.

---

[9]     *See* JPMorgan Chase Press Release, *JPMorgan Chase Reports First-Quarter 2009 Net Income of $2.1 Billion, or $0.40 per Share,* April 16, 2009. Specifically, net income in JPMorgan Chase's Retail Financial Services division "was $474 million, compared with a net loss of $311 million in the prior year" due, in part, to the "positive impact of the Washington Mutual transaction . . ." Net income in JPMorgan Chase's Commercial Banking division "was $338 million, an increase of $46 million, or 16%, from the prior year, driven by higher net revenue reflecting the impact of the Washington Mutual transaction . . ." "Net interest income [at JPMorgan Chase] was $15.5 billion, up by $6.1 billion, or 65%, due to the impact of the Washington Mutual transaction," among other things.

[10]    http://www.bloomberg.com/apps/news?pid=20601087&sid=aYhaiSOq_Tbc &refer=home

### E. Former Intercompany Amounts Due Assumed and Payable by JPMorgan Chase

76.     WMB was indebted to WMI, or certain of WMI's non-bank, non-Debtor subsidiaries, under certain demand promissory notes that are due and payable in an approximate aggregate amount of $177 million as of the Petition Date (the "Promissory Notes"), plus interest accruing thereafter, as follows:[11]

- $82,048,081 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Corporation, as lender. H.S. Loan Corporation is a subsidiary of WMI, in which WMB owns 1.3283%.

- $73,670,153 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Partners, as lender. H.S. Loan Partners is an indirect, wholly-owned subsidiary of WMI.

- $7,781,240 under that certain Revolving Master Note, dated as of February 11, 2005, by and between WMB, as borrower, and WMHFA Delaware Holdings LLC, as lender. WMEIFA Delaware Holdings LLC is an indirect, wholly-owned subsidiary of WMI.

- $13,576,245 under that certain Registered Security, Note A, dated as of December 17, 2004, by and between University Street, Inc., as payor and predecessor in interest to WMB, and WMRP Delaware Holdings LLC, as payee, and predecessor in interest to PCA Asset Holdings LLC. This Promissory Note is recorded on WMI's books and records as an obligation owed to PCA Asset Holdings LLC, an indirect subsidiary of WMI, by WMB.

77.     Further, there were significant intercompany receivables, that arose pursuant to that certain Administrative Services Agreement (the "Administrative Services Agreement"), identified by account numbers 28101, 28120, and 28025 owed WMI by WMB or its subsidiary WaMu Capital Corp. in the approximate amount of $22.5 million (the "Intercompany Receivables"). A summary of the amounts owed to WMI is as follows:

| Account Debtor | WMI A/R Number | Amount |
| --- | --- | --- |
| WMB | 28101 | $9,298,479 |
| WMB | 28120 | $13,200,977 |

---

[11]     Separately, WMB and WMB fsb were indebted to the Debtors on account of deposit liabilities in an amount in excess of $4 billion. These deposit liabilities are the subject of a separate adversary proceeding commenced on April 27, 2009, captioned *Washington Mutual, Inc. et al.v. JPMorgan Chase Bank, N.A.*, Adv. No. 09-50934.

| WaMu Capital Corp. | 28025 | $28,558 |
|---|---|---|

78.    Additionally, there may be other service agreements which would fall under the Administrative Services Agreement that operated to benefit WMB or one of its subsidiaries prior to the Petition Date. To the extent it is determined that the Debtors are liable for any amounts owed under such agreements, a related intercompany payable would have accrued payable from WMB to WMI (the "Additional Intercompany Receivables").

79.    Separately, as of the Petition Date, WMI sponsored a tax qualified cash balance pension plan, the WaMu Pension Plan (the "Plan"). Beginning in December 2006, and contrary to historical practice, WMI began to make contributions on account of both WMI and WMB plan participants. Pursuant to the Administrative Services Agreement, WMB is obligated to compensate WMI for such contributions. From December 2006 through the Petition Date, WMI contributed approximately $491 million on account of both WMI and WMB plan participants and has not been paid any amounts owed it by WMB for the amount contributed on account of WMB plan participants (the portion allocable to WMB or WMB subsidiary plan participants being the "Retirement Benefit Advances," and collectively, with the Promissory Notes, the Intercompany Receivables, and the Additional Intercompany Receivables, the "Intercompany Amounts Due").

80.    Under the P&A Agreement, JPMorgan Chase "expressly assumes . . . all of the liabilities of [WMB] which are reflected on the Books and Records of [WMB]. . .and all liabilities associated with any and all employee benefit plans . . . ." (P&A Agreement at § 2.1). Thus, JPMorgan Chase assumed the Intercompany Amounts Due. However, the Intercompany Amounts Due have not been paid to WMI's estate and remain due and payable.

### F.    JPMorgan Chase's Unauthorized Use of the WaMu Trademarks

81.    WMI is the owner of more than 80 federal trademark registrations and applications comprising a family of Washington Mutual trademarks, including but not limited to the marks

"WAMU," "WASHINGTON MUTUAL," and the "W Logo" for a variety of services including but not limited to banking, credit card, lending, investment and other financial services as well as community, education and philanthropic oriented services (the "WaMu Marks"). The registrations are valid and subsisting, unrevoked and uncancelled, in full force and effect. A list of the aforesaid federal trademark registrations and applications is attached hereto as Exhibit 3.

82. In the years preceding the seizure, the WaMu corporate family encompassed dozens of companies that operated, primarily under the WAMU brand, as a single, unified organization. Many of these companies conducted business under the WaMu Marks, as part of the larger Washington Mutual corporate family.

82. The WaMu Marks are unquestionably famous and extremely valuable. Banking services and related services have been provided under some or all of the WaMu Marks since 1889. The WAMU mark has been continuously used since at least as early as 1983. At the time of the seizure of WMB, it was the largest thrift and the sixth largest banking institution in the United States. In fact, the rights to the WAMU brand alone was recently valued at approximately $6 billion.

83. WMI also owns registrations for at least 140 other trademarks and service marks, each in connection with various lines of business of the WaMu corporate family (the "Secondary Marks"). The registrations are valid and subsisting, unrevoked and uncancelled, in full force and effect. A list of the aforesaid federal trademark registrations and applications is attached hereto as Exhibit 4.

84. It was WMI's policy and practice to register the WaMu Marks and the Secondary Marks with the United States Patent and Trademark Office in the name of WMI, the holding company. WMI subsidiaries operating under the WaMu Marks and/or using the Secondary Marks

were permitted to use them for the products and services relevant to such subsidiary's business pursuant to an implied license from WMI for as long as the subsidiary remained part of the Washington Mutual corporate family.

85. WMI is the owner of approximately 1350 domain names containing the WaMu Marks and the Secondary Marks, including, but not limited to, wamu.com, washingtonmutual.com, and wamubank.com. WMI is also the owner of numerous other domain names related to (collectively, the "WaMu Domain Names"), which contain either the WaMu Marks, the Secondary Marks, or references to past advertising campaigns (together, the "WaMu Domain Names"). WMI subsidiaries were permitted to use the WaMu Domain Names to advertise and provide information to customers regarding the products and services relevant to such subsidiary's business pursuant to an implied license from WMI for as long as the subsidiary remained part of the Washington Mutual corporate family.

86. Wamu.com was the primary website for WMI and its subsidiaries, and as such was the primary centralized focal point for customer interaction, from advertising WMI's various products and services to providing online banking and financial and investment consultation services. In addition, WAMU.COM is the subject of a U.S. federal trademark registration for a broad range of banking and financial services.

87. WMB, as a subsidiary of WMI, used the WaMu Marks and the Secondary Marks pursuant to an implied license from WMI which operated so long as WMB remained a member of WMI's corporate family.

88. On September 25, 2008, upon the OTS's seizure of WMB, WMB's license to use the WaMu Marks and the Secondary Marks terminated.

89.     JPMorgan Chase's continued use of the WaMu Marks, including and the ~~WaMu Domain Names~~Secondary Marks, in connection with its business operations is unauthorized and infringing.

90.     JPMorgan Chase has infringed the WaMu Domain Names by continuing to use at least 120 active domain names, including, but not limited to wamu.com, and by causing at least 60 ~~active~~ of the active WaMu Domain Names, including, but not limited to wamu.com, to display JPMorgan Chase-branded and run websites.

91.     JPMorgan Chase's continued use of the WaMu Marks, the Secondary Marks and the WaMu Domain Names will cause consumers to falsely believe that the products and/or services provided by JPMorgan Chase under such marks and domain names emanate from WMI, or are being rendered with the authorization or approval of WMI, when they are not.

92.     JPMorgan Chase's use of the WaMu Marks, the Secondary Marks and the WaMu Domain Names is intentional and willful.

# FIRST COUNTERCLAIM

## Avoidance and Recovery of Capital Contributions Pursuant to 11 U.S.C. §§ 548, 550

93.     Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-92.

94.     Each of the Capital Contributions was a transfer of an interest in WMI's property within two years of the Petition Date.

95.     WMI received no direct consideration in exchange for each of the Capital Contributions.

96.     As of the time of each of the Capital Contributions, to the extent that WMI was either insolvent or was left with unreasonably small capital and WMB was insolvent or the prospect of WMB being seized by the OTS was so likely that equity shares in WMB were valueless, each of the Capital Contributions was for less than reasonably equivalent value and is avoidable as a fraudulent transfer under section 548 of the Bankruptcy Code.

97.     JPMorgan Chase is liable to WMI's estate as a subsequent transferee of the interest in WMI's property that was transferred by each of the Capital Contributions plus pre-judgment interest at the highest applicable rate to be determined by the Court.  JPMorgan Chase did not acquire its interest in the WMI property that was transferred by each of the Capital Contributions in good faith and without knowledge of the voidability of each of the Capital Contributions.

# SECOND COUNTERCLAIM

## Avoidance and Recovery of Capital Contributions Pursuant to
## 11 U.S.C. §§ 544, 550; RCW §§ 19.40.041, 19.40.051, 19.40.071 & 19.40.081

98.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-97.

99.    On the dates of each of the Capital Contributions, there were actual creditors of the Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of sections 502(d) and 544(b) of the Bankruptcy Code, which claims remained unsatisfied on the Petition Date. Pursuant to section 544(b) of the Bankruptcy Code, the Debtors have the rights of an existing unsecured creditor of the Debtors.

100.    Each of the Capital Contributions was a transfer of an interest in WMI's property within four years of the Petition Date.

101.    WMI received no direct consideration in exchange for each of the Capital Contributions.

102.    As of the time of each of the Capital Contributions, to the extent that WMI was either insolvent or was left with unreasonably small remaining assets and WMB was insolvent or the prospect of WMB being seized by the OTS was so likely that equity shares in WMB were valueless, each of the Capital Contributions was not for reasonably equivalent value and are avoidable fraudulent transfers under RCW §§ 19.40.041, 19.40.051 and section 544 of the Bankruptcy Code.

103.    JPMorgan Chase is liable to WMI's estate as a subsequent transferee of the interest in WMI's property that was transferred by each of the Capital Contributions plus pre-judgment interest at the highest applicable rate to be determined by the Court. JPMorgan Chase did not

acquire its interest in the WMI property that was transferred by each of the Capital Contributions in good faith and without knowledge of the voidability of each of the Capital Contributions.

## THIRD COUNTERCLAIM

### Avoidance and Recovery of Trust Securities Pursuant to 11 U.S.C. §§ 548, 550

104.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-103.

105.    The transfer of the Trust Securities to WMB or to JPMorgan Chase is avoidable pursuant to 11 U.S.C. § 548.

106.    The transfer of the Trust Securities was a transfer of an interest in WMI's property within two years of the Petition Date.

107.    At the time of the transfer of the Trust Securities, WMI was insolvent or had unreasonably small capital. WMI did not receive any value for transferring the Trust Securities to WMB or to JPMorgan Chase. Further, WMI received no indirect benefit either, such as increased equity value flowing from WMB because its wholly-owned subsidiary WMB was insolvent or had been seized by FDIC thereby rendering WMI's equity stake in WMB worthless. Moreover, both the purported transfer, and the Assignment the day prior, were made after WMB had been seized by the OTS, and thus WMI's equity shares in WMB were likewise valueless.

108.    If the Trust Securities were transferred by WMI to JPMorgan Chase, then pursuant to section 550 of the Bankruptcy Code, WMI may recover the Trust Securities from JPMorgan Chase as initial transferee, or the value of the Trust Securities for the benefit of WMI's estate plus, in both instances, pre-judgment interest at the highest applicable rate to be determined by the Court.

109.    If the Trust Securities were transferred by WMI to WMB and then to JPMorgan Chase, then pursuant to section 550 of the Bankruptcy Code, WMI may recover the Trust Securities from JPMorgan Chase as subsequent transferee, or the value of the Trust Securities for

the benefit of WMI's estate plus, in both instances, pre-judgment interest at the highest applicable rate to be determined by the Court. JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Trust Securities.

## FOURTH COUNTERCLAIM

### Avoidance and Recovery of Trust Securities Pursuant to 11 U.S.C. §§ 544, 550; RCW §§ 19.40.041, 19.40.051, 19.40.071 & 19.40.081

110.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-109.

111.    The transfer of the Trust Securities to WMB or to JPMorgan Chase is avoidable pursuant to applicable Washington state law.

112.    The transfer of the Trust Securities was a transfer of an interest in WMI's property within four years of the Petition Date.

113.    On the date of the transfer of the Trust Securities, there were actual creditors of WMI holding unsecured claims allowable against WMI's estate within the meaning of sections 502(d) and 544(b) of the Bankruptcy Code, which claims remained unsatisfied on the Petition Date. Pursuant to section 544(b) of the Bankruptcy Code, WMI has the rights of an existing unsecured creditor of WMI.

114.    At the time of the transfer of the Trust Securities, WMI was insolvent or had unreasonably small remaining assets. WMI did not receive any value for transferring the Trust Securities to WMB or to JPMorgan Chase. Further, WMI received no indirect benefit either, such as increased equity value flowing from WMB because its wholly-owned subsidiary WMB was insolvent or had been seized by FDIC thereby rendering WMI's equity stake in WMB worthless. Moreover, both the purported transfer, and the Assignment the day prior, were made after WMB had been seized by the OTS, and thus WMI's equity shares in WMB were likewise valueless.

115.     If the Trust Securities were transferred by WMI to JPMorgan Chase, then pursuant to section 550 of the Bankruptcy Code, WMI may recover the Trust Securities from JPMorgan Chase as initial transferee, or the value of the Trust Securities for the benefit of WMI's estate plus, in both instances, pre-judgment interest at the highest applicable rate to be determined by the Court.

116.     If the Trust Securities were transferred by WMI to WMB and then to JPMorgan Chase, then pursuant to section 550 of the Bankruptcy Code, WMI may recover the Trust Securities from JPMorgan Chase as subsequent transferee, or the value of the Trust Securities for the benefit of WMI's estate plus, in both instances, pre-judgment interest at the highest applicable rate to be determined by the Court.  JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Trust Securities.

### FIFTH COUNTERCLAIM

#### Avoidance and Recovery of Trust Securities
#### Pursuant to 11 U.S.C. §§ 547, 550

117.     Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-116.

118.     In the alternative to the third and fourth counterclaims, if it is determined at or before trial that WMI transferred the Trust Securities to WMB or to JPMorgan Chase in satisfaction of the Downstream Undertakings as valid, enforceable, antecedent obligations, then such transfer is avoidable pursuant to 11 U.S.C. § 547.

119.     As such, WMB or JPMorgan Chase, as subrogee or successor in interest to WMB, were creditors of WMI pursuant to the Downstream Undertakings at the time the transfer was made.

120. The transfer of the Trust Securities was a transfer of an interest in WMI's property within ninety days of the Petition Date.

121. WMI was insolvent at the time the transfer was made.

122. As asserted above, WMB, as recipient of the Capital Contributions, is a transferee of a transfer avoidable under the Bankruptcy Code. Property is recoverable under the Bankruptcy Code from JPMorgan Chase on account of its status as a transferee of the Capital Contributions.

123. The transfer allowed WMB or JPMorgan Chase to receive more by virtue of the transfer than either of them would have received had the transfer not been made in a hypothetical WMI chapter 7 bankruptcy case.

124. Pursuant to section 550 of the Bankruptcy Code, WMI may recover the Trust Securities from JPMorgan Chase as initial or subsequent transferee, or the value of the Trust Securities for the benefit of WMI's estate plus, in both instances, pre-judgment interest at the highest applicable rate to be determined by the Court. JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Trust Securities.

## SIXTH COUNTERCLAIM

### Avoidance and Recovery of Trust Securities Pursuant to 11 U.S.C. §§ 544, 550; RCW §§ 19.40.051, 19.40.071 & 19.40.081

125. Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-124.

126. On the dates of the transfer of the Trust Securities, there were actual creditors of WMI holding unsecured claims allowable against WMI's estate within the meaning of sections 502(d) and 544(b) of the Bankruptcy Code, which claims remained unsatisfied on the Petition Date.

Pursuant to section 544(b) of the Bankruptcy Code, WMI has the rights of an existing unsecured creditor of WMI.

127.   In the alternative to the third and fourth counterclaims, if it is determined at or before trial that WMI transferred the Trust Securities to WMB or to JPMorgan Chase in satisfaction of the Downstream Undertakings as valid, enforceable, antecedent obligations, then such transfer is avoidable pursuant to 11 U.S.C. § 544 and Washington state law.

128.   As such, WMB or JPMorgan Chase, as successor in interest to WMB, were creditors of WMI pursuant to the Downstream Undertakings at the time the transfer was made.

129.   WMB or JPMorgan Chase, as successor in interest to WMB, was an insider of WMI under applicable law at the time the transfer of the Trust Securities was made.

130.   The transfer of the Trust Securities was a transfer of an interest in WMI's property within one year of the Petition Date.

131.   WMI was insolvent at the time the transfer was made and WMB or JPMorgan Chase had reasonable cause to believe that WMI was insolvent in light of the seizure of WMB by the FDIC, among other reasons.

132.   Pursuant to section 550 of the Bankruptcy Code, WMI may recover the Trust Securities from JPMorgan Chase as subsequent transferee, or the value of the Trust Securities for the benefit of WMI's estate plus, in both instances, pre-judgment interest at the highest applicable rate to be determined by the Court.  JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Trust Securities.

## SEVENTH COUNTERCLAIM

### Declaratory Judgment that Trust Securities are Property of the Estate

133.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-132.

134.    In the alternative to the third, fourth, fifth, and sixth counterclaims, as set forth above, the Trust Securities were not transferred to WMB, the FDIC, or JPMorgan Chase.

135.    JPMorgan Chase asserts a claim of ownership to the Trust Securities.

136.    The Trust Securities were not assigned to JPMorgan Chase under the terms of the P&A Agreement.  Thus, at best, JPMorgan Chase has a general unsecured claim against WMI's estate as subrogee to WMB.

137.    There is an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

138.    Debtors request a declaratory judgment that the Trust Securities are property of WMI's bankruptcy estate and were never delivered or transferred therefrom.

### EIGHTH COUNTERCLAIM

#### Avoidance and Recovery of Preferential Transfers to WMB
#### Pursuant to 11 U.S.C. §§ 547, 550

139.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-138.

140.    The Preferential Transfers were transfers of an interest in WMI's property within one year of the Petition Date.

141.    WMB and WMB fsb were creditors of WMI at the time the Preferential Transfers were made and the Preferential Transfers were made to WMB or WMB fsb or for their benefit.

142.    WMB and WMB fsb were insiders of WMI within the meaning of the Bankruptcy Code at the time the Preferential Transfers were made.

143. The Preferential Transfers allowed WMB and WMB fsb to receive more by virtue of the Preferential Transfers than they would have received had the Preferential Transfers not been made in a hypothetical WMI chapter 7 bankruptcy case.

144. To the extent WMI was insolvent at the time the Preferential Transfers were made, the Preferential Transfers are avoidable pursuant to 11 U.S.C. § 547.

145. JPMorgan Chase is liable to WMI's estate as a subsequent transferee of the Preferential Transfers plus pre-judgment interest at the highest applicable rate to be determined by the Court. JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Preferential Transfers.

## NINTH COUNTERCLAIM

### Avoidance and Recovery of Preferential Transfers to WMB Pursuant to 11 U.S.C. §§ 544, 550; RCW §§ 19.40.051, 19.40.071 & 19.40.081

146. Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-145.

147. On the dates of the Preferential Transfers, there were actual creditors of WMI holding unsecured claims allowable against WMI's estate within the meaning of sections 502(d) and 544(b) of the Bankruptcy Code, which claims remained unsatisfied on the Petition Date. Pursuant to section 544(b) of the Bankruptcy Code, WMI has the rights of an existing unsecured creditor of WMI.

148. The Preferential Transfers were transfers of an interest in WMI's property within one year of the Petition Date.

149. WMB and WMB fsb were creditors of WMI at the time the Preferential Transfers were made.

150.    WMB and WMB fsb were insiders of WMI under applicable law at the time the Preferential Transfers were made.

151.    To the extent WMI was insolvent at the time the Preferential Transfers were made (which WMB and WMB fsb each would have had reason to know of), the Preferential Transfers are avoidable pursuant to 11 U.S.C. § 544 and Washington state law.

152.    Pursuant to section 550 of the Bankruptcy Code, JPMorgan Chase is liable to WMI's estate as a subsequent transferee of the Preferential Transfers plus pre-judgment interest at the highest applicable rate to be determined by the Court.  JPMorgan Chase did not acquire its interest in WMI property in good faith and without knowledge of the voidability of the Preferential Transfers.

## TENTH COUNTERCLAIM

### Fraudulent Transfer Pursuant to 11 U.S.C. § 541; RCW §§ 19.40.041, 19.40.051, 19.40.071, & 19.40.081; NEV. REV. STAT. §§ 112.180, 112.190, 112.210, & 112.220

153.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-152.

154.    The P&A Transaction is avoidable as a fraudulent transfer by WMI in WMI's capacity as a creditor of WMB under Nevada state law or alternatively under Washington state law.

155.    At the time of the P&A Transaction, WMI was an actual creditor of WMB pursuant to various promissory notes and other intercompany payables.  WMB was insolvent at the time of, or was rendered insolvent by, the P&A Transaction or was engaged in a business for which its remaining assets were unreasonably small.

156. The P&A Transaction is avoidable because it took place within four years of the date hereof and WMB did not receive reasonably equivalent value for its assets from JPMorgan Chase.

157. JPMorgan Chase did not acquire WMB's assets in good faith.

158. JPMorgan Chase is liable to WMI's estate for the actual value of WMB's assets at the time of the P&A Transaction to be demined at trial plus pre-judgment interest at the highest applicable rate to be determined by the Court.

159. Alternatively, JPMorgan Chase is liable to WMI's estate in an amount necessary to satisfy any and all claims that WMI has against WMB in full.

160. With respect to the claims recited in paragraphs 158 and 159 hereof, WMI has a claim against JPMorgan Chase for money damages and for any other relief that the circumstances may require.

161. Alternatively, WMI may avoid the P&A Transaction to the extent necessary to satisfy any and all claims that WMI has against WMB in full.

## ELEVENTH COUNTERCLAIM

### Disallowance of Claims
### Pursuant to 11 U.S.C. §§ 105, 502

162. Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-161.

163. JPMorgan Chase filed proofs of claims in the Debtors' bankruptcy cases. The Debtors hereby object to any and all claims filed or asserted by JPMorgan Chase pursuant to section 502(d) of the Bankruptcy Code.[12]

---

[12] The Debtors reserve their rights to object to JPMorgan Chase's proofs of claims on different grounds through the Debtors' claims reconciliation process.

164.     Property is recoverable from JPMorgan Chase on account of its status as a transferee of the Capital Contributions, the Preferential Transfers, and to the extent applicable, the Trust Securities, as asserted above.  JPMorgan Chase has failed to turn over to the Debtors such property of the Debtors' estates.

165.     Pursuant to Section 502(d) of the Bankruptcy Code, each claim asserted by JPMorgan Chase must be disallowed because property of the Debtors' estates is recoverable from JPMorgan Chase and JPMorgan Chase has not turned over all of such property to the Debtors.

166.     Further, pursuant to Section 502(b)(1) of the Bankruptcy Code, the Debtors have a right of setoff under applicable state law, and because the Debtors have claims against JPMorgan Chase that exceed the amount (if any) owed by the Debtors to JPMorgan Chase, JPMorgan Chase's claims are unenforceable and must be disallowed.

## TWELFTH COUNTERCLAIM

### Declaratory Judgment that Certain Assets are Property of the Estate

167.     Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-166.

168.     In its Complaint, JPMorgan Chase asserts a claim of ownership to the:  (i) Trust Securities; (ii) Tax Refunds; (iii) $3.7 Billion Book Entry Transfer; (iv) Anchor and American Judgments (as defined therein) and all monies paid on account of those judgments, as well as any future judgment in either the *Anchor Savings Bank* or the *American Savings Bank* litigations; (v) Legacy Rabbi Trusts; (vi) Pension and 401(k) Plans; (vii) BOLI and Split Dollar Policies; (viii) Visa Shares; and (ix) Intangible Assets (each as defined in the Complaint, and collectively, the "Disputed Assets").

169.    The Disputed Assets are property of the Debtors' estates and were not purchased by JPMorgan Chase under the terms of the P&A Agreement.

170.    There is an actual controversy that is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

171.    The Debtors request a declaratory judgment determining that all of the Disputed Assets are property of the Debtors' estates and were not purchased by JPMorgan Chase under the terms of the P&A Agreement.

## THIRTEENTH COUNTERCLAIM

### Turnover of Intercompany Amounts Due
### Pursuant to 11 U.S.C. § 542

172. Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-171.

173. The Intercompany Amounts Due are debts owed to the Debtors' estates that are matured and payable on demand.

174. Pursuant to section 542 of the Bankruptcy Code, JPMorgan Chase is required to pay the Intercompany Amounts Due, including pre-judgment interest at the highest applicable rate to be determined by the Court, to the Debtors' estates.

## FOURTEENTH COUNTERCLAIM

### Unjust Enrichment, Constructive Trust, and Equitable Lien

175. Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-174.

176. JPMorgan Chase would be unjustly enriched if it were allowed to retain the Capital Contributions, the Trust Securities (if transferred), the Preferential Transfers, or any of the Disputed Assets.

177. In order to prevent that unjust enrichment, equity entitles WMI to recover the value of the property transferred, including through the remedies of constructive trust and/or equitable lien.

## FIFTEENTH COUNTERCLAIM

### Trademark Infringement Pursuant to 15 U.S.C. § 1114

178. Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-177.

179. JPMorgan Chase's continued use of the WaMu Marks, the Secondary Marks, and the WaMu Domain Names that incorporate either the WaMu Marks or the Secondary Marks, in connection with its business operations is unauthorized and infringing.

180. JPMorgan Chase's use of the WaMu Marks, the Secondary Marks and the WaMu Domain Names is intentional and willful.

181. The aforesaid acts of JPMorgan Chase constitute trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

182. The aforesaid acts of Counterclaim-Defendants have caused, and are causing, great and irreparable harm to WMI and, unless JPMorgan Chase is permanently restrained by this Court, said injury will continue.

183. WMI, the owner of the WASHINGTON MUTUAL and W Logo marks, permitted WMB, as its licensee, to retain two United States trademark registrations that cover a small fraction of WMB's services (United States Trademark Registrations Nos. 1197378 and 1214303), as an administrative convenience. Since the license is now terminated, WMI is entitled to an order requiring that JPMorgan Chase assign said trademark registrations to WMI to rectify the Federal Register or, in the alternative, cancelling such registrations.

184. WMI is entitled to recover its damages sustained as a result of JPMorgan Chase's federal trademark infringement, together with an accounting of JPMorgan Chase profits arising from such infringing activities.

185. WMI is entitled to recover treble damages under 15 U.S.C. § 1117 by reason of the willful and deliberate acts of federal trademark infringement by JPMorgan Chase.

186. WMI is entitled to recover its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

## SIXTEENTH COUNTERCLAIM

### Common Law Trademark Infringement

187.     Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-186.

188.     The aforesaid acts of JPMorgan Chase constitute use that is likely to cause confusion as to the source of JPMorgan Chase's services.

189.     The aforesaid acts of JPMorgan Chase constitute trademark infringement in violation of WMI's continuing and residual common law trademark rights in the WaMu Marks and the Secondary Marks.

190.     The aforesaid acts of JPMorgan Chase have caused, and are causing, great and irreparable harm to WMI, and, unless permanently restrained by this Court, said injury will continue.

191.     WMI is entitled to recover JPMorgan Chase's profits and/or damages by reason of JPMorgan Chase's acts of trademark infringement under the common law.

## SEVENTEENTH COUNTERCLAIM

### Patent Infringement

192.     Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-191.

193.     The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

194.     WMI is the owner by assignment of United States Patent No. 6,681,985, entitled "System For Providing Enhanced Systems Management, Such As In Branch Banking" (the "'985 patent"). The '985 patent was duly and legally issued by the United States Patent and Trademark

Office ("USPTO") on January 27, 2004. A true and correct copy of the '985 patent is attached hereto as Exhibit 5.

195.    In the years preceding the seizure, the WaMu corporate family encompassed dozens of companies that operated as a single, unified organization. WMB practiced the '985 patent as part of the larger corporate family.

196.    Related companies were permitted to practice the '985 patent pursuant to an implied license from WMI for as long as they remained part of the Washington Mutual corporate family.

197.    On September 25, 2008, upon the OTS's seizure of WMB, WMB's implied license to practice the '985 patent terminated.

198.    JPMorgan Chase has continued to practice the '985 patent in connection with its business operations, which use is unauthorized and infringing.

199.    In violation of 35 U.S.C. § 271, JPMorgan Chase has been and is now directly infringing and indirectly infringing, by way of inducement and/or contribution, literally and/or under the doctrine of equivalents, the '985 patent by practicing one or more claims of the '985 patent by making, using, selling, offering for sale, contributing to the use of, and/or inducing the use of financial transaction processing systems to process financial transactions for a customer in a branch bank.

200.    JPMorgan Chase's infringement of the '985 patent includes, but is not limited to, use of the patented system in connection with banking operations in former Washington Mutual branch banks.

201.    JPMorgan Chase's actions have damaged WMI in an amount to be determined at trial and have caused and will continue to cause WMI irreparable injury for which WMI has no adequate remedy at law.

202.    Upon information and belief, JPMorgan Chase's infringement, contributory infringement, and inducement to infringe have been, and continue to be, willful, and will continue to injure WMI unless and until the Court enters an injunction prohibiting further infringement.

203.    WMI is entitled to an award of damages adequate to compensate WMI for the infringement that has occurred, together with prejudgment interest from the date infringement began.

204.    WMI is also entitled to increased damages as permitted under 35 U.S.C. § 284, as well a finding that this case is exceptional, entitling WMI to attorneys' fees and costs as provided by 35 U.S.C. § 285.

205.    WMI is also entitled to a permanent injunction prohibiting JPMorgan Chase's further infringement, inducement of infringement, and contributory infringement of the '985 patent.

## EIGHTEENTH COUNTERCLAIM
### Federal Copyright Infringement Pursuant to 17 U.S.C. § 501

206.    Debtors repeat and re-allege each and every allegation contained in the preceding paragraphs 1-205.

207.    WMI owns the copyright for, and has applied to register, its website at wamu.com (the "Website").  True and correct copies of the applications as filed withCertificates of Registration issued by the United States Copyright Office, and the filing receipts for these applications, are attached hereto as Exhibit 6.

208. Upon information and belief, JPMorgan Chase has continued to display, reproduce and distribute the Website, or significant parts thereof, without authorization from WMI.

209. Upon information and belief, JPMorgan Chase has created, reproduced and distributed derivative works based on the Website without authorization from WMI.

210. The actions and conduct by JPMorgan Chase as described above infringe upon the exclusive rights of WMI granted by Section 106 of the Copyright Act, 17 U.S.C. § 106, to display, reproduce, and distribute the copyrighted Website to the public, and to create derivative works based on the copyrighted Website. WMI is informed and believes, and on that basis alleges, that JPMorgan Chase has infringed directly and indirectly WMI's exclusive rights in the Copyrighted Website.

211. Such actions and conduct by JPMorgan Chase constitute copyright infringement under Section 501 of the Copyright Act, 17 U.S.C. § 501.

212. As a result of the copyright infringement described above, WMI is entitled to relief including, but not limited to, injunctive relief, actual damages, and prejudgment interest.

# Amended Exhibit 2

**In re: Washington Mutual Inc.**
**Payments made to Washington Mutual Bank and Washington Mutual Bank fsb**
**Tax Transfers**

| Date | Amount | Paid to |
|---|---|---|
| 11/9/2007 | 11,489,211 | Washington Mutual Bank, fsb |
| 11/9/2007 | 390,077,331 | Washington Mutual Bank |
| 12/17/2007 | 139,388,137 | Washington Mutual Bank |
| 2/26/2008 | 1,938,609,898 | Washington Mutual Bank |
| 3/17/2008 | 136,661,251 | Washington Mutual Bank |
| 6/16/2008 | 196,412,285 | Washington Mutual Bank |
| 9/15/2008 | 238,489,257 | Washington Mutual Bank |
| **Total** | **3,051,127,370** | |

In re: Washington Mutual Inc.
Payments made to Washington Mutual Bank
Long Beach Transfers

| Date | Amount | Paid to |
|---|---|---|
| 3/31/2008 | $31,220,000 | Washington Mutual Bank |
| 5/30/2008 | $122,406,521 | Washington Mutual Bank |
| 6/30/2008 | $29,293,090 | Washington Mutual Bank |
| 9/18/2008 | $9,252,201 | Washington Mutual Bank |
| Total | $192,171,812 | |

In re: Washington Mutual, Inc.
Case No. 08-12229
SOFA 23 Payments to Insiders
Payments made to Washington Mutual Bank

| Date Paid | Amount Paid to WMB |
|---|---|
| 10/11/2007 | 857,230.47 |
| 10/18/2007 | 3,446,107.42 |
| 11/8/2007 | 1,189.73 |
| 11/15/2007 | 254,364.42 |
| 12/13/2007 | 186,438.82 |
| 1/10/2008 | 6,863,343.95 |
| 1/17/2008 | 2,190.72 |
| 2/7/2008 | 2,319,329.88 |
| 3/6/2008 | 7,948.56 |
| 3/13/2008 | 773,837.68 |
| 3/31/2008 | 14,030,414.67 |
| 4/10/2008 | 4,488,747.40 |
| 4/24/2008 | 3,759,043.02 |
| 5/8/2008 | 2,598,863.39 |
| 5/30/2008 | 1,240,005.70 |
| 6/19/2008 | 170.28 |
| 6/26/2008 | 10,520,771.72 |
| 7/24/2008 | 581,788.51 |
| 8/14/2008 | 1,431,922.60 |
| 8/21/2008 | 4,194,820.96 |
| 9/11/2008 | 112,923.51 |
| 9/25/2008 | 4,101,278.69 |
| 10/18/2007 | 175,635.71 |
| 10/25/2007 | 305,110.56 |
| 10/31/2007 | 1,434,522.37 |
| 11/8/2007 | 4,966,409.90 |
| 11/15/2007 | 725,599.67 |
| 12/13/2007 | 8,865,013.39 |
| 12/31/2007 | 6,205.49 |
| 1/10/2008 | 6,362,822.58 |
| 1/17/2008 | 914,011.32 |
| 1/31/2008 | 12,447,072.22 |
| 2/7/2008 | 3,377,908.39 |
| 2/14/2008 | 292,691.98 |
| 2/21/2008 | 671,242.69 |
| 2/29/2008 | 750,288.31 |
| 3/13/2008 | 3,256,230.57 |
| 3/20/2008 | 1,096,451.96 |

| Date Paid | Amount Paid to WMB |
|-----------|-------------------:|
| 4/10/2008 | 3,429,936.11 |
| 5/15/2008 | 1,956,466.25 |
| 5/22/2008 | 3,062,583.76 |
| 6/19/2008 | 1,422,117.59 |
| 6/30/2008 | 5,284,659.08 |
| 7/10/2008 | 2,598,631.45 |
| 7/24/2008 | 2,879,785.16 |
| 8/7/2008 | 1,805,099.83 |
| 8/14/2008 | 2,573,609.62 |
| 9/11/2008 | 614,326.45 |
| 9/18/2008 | 17,205,753.61 |
| 9/25/2008 | 1,681,646.07 |
| **Total:** | 151,934,564.19 |

# Amended Exhibit 6

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

**TX 6-935-497**

**Effective date of registration:**

June 1, 2009

## Title

**Title of Work:** wamu.com website September 24, 2008

## Completion/ Publication

**Year of Completion:** 2008

**Date of 1st Publication:** September 24, 2008     **Nation of 1st Publication:** United States

## Author

- **Author:** Washington Mutual, Inc.

**Author Created:** text, editing, computer program, artwork

**Work made for hire:** Yes

**Citizen of:** United States     **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Washington Mutual, Inc.

1301 Second Avenue, WMC 3601, Seattle, WA, 98101, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program, artwork

**New material included in claim:** text, editing, computer program, artwork

## Rights and Permissions

**Organization Name:** Washington Mutual, Inc.

**Address:** 1301 Second Avenue

WMC 3601

Seattle, WA 98101 United States

## Certification

|  |  |
|---|---|
| **Name:** | Lynne E. Graybeal |
| **Date:** | May 29, 2009 |
| **Applicant's Tracking Number:** | 53000.6000.0001.US006 |

---

|  |  |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations. |

IPN#:

Registration #:    TX0006935497

Service Request #:  1-198669154

Perkins Coie LLP
Lynne E. Graybeal
1201 Third Ave., Ste. 4800
Seattle, WA 98101  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## TX 6-935-465

**Effective date of registration:**

June 10, 2009

## Title

**Title of Work:** wamu.com website November 2002

## Completion/ Publication

**Year of Completion:** 2002

**Date of 1st Publication:** November 22, 2002   **Nation of 1st Publication:** United States

## Author

- **Author:** Washington Mutual, Inc.

  **Author Created:** text, editing, computer program, artwork

  **Work made for hire:** Yes

  **Citizen of:** United States   **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Washington Mutual, Inc.

1301 Second Avenue, WMC 3601, Seattle, WA, 98101, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program, artwork

**New material included in claim:** text, editing, computer program, artwork

## Rights and Permissions

**Organization Name:** Washington Mutual, Inc.

**Address:** 1301 Second Avenue

WMC 3601

Seattle, WA 98101  United States

## Certification

|  |  |
|---|---|
| **Name:** | Lynne E. Graybeal |
| **Date:** | May 28, 2009 |
| **Applicant's Tracking Number:** | 53000.6000.0001.US002 |

---

|  |  |
|---|---|
| **Correspondence:** | Yes |
| **Copyright Office notes:** | Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations. |

IPN#:

Registration #:    TX0006935465

Service Request #:  1-198473965

Perkins Coie LLP
Lynne E. Attn: Graybeal
1201 Third Ave., Ste. 4800
Seattle, WA 98101  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

**TX 6-935-477**

**Effective date of registration:**

June 10, 2009

## Title

**Title of Work:** wamu.com website April 2004

## Completion/ Publication

**Year of Completion:** 2004

**Date of 1st Publication:** April 6, 2004        **Nation of 1st Publication:** United States

## Author

- **Author:** Washington Mutual, Inc.

  **Author Created:** text, editing, computer program, artwork

  **Work made for hire:** Yes

  **Citizen of:** United States        **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Washington Mutual, Inc.

1301 Second Avenue, WMC 3601, Seattle, WA, 98101, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program, artwork

**New material included in claim:** text, editing, computer program, artwork

## Rights and Permissions

**Organization Name:** Washington Mutual, Inc.

**Address:** 1301 Second Avenue

WMC 3601

Seattle, WA 98101  United States

## Certification

|                              |                           |
|-----------------------------:|:--------------------------|
| **Name:**                    | Lynne E. Graybeal         |
| **Date:**                    | May 28, 2009              |
| **Applicant's Tracking Number:** | 53000.6000.0001.US003 |

---

|                              |                           |
|-----------------------------:|:--------------------------|
| **Correspondence:**          | Yes                       |
| **Copyright Office notes:**  | Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations. |

**IPN#:**

**Registration #:**   TX0006935477

**Service Request #:**   1-198474378

Perkins Coie LLP
To Whom it May Concern
Attn: Lynne E. Graybeal
1201 Third Ave., Ste. 4800
Seattle, WA 98101  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

Registration Number:

**TX 6-935-480**

Effective date of registration:

June 10, 2009

## Title

**Title of Work:** wamu.com website March 2006

## Completion/ Publication

**Year of Completion:** 2006

**Date of 1st Publication:** March 14, 2006      **Nation of 1st Publication:** United States

## Author

- **Author:** Washington Mutual, Inc.

  **Author Created:** text, editing, computer program, artwork

  **Work made for hire:** Yes

  **Citizen of:** United States      **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Washington Mutual, Inc.

1301 Second Avenue, WMC 3601, Seattle, WA, 98101, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program, artwork

**New material included in claim:** text, editing, computer program, artwork

## Rights and Permissions

**Organization Name:** Washington Mutual, Inc.

**Address:** 1301 Second Avenue

WMC 3601

Seattle, WA 98101 United States

## Certification

Name: Lynne E. Graybeal

Date: May 28, 2009

Applicant's Tracking Number: 53000.6000.0001.US004

Correspondence: Yes

Copyright Office notes: Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations.

IPN#:

Registration #:    TX0006935480

Service Request #:   1-198474422

Perkins Coie LLP
To Whom it May Concern
Attn: Lynne E. Graybeal
1201 Third Ave., Ste. 4800
Seattle, WA 98101  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

Registration Number:

## TX 6-935-487

Effective date of registration:

June 1, 2009

## Title

**Title of Work:** wamu.com website June 1998

## Completion/Publication

**Year of Completion:** 1998

**Date of 1st Publication:** June 14, 1998     **Nation of 1st Publication:** United States

## Author

■    **Author:** Washington Mutual, Inc.

**Author Created:** text, computer program, artwork

**Work made for hire:** Yes

**Citizen of:** United States      **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Washington Mutual, Inc.

1301 Second Avenue, WMC 3601, Seattle, WA, 98101, United States

## Rights and Permissions

**Organization Name:** Washington Mutual, Inc.

**Address:** 1301 Second Avenue

WMC 3601

Seattle, WA 98101 United States

## Certification

**Name:** Lynne E. Graybeal

**Date:** May 28, 2009

**Applicant's Tracking Number:** 53000-6000.0001.US001

**Correspondence:** Yes

IPN#: 
★ ★

Registration #:   TX0006935487

Service Request #:  1-198424731

Perkins Coie LLP
To Whom it May Concern
Attn: Lynne E. Graybeal
1201 Third Ave., Ste. 4800
Seattle, WA 98101  United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## TX 6-935-492

**Effective date of registration:**

June 1, 2009

## Title

**Title of Work:** wamu.com website September 8, 2008

## Completion/Publication

**Year of Completion:** 2008

**Date of 1st Publication:** September 8, 2008     **Nation of 1st Publication:** United States

## Author

**Author:** Washington Mutual, Inc.

**Author Created:** text, editing, computer program, artwork

**Work made for hire:** Yes

**Citizen of:** United States     **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Washington Mutual, Inc.

1301 Second Avenue, WMC 3601, Seattle, WA, 98101, United States

## Limitation of copyright claim

**Material excluded from this claim:** text, computer program, artwork

**New material included in claim:** text, editing, computer program, artwork

## Rights and Permissions

**Organization Name:** Washington Mutual, Inc.

**Address:** 1301 Second Avenue

WMC 3601

Seattle, WA 98101 United States

## Certification

Name: Lynne E. Graybeal

Date: May 29, 2009

Applicant's Tracking Number: 53000.6000.0001.US005

Correspondence: Yes

IPN#: 
★ ★

Registration #:   TX0006935492

Service Request #:   1-198669081

Perkins Coie LLP
To Whom it May Concern
Attn: Lynne E. Graybeal
1201 Third Ave., Ste. 4800
Seattle, WA 98101  United States